IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EVANS HOTELS, LLC, a California limited
liability company; BH PARTNERSHIP LP,
a California limited partnership; and EHSW,
LLC, a Delaware limited liability company

*Plaintiffs/Appellants/Cross-Appellees,*

*- v. -*

UNITE HERE! LOCAL 30; BRIGETTE
BROWNING; SAN DIEGO COUNTY
BUILDING AND CONSTRUCTION
TRADES COUNCIL, AFL-CIO;
TOM LEMMON; DOES 1-10

*Defendants/Appellees/Cross-Appellants.*

On Appeal from the United States District Court for the
Southern District of California
Case No. 3:18-cv-02763-RSH-AHG

**FIRST BRIEF ON CROSS-APPEAL
[APPELLANTS' OPENING BRIEF]**

| | |
|---|---|
| **HIGGS FLETCHER & MACK LLP** | **COMPLEX APPELLATE LITIGATION GROUP LLP** |
| William M. Low | Rex S. Heinke |
| 401 West A Street, Suite 2600 | Jessica M. Weisel |
| San Diego, CA 92101-7910 | 811 Wilshire Boulevard, 17th Fl. |
| (619) 236-1551 | Los Angeles, CA 90017 |
| wlow@higgslaw.com | (213) 878 0404 |
| | rex.heinke@calg.com |
| | jessica.weisel@calg.com |

*Additional Counsel Listed on Inside Cover*

**MOGIN RUBIN LLP**
Daniel J. Mogin
Timothy Z. LaComb
600 West Broadway, Ste. 3300
San Diego, CA 92101
(619) 687-6611
dmogin@moginrubin.com
tlacomb@moginrubin.com

**LITTLER MENDELSON, P.C.**
Lawrence D. Levien
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006
(202) 842-3400
LLevien@littler.com

*Attorneys for Plaintiffs/Appellants/Cross-Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Appellants Evans Hotels, LLC, BH Partnership, LP, and EHSW, LLC have no parent corporations.  No publicly held corporation owns 10 percent or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES....................................................v

STATEMENT OF JURISDICTION.........................................1

ISSUES TO BE DECIDED ...................................................2

STATUTORY PROVISIONS INVOLVED...............................2

STATEMENT OF THE CASE ..............................................3

    A.    PLAINTIFFS' HOTEL OPERATIONS. ...............................3

    B.    DEFENDANTS FOLLOW A "PLAYBOOK" OF ILLEGAL METHODS TO FORCE HOTELS TO UNIONIZE. .............3

    C.    DEFENDANTS DEPLOY THEIR PLAYBOOK AGAINST PLAINTIFFS. ........................................................5

        1.    THE FIRST PLAY – ASSERTING SHAM CLAIMS AGAINST THE BAHIA REDEVELOPMENT............6

        2.    THE SECOND PLAY - THREATENING SEAWORLD TO FORCE IT TO PRESSURE PLAINTIFFS............................................10

PROCEDURAL HISTORY....................................................12

STANDARD OF REVIEW.....................................................17

SUMMARY OF ARGUMENT ...............................................17

ARGUMENT ........................................................................21

    I.    PLAINTIFFS PROPERLY ALLEGED THAT DEFENDANTS ENGAGED IN UNLAWFUL SECONDARY BOYCOTTS, WHICH ARE NOT PROTECTED BY THE FIRST AMENDMENT.................21

        A.    EVANS HOTELS PROPERLY ALLEGED TWO UNLAWFUL SECONDARY BOYCOTTS. ...............21

        B.    THE FIRST AMENDMENT DOES NOT PROTECT SECONDARY BOYCOTTS. ......................................28

    II.    *NOERR-PENNINGTON'S* SCOPE SHOULD NOT BE DECIDED AT THE PLEADING STAGE. ..........................36

III.  IN ANY EVENT, *NOERR-PENNINGTON* DOES NOT APPLY TO MANY OF DEFENDANTS' ACTIONS. .......... 39

    A.  DEFENDANTS' THREATS TO SEAWORLD AND PLAINTIFFS WERE *UNRELATED* TO PETITIONING, SO THEY ARE NOT PROTECTED BY *NOERR-PENNINGTON*. ..................................... 40

    B.  *NOERR-PENNINGTON* DOES NOT PROTECT COMMUNICATIONS IN VIOLATION OF THE BROWN ACT, LOBBYING DISCLOSURE LAWS, AND PROHIBITIONS ON EX PARTE COMMUNICATIONS WITH ELECTED OFFICIALS. ............................................... 44

IV.  EVEN IF *NOERR-PENNINGTON* APPLIES HERE, DEFENDANTS ENGAGED IN SHAM PETITIONING UNPROTECTED BY *NOERR-PENNINGTON*. ................ 46

    A.  DEFENDANTS ENGAGED IN INDIVIDUAL INSTANCES OF SHAM PETITIONING. ................. 46

        1.  DEFENDANTS' PETITIONING AGAINST THE BAHIA REDEVELOPMENT AND ANY SEAWORLD PROJECT WAS INDIVIDUAL SHAM PETITIONING. ..................................... 47

        2.  JUDGES ROBINSON AND LOPEZ CORRECTLY FOUND THE INDIVIDUAL SHAM EXCEPTION APPLIES TO DEFENDANTS' CONDUCT; JUDGE HUIE ERRED IN HOLDING OTHERWISE. ............. 51

    B.  DEFENDANTS ENGAGED IN SERIAL SHAM PETITIONING BY REFLEXIVELY CHALLENGING ALL HOTEL PROJECTS IN THE RELEVANT MARKET REGARDLESS OF MERIT. 53

        1.  DEFENDANTS' OBJECTIONS TO ALL HOTEL PROJECTS IN THE RELEVANT MARKET IS SERIAL SHAM PETITIONING. 54

        2.  CONSISTENT WITH THEIR PLAYBOOK, DEFENDANTS MADE REFLEXIVE,

BASELESS CHALLENGES TO THE BAHIA
REDEVELOPMENT AND THREATENED TO
DO THE SAME TO ANY SEAWORLD
PROJECT. ........................................................ 56

3.  MANY COURTS HAVE FOUND SIMILAR
    ALLEGATIONS OF SHAM PETITIONING TO
    BE UNPROTECTED BY NOERR-
    PENNINGTON. ................................................ 58

4.  THE DISTRICT COURT ERRED WHEN IT
    FOUND THE SERIAL SHAM EXCEPTION
    DID NOT APPLY. ............................................. 61

5.  DEFENDANTS' CONDUCT DIRECTED AT
    ADMINISTRATIVE AND LEGISLATIVE
    AGENCIES FALLS UNDER THE SERIAL
    SHAM EXCEPTION .......................................... 63

    a.  LOBBYING LEGISLATIVE
        AND ADMINISTRATIVE
        BODIES FALLS WITHIN THE
        SERIAL SHAM EXCEPTION ................. 64

    b.  PLAINTIFFS SUFFICIENTLY
        ALLEGED DEFENDANTS'
        LOBBYING EFFORTS WERE
        MADE IN ADJUDICATIVE
        SETTINGS. ............................................ 67

V.   PLAINTIFFS' MONOPOLIZATION CLAIMS SHOULD
     BE REMANDED TO THE DISTRICT COURT TO BE
     DECIDED ON THEIR MERITS. ........................................ 70

VI.  THE DISTRICT COURT  SHOULD ALLOW PLAINTIFFS
     TO FILE A FOURTH AMENDED COMPLAINT. ............. 71

CONCLUSION ...................................................................... 76

STATEMENT OF RELATED CASES .................................. 77

CERTIFICATE OF COMPLIANCE

ADDENDUM OF STATUTORY CITATIONS

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AbCellera Biologics Inc. v. Berkeley Lights, Inc.*
No. 20-CV-08624-LHK, 2021 U.S. Dist. LEXIS 123839
2021 WL 2719264 (N.D. Cal. July 1, 2021) .......... 36

*Acco Constr. Equip., Inc. v. NLRB*
511 F.2d 848 (9th Cir. 1975) .......... 27

*Affordable Housing Development Corporation v. City of Fresno*
433 F.3d 1182 (9th Cir. 2006) .......... 43

*Alemu v. Dep't of For-Hire Vehicles*
327 F. Supp. 3d 29 (D.D.C. 2018) .......... 44

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
486 U.S. 492 (1988) .......... 40, 46, 62, 64, 66

*Aguayo v. U.S. Bank*
653 F.3d 912 (9th Cir. 2011) .......... 17

*Associated Gen. Contractors v. NLRB*
514 F.2d 433 (9th Cir. 1975) .......... 23

*Barker v. Riverside County Office of Educ.*
584 F.3d 821 (9th Cir. 2009) .......... 17, 37

*Boone v. Redevelopment Agency of San Jose*
841 F.2d 886 (9th Cir. 1988) .......... 66, 67

*California Motor Transp. Co. v. Trucking Unlimited*
404 U.S. 508 (1972) .......... 44, 51, 53, 54, 65

*Citizens for Planning Responsibly v. Cnty. of San Luis Obispo*
176 Cal. App. 4th 357 (2009)      68, 69

*City of Columbia v. Omni Outdoor Advertising, Inc.*
499 U.S. 365 (1991)      40, 47, 51

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*
690 F.2d 1240 (9th Cir.)      36, 48, 52

*Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*
421 U.S. 616 (1975)      26, 35

*Consol. Express, Inc. v. N.Y. Shipping Ass'n*
602 F.2d 494 (3d Cir. 1979)      35

*DCD Programs, Ltd. v. Leighton*
833 F.2d 183 (9th Cir. 1987)      71

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*
365 U.S. 172 (1961)      2

*Edward J. Debartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*
485 U.S. 568 (1988)      34

*Empress LLC v. City & Cnty. of San Francisco*
419 F.3d 1052 (9th Cir. 2005)      39

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*
663 F.2d 253 (D.C. Cir. 1981)      44

*Foman v. Davis*
371 U.S. 178 (1962)      71

*Freeman v. Lasky, Haas & Cohler*
410 F.3d 1180 (9th Cir. 2005) 40

*Giboney v. Empire Storage & Ice Co.*
336 U.S. 490 (1949**)** 33, 34

*Group14 Techs., Inc. v. Nexeon Ltd.*
No. C22-1354 TSZ, 2023 WL 3599580 (W.D.
Wash. May 23, 2023) 36

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*
806 F.3d 162 (3d Cir. 2015) 51, 60, 64

*Howey v. United States*
481 F.2d 1187 (9th Cir. 1973) 71

*Hurn v. Ret. Fund Tr. of Plumbing, Heating & Piping*
*Indus. of S. Cal.*
648 F.2d 1252 (9th Cir. 1981) 75

*In re Prograf Antitrust Litig.*
1:11-MD-2242-RWZ, 2012 WL 293850, 2012 U.S.
Dist. LEXIS 12053, 2012 WL 293850
(D. Mass. Feb. 1, 2012) 64, 65

*In re Skelaxin Metaxalone Antitrust Litig.*
No. 1:12-md-2343, 2013 WL 2181185
2013 U.S. Dist. LEXIS 70968 64, 65

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*
555 F. Supp. 3d 829 (N.D. Cal. 2021) 36

*Int'l Bhd. of Elec. Workers v. NLRB*
341 U.S. 694 (1951) 28, 29, 31, 32, 33, 35

*Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*
456 U.S. 212 (1982) 22, 23

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*
  863 F.3d 1178 (9th Cir. 2017)           55, 62

*Iron Workers Dist. Council v. NLRB*
  913 F.2d 1470 (9th Cir. 1990)           22

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*
  52 F.3d 1033 (9th Cir. 2009)           46

*Katana Silicon Techs. LLC v. Micron Tech., Inc.*
  No. 1:22-cv-00282-DCN, 2023 WL 3231201
  (D. Idaho May 3, 2023)           37

*Kottle v. Nw. Kidney Ctrs.*
  146 F.3d 1056 (9th Cir. 1998)           66, 67

*Local 1976, United Bhd. of Carpenters & Joiners v. NLRB*
  357 U.S. 93 (1958)           23

*Lockheed Martin Corp. v. Network Sols., Inc.*
  194 F.3d 980 (9th Cir. 1999)           71, 72

*Manistee Town Ctr. v. City of Glendale*
  227 F.3d 1090 (9th Cir. 2000)           66

*Mula v. Mula-Stouky*
  No. 21-cv-04540-BLF, 2022 WL 3357673
  (N.D. Cal. Aug. 15, 2022)           37

*Metro. Reg'l Council of Philadelphia*
  No. 21-cv-04540-BLF, 2022 WL 3357673
  (N.D. Cal. Aug. 15, 2022)           24

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*
  386 U.S. 612 (1967)           21, 22

*NAACP v. Claiborne Hardware Co.*
  458 U.S. 886 (1982)           32

*NLRB v. Assoc. Gen. Contractors, Inc.*
  633 F.2d 766 (9th Cir. 1980)                     32

*NLRB v. Denver Bldg. & Trades Council*
  341 U.S. 675 (1951)                            22

*NLRB v. Elec. Workers Local 769*
  405 F.2d 159 (9th Cir. 1968)                  24

*NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental,*
  *& Reinforcing Iron Workers, Local 229, AFL-CIO*
  941 F.3d 902 (9th Cir. 2019)       28, 30, 32, 34, 35

*NLRB v. Int'l Ass'n of Bridge, Structural,*
  *& Reinforcing Iron Workers, Local 229, AFL-CIO*
  974 F.3d 1106 (9th Cir. 2020)              31

*NLRB v. Hotel & Rest. Emps. Bartenders' Union Local 531*
  623 F.2d 61 (9th Cir. 1980)                   27

*NLRB v. Local 74, United Bhd. of Carpenters & Joiners of Am.*
  181 F.2d 126 (6th Cir. 1950)                  30

*NLRB v. Local Union 103, Int'l Ass'n of Bridge, Structural &*
  *Ornamental Iron Workers, AFL-CIO*
  434 U.S. 335 (1978)                          26

*NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers*
  477 F.2d 260 (2d Cir. 1973)                 28, 31

*NLRB v. Operating Eng'rs, Local 571*
  317 F.2d 638 (8th Cir. 1963)                  24

*NLRB v. Retail Store Emps. Union Local 1001*
  447 U.S. 607 (1980)                          23

*Or. Nat. Res. Council v. Mohla*
   944 F.2d 531 (9th Cir. 1991)                  39

*Paper Converters Union v. Le Baron*
   171 F.2d 331 (9th Cir. 1948)                  30

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*
   551 U.S. 701 (2007)                       67

*Park at Cross Creek, LLC v. City of Malibu*
   12 Cal. App. 5th 1196 (2017)               68, 69

*Pye v. Teamsters Local 122*
   875 F. Supp. 921 (D. Mass. 1995)           24

*Rodime PLC v. Seagate Tech., Inc.*
   174 F.3d 1294 (Fed. Cir. 1999)             44

*San Bruno Comm. for Econ. Justice v. City of San Bruno*
   15 Cal. App. 5th 524 (2017)              68, 69

*Schvimmer v. Off. of Ct. Admin.*
   857 F. App'x 668 (2d Cir. 2021)            74

*Serv. Emps. Int'l Local 525*
   329 NLRB 638 (1999)                     24

*Smithfield Foods, Inc. v. United Food & Commer.*
  *Workers Int'l Union*
   593 F. Supp. 2d 840 (E.D. Va. 2008)     59, 60, 62

*Sosa v. DIRECTTV, Inc.*
   437 F.3d 923 (9th Cir. 2006)             40, 43

*State Teachers Retirement Bd. v. Fluor Corp.*
   654 F.2d 843 (2d Cir. 1981)               72

*Swierkiewicz v. Sorema N. A.*
  534 U.S. 506 (2002)                                      39

*United Bhd. of Carpenters v. Sperry*
  170 F.2d 863 (10th Cir. 1948)                            30

*United Mine Workers v. Pennington*
  381 U.S. 657 (1965)                                       2

*United States v. Koziol*
  993 F.3d 1160 (9th Cir. 2021)                            63

*United States v. Stevens*
  559 U.S. 460 (2010)                                      34

*United States v. United Healthcare Ins. Co.*
  848 F.3d 1161 (9th Cir. 2016)                            17

*United States v. Williams*
  553 U.S. 285 (2008)                                      34

*USS-POSCO Indus. v. Contra Costa County Bldg. &
  Constr. Trades Council*
  31 F.3d 800 (9th Cir. 2020)                          53, 61

*Warshawsky & Co. v. NLRB*
  182 F.3d 948 (D.C. Cir. 1999)                     28, 30, 31

*Waugh Chapel S., LLC v. United Food & Com. Workers
  Union Loc. 27*
  728 F.3d 354 (4th Cir. 2013)              52, 59, 61, 62, 64

*Wayte v. United States*
  470 U.S. 598 (1985)                                      33

*Wells v. NLRB*
  361 F.2d 737 (6th Cir. 1966)                             23

**STATUTES**

| | |
|---|---|
| 15 U.S.C. §1 | 2, 16, 21, 73, 74, 76 |
| 15 U.S.C. §2 | 12, 21, 76 |
| 28 U.S.C. §1291 | 1 |
| 28 U.S.C. §1331 | 1 |
| 29 U.S.C. §158 | 12, 21, 22-24, 26, 27, 29-33, 35 |
| Cal. Pub. Res. Code §30324 | 45 |

**RULES**

| | |
|---|---|
| Fed. R. App. P. 4(a)(1) | 1 |
| Fed. R. Civ. P. 8(a)(2) | 39 |
| Fed. R. Civ. P 12(b)(6) | 17 |
| Fed. R. Civ. P. 15(a) | 71 |

## STATEMENT OF JURISDICTION

The district court had jurisdiction. 28 U.S.C. §1331. On July 6, 2023, it granted Defendants-Appellees-Cross-Appellants UNITE HERE! Local 30 ("Local 30"); Brigette Browning; San Diego County Building and Construction Trades Council, AFL-CIO ("Building Trades"); and Tom Lemmon's (together, "Defendants") motion to dismiss Plaintiffs-Appellants-Cross-Appellees Evans Hotels, LLC; BH Partnership LP; and EHSW, LLC's ("Plaintiffs") third amended complaint ("TAC") without leave to amend.

Plaintiffs timely appealed on August 4, 2023. 2-ER-41-47; Fed. R. App. P. 4(a)(1). This Court has jurisdiction. 28 U.S.C. §1291.

Defendants cross-appealed. 2-ER-37-40.

## ISSUES TO BE DECIDED

1.    Whether Plaintiffs properly pled two claims for violation of the National Labor Relations Act's ("NLRA") prohibition on secondary boycotts.

2.    Whether the First Amendment right to petition the government for redress of grievances, often referred to as the *Noerr-Pennington* doctrine,[1] defeats a secondary boycott claim.

3.    Whether Plaintiffs' claims are barred by *Noerr-Pennington*.

4.    Whether the district court should decide whether the two amended monopolization claims in the TAC, which are repeated in the Fourth Amended Complaint ("FAC"), state a claim.

5.    Whether the district court should allow Plaintiffs to file a FAC with a new Sherman Act §1 claim.

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the Addendum of Statutory Citations.

---

[1] It is based on *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

# STATEMENT OF THE CASE

## A.     PLAINTIFFS' HOTEL OPERATIONS.

Plaintiff Evans Hotels, LLC operates three hotels, including the
Bahia Hotel ("Bahia") in Mission Bay Park, San Diego.  3-ER-594**.**
Plaintiff BH Partnership owns the Bahia.  3-ER-595.  Plaintiff EHSW,
LLC entered into a Joint Venture with SeaWorld to develop a branded
SeaWorld hotel.  4-ER-657-658.

Since the 1980s, BH Partnership has contemplated redeveloping
the Bahia.  3-ER-592-593.  It operates under a long-term lease with the
City of San Diego ("City").  *Id.*  Any significant redevelopment of the
Bahia requires a lease amendment that complies with the 1994 Mission
Bay Park Master Plan Update ("Master Plan").  *Id.*

## B.     DEFENDANTS FOLLOW A "PLAYBOOK" OF ILLEGAL METHODS TO FORCE HOTELS TO UNIONIZE.

Defendant Local 30 is the local affiliate of the national UNITE
HERE! Union, representing service workers in San Diego.  3-ER-595-
596.  During the relevant time, Defendant Browning was Local 30's
President.  *Id.*  Defendant Building Trades represents construction and

trade unions in San Diego. 3-ER-596. During the relevant time,

Defendant Lemmon was its business manager. *Id.*

Defendants do not represent Plaintiffs' employees. 3-ER-594.

They have never had a collective bargaining agreement with Plaintiffs.

*Id.* Instead, to increase their membership (and their dues), 3-ER-602-

603, Defendants circumvent the lengthy unionization process by using a

"playbook" of illegal methods to achieve their goal. 3-ER-589-593, 605-

607.

Defendants' first "play" is public attacks, including negative

publicity campaigns as well as lobbying and litigation against non-

union projects on sham environmental and land use grounds. *Id.* The

second "play" is threats to third parties in business with the targeted

owners or developers of the non-union projects. 3-ER-608-610.

Defendant Local 30's goal is to obtain a card check neutrality

agreement ("neutral agreement"), 3-ER-599, through which an

employer pledges to remain neutral to Local 30's organizing campaigns,

not to campaign against unionization, and to recognize a union if Local

30 collects signed authorization cards from a majority of employees. *Id.*

Defendant Building Trades' goal is to obtain a project labor agreement ("PLA"), pursuant to which a developer agrees before beginning a project to work only with a unionized general contractor which would subcontract work only to unionized entities or individuals. 3-ER-603-604. Defendants work together to accomplish these goals. 3-ER-611.

Defendants have deployed their "playbook" against at least ten hotel projects since 2007. 3-ER-611-4-ER-647.

## C. DEFENDANTS DEPLOY THEIR PLAYBOOK AGAINST PLAINTIFFS.

This action initially arises from Plaintiffs' efforts to obtain an amendment to the Bahia lease to renovate its existing facilities and add rooms. 3-ER-593; *see also* 4-ER-649. After years of work with the City's Development Services Department on environmental documents, Plaintiffs met with the City's Department of Real Estate Assets and the City Attorney in January 2018 to negotiate the lease amendment needed for the redevelopment project. 4-ER-649

### 1. THE FIRST PLAY – ASSERTING SHAM CLAIMS AGAINST THE BAHIA REDEVELOPMENT.

On February 28, 2018, Defendants implemented their first play against Plaintiffs. 4-ER-649-650. Local 30's attorney sent a letter to then-Mayor Kevin Faulconer and City Councilmembers "to express concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment for the Bahia Resort Hotel Renovation Project." *Id.* He sent a second letter on May 11, 2018, contending the proposed Bahia redevelopment did not comply with the Master Plan because the proposed plan would eliminate Gleason Road (a road adjacent to the Bahia). 4-ER-650. Defendants also communicated with a majority of the City Council to secure their opposition to the lease amendment. 4-ER-651.

Plaintiffs first learned of Defendants' actions in February or March 2018. *Id.* On February 16, 2018, Bill Evans, an owner of Evans Hotels, ran into an unnamed council member ("Council member I") and asked her about the Bahia redevelopment. *Id.* She responded by asking whether he had met with Defendant Browning. *Id.* When he responded that he had not, Council member I informed him that

Plaintiffs had to sign a neutrality agreement with Defendant Browning before she would support the project. *Id.*

After learning about Mr. Evans' conversation, Plaintiffs' Executive Chairwoman, Grace Cherashore, had a meeting with Council member I on February 23, 2018. 4-ER-651-652. Although Council member I expressed support for the project after Ms. Cherashore's presentation, *id.*, Council member I's staff called several weeks later saying that there was a "problem" with the Bahia proposal and that Council member I and other council members could no longer support it. 4-ER-652-653. Plaintiffs allege that Council member I's change of heart was the result of Defendant Browning's threat to condition future funding and political support on the Council member's opposition to the Bahia unless Plaintiffs signed a neutrality agreement. *Id.*

Council member I's demand that Plaintiffs agree to such an agreement was unlawful. 4-ER-653. In 2015, the San Diego City Attorney advised the City Council that it could not require a developer to accept a card check neutrality agreement and PLA as a condition of approval. *Id.* On June 30, 2018, Defendant Lemmon met with Mr. Evans, 4-ER-654, about signing a neutrality agreement with the Local

30 Defendants. 4-ER-654-655. When he refused to do so, Defendant Lemmon threatened him with litigation and informed him about the letters Local 30 had sent to the Mayor and City Council. *Id.* Defendant Lemmon closed by threatening that the project would be "doomed" if Plaintiffs did not capitulate to Defendant Browning because "[they] know how to do it, [they] do it all the time." *Id.*

In October 2018, Plaintiffs learned that the Bahia lease amendment was not on the agenda for a mid-October City Committee meeting. 4-ER-656. That same month, a representative of Plaintiffs spoke with a staffer of another council member ("Council member II"), who refused to calendar the lease amendment because of a close personal friendship with Defendant Browning. *Id.*

On October 19, 2018, Defendants Lemmon and Browning texted Plaintiffs' CEO, Robert Gleason. 4-ER-656-657. Defendant Lemmon told Defendant Browning to "send Robert [Gleason] [her] card check language in advance . . . [because Defendant Lemmon has] got the feeling he's gonna need it." *Id.* (first, second, and third alterations in original). Defendant Lemmon added that he would "like to see all

construction and future maintenance done by Union signatory contractors." *Id.*

Plaintiffs' problems persisted following City Council elections in November 2018. 4-ER-665-666. For example, the new City Council President indicated that she would not docket the Bahia lease amendment because the unions had given her "hundreds of thousands of dollars to win this thing" and Defendants Browning and Lemmon would be upset if the project were docketed before the new City Council members took office. *Id.*

Plaintiffs therefore turned to then-Mayor Faulconer, 4-ER-666, because staff who work for the Mayor must make recommendations and prepare reports about pending projects. 3-ER-606. But the Mayor and Defendants had made a "secret agreement" in mid-2017 giving Defendants "veto power" over any non-union projects they opposed. 3-ER-590, 614-615. Defendants had contacted the Mayor's office and exercised their veto power to demand that the Bahia project not be docketed. 4-ER-223.

On November 27, 2018, Defendant Browning, Defendant Lemmon, and Carol Kim, the Political Director for the Building Trades, met with

Mr. Gleason and Mr. Evans. *Id.* When asked why Plaintiffs should agree to the neutrality agreement and PLA, Defendant Browning responded, "[S]o that you can go forward with your project," adding that Defendants would "stop at nothing" to prevent the Bahia project from going forward. *Id.* Defendants Browning and Lemmon indicated that they had the new City Council President's vote "all locked up." *Id.* Defendant Lemmon likened Defendants' conduct to a "grenade with the pin out on the table," adding that, although the pin had been taken out, there was still time to put it back in. *Id.*

### 2. THE SECOND PLAY - THREATENING SEAWORLD TO FORCE IT TO PRESSURE PLAINTIFFS.

Having successfully delayed the Bahia vote, Defendants "turned up the volume" by implementing their second play and "going after" Plaintiffs' business partner, Sea World LLC ("SeaWorld"). 4-ER-657. Plaintiffs and SeaWorld had a "cooperative marketing relationship for decades," which included Plaintiffs selling tickets for SeaWorld and offering branded room packages. *Id.*

On April 21, 2015, Plaintiffs and SeaWorld signed a letter of intent and, on November 4, 2015, a Preliminary Project Agreement about a potential SeaWorld hotel next to SeaWorld's park. *Id.*

Plaintiffs and SeaWorld issued a press release concerning the anticipated project on November 9, 2015, *id.*, and entered into a formal contract for the Joint Venture on January 22, 2018. 4-ER-657-658.

SeaWorld needs approval from the California Coastal Commission to build new attractions. 4-ER-658. Consequently, SeaWorld worked with a consultant, Allison Rolfe, President of Collaborative Land Use Solutions and a former environmental activist, to facilitate its dealings with the California Coastal Commission and environmental groups. *Id.* Ms. Rolfe is a "very close friend" of Defendant Browning and acts as "intermediary" between Defendants and their targets, including Plaintiffs. 4-ER-659-660. For example, at a March 22, 2018 lunch meeting, Ms. Rolfe told Mr. Evans that Defendant Browning "had a real problem with [him]" and that unless Plaintiffs agreed to a deal with Defendant Browning, Defendants would target Plaintiffs' projects and SeaWorld, as their business partner. 4-ER-660-661.

In June or July 2018, Defendants told SeaWorld, through Ms. Rolfe, that it would face "severe" opposition from unions and their allies in opening new attractions if it did not sever ties with Plaintiffs. 4-ER-661-662. Defendants threatened to interfere with SeaWorld's ability to

obtain approval for its plans from the City Council and California Coastal Commission and to "drum up negative publicity." *Id.*

In mid-July, SeaWorld's then-interim CEO called Mr. Evans, stating he understood that Plaintiffs had "a big problem" with Defendants and informing Mr. Evans that SeaWorld could not afford to be involved with anyone that would delay its ability to obtain approval of its plans. 4-ER-662-663. SeaWorld ultimately concluded that it could not risk its "core business" of opening new attractions. 4-ER-662-665. Consequently, SeaWorld ended the Joint Venture on September 19, 2018, depriving Plaintiffs of in excess of $100 million in lost profits, legal fees, and other costs. 4-ER-664, 671, 686.

## PROCEDURAL HISTORY

Plaintiffs sued in the Southern District of California on December 7, 2018. 9-ER-2232-2281 (Complaint). Among other things, they alleged two unlawful secondary boycotts in violation of §8(b)(4)(ii)(A) and (B) of the NLRA, and attempted monopolization and conspiracy to monopolize in violation of the Sherman Act §2, 15 U.S.C. §2.

Defendants filed motions to dismiss; Plaintiffs filed a First Amended Complaint. 8-ER-2066-9-ER-2149 (Amended Complaint); 9-

ER-2196-2198 (Motion to Dismiss). After denying as moot the pending motions, Judge Marilyn Huff recused herself; the case was transferred to Judge William Hayes. 9-ER-2291 at Dkt No. 26. Defendants filed new motions to dismiss on April 19, 2019, which Judge Hayes dismissed without prejudice on January 7, 2020. 5-ER-1227-6-1253 (Minute Order); 6-ER-1258-1297 (Building Trades Memorandum); 6-ER-1342-1383 (Local 30 Memorandum). Plaintiffs moved for reconsideration and for leave to file an amended complaint. 5-ER-1075-1196 (Second Amended Complaint); 5-ER-1201-1226 (Reconsideration Memorandum). Judge Hayes granted Plaintiffs leave to file an amended complaint. 5-ER-1070-1-74. Plaintiffs filed their SAC on April 21, 2020. 5-ER-947-1069. Defendants again moved to dismiss. 4-ER-818-853 (Building Trades Memorandum), 4-ER-857-891 (Local 30 Memorandum).

The case was transferred to Judge Todd Robinson. 4-ER-813. On August 26, 2021, more than a year after Defendants' motions were filed, Judge Robinson denied their motions to dismiss with respect to Plaintiffs' secondary boycott claims, holding these had been adequately pled. 4-ER-780-781.

Judge Robinson granted the motion on Plaintiffs' monopolization claims. 4-ER-782-794. He held Plaintiffs had failed to allege that Defendants participated in the relevant market, injured competition, and had a sufficiently large market share. 4-ER-792. He also held that Plaintiffs had properly alleged that the statutory and non-statutory exemptions for union action did not bar Plaintiffs' monopolization claims. 4-ER-783-789.

Judge Robinson also concluded that Plaintiffs sufficiently alleged the sham exception to the *Noerr-Pennington* doctrine applied, so the First Amendment did not bar Plaintiffs' claims. He decided that Plaintiffs sufficiently alleged that "Defendants' objections to the City Council were intended only to delay Plaintiffs, not to influence government action." 4-ER-776:7-9 (citations, alterations, and quotations omitted). He also found that Plaintiffs adequately alleged that Defendants' threatened opposition to SeaWorld's future attractions was a sham because "it is difficult to imagine in what way Defendants could intend to influence governmental action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions." 4-ER-778:3-5.

Judge Robinson granted leave to amend. 4-ER-812. Defendants then indicated they would file a motion for reconsideration. As a result, Judge Robinson ordered that "Plaintiffs **MAY FILE** their third amended complaint within twenty-one (21) days of the electronic docketing of the Court's ruling on Defendants' anticipated motion for reconsideration." 4-ER-750-751 (original emphasis).

On September 23, 2021, Defendants filed a motion for reconsideration. 4-ER-709-714 (Notice); 4-ER-715-749 (Memorandum). While it was pending, the case was transferred to Judge Linda Lopez. 4-ER-706-708.

On January 28, 2022, Judge Lopez denied Defendants' motion for reconsideration, explaining that Judge Robinson "considered the entirety of the SAC as well as all the arguments Defendants reiterate in their motion" and that Judge Robinson's order was correct. 4-ER-705:2-3. However, she cut the amount of time for Plaintiffs to file the TAC to ten days and limited its scope, holding "[a]bsent a motion demonstrating good cause, that complaint must not contain any new claims for relief." *Id.*

On February 7, 2022, Plaintiffs filed the TAC. *See generally* 3-ER-587-4-ER-694. It included new allegations to cure the issues Judge Robinson identified with Plaintiffs' monopolization claims. *Id.* The secondary boycott claims were unchanged. *Id.*

On February 25, 2022, Plaintiffs filed a motion for leave to file a FAC, which was based on the same nucleus of facts but added an antitrust cause claim under the Sherman Act §1, 15 U.S.C. §1. 2-ER-318-320 (Notice), 2-ER-321-3-ER-342 (Memorandum).

On June 24, 2022, the case was transferred to its fifth judge – Judge Robert Huie. 2-ER-283-284. Judge Huie denied the motion for leave to file the FAC. 2-ER-270-282.

On September 20, 2022, Defendants filed motions to dismiss the entire TAC, raising the same arguments Judge Robinson and Judge Lopez had rejected. 2-ER-48 (Notice); 2-ER-52-102 (Memorandum).

On July 6, 2023, Judge Huie dismissed all claims with prejudice based on *Noerr-Pennington*. 1-ER-3-36. Contrary to Judge Robinson's and Judge Lopez's orders, Judge Huie held that *all* of Defendants' conduct was protected by *Noerr-Pennington*. *See generally id.*; 1-ER-33:6-7. He did not explain why he disagreed with Judges Robinson and

Lopez. Judge Huie also denied leave to amend, holding that any amendment would be futile. 1-ER-33:9-26.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). The Court "accept[s] as true the facts alleged in the complaint" and "must draw inferences in the light most favorable to the plaintiff." *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal quotations and citations omitted).

This Court reviews denial of leave to amend for an abuse of discretion and reviews the question of futility of an amendment *de novo*. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016).

## SUMMARY OF ARGUMENT

Judge Huie did not question that Plaintiffs have adequately alleged claims for two unlawful secondary boycotts under federal labor law. However, he concluded that *Noerr-Pennington* protects unlawful

secondary boycotts.  He held that "coercive" or "threatening" speech –

outlawed by federal labor law as a secondary boycott – is protected by

the First Amendment unless an exception to *Noerr-Pennington* applies.

He then held no exception applies.

However, the Supreme Court, this Court, the Second Circuit, the

D.C. Circuit, and other courts have held that the First Amendment *does*

*not protect* speech used to implement an unlawful secondary boycott.

Because *Noerr-Pennington* is based on the First Amendment, it cannot

apply where the First Amendment does not.  Therefore, it was error to

dismiss the secondary boycott claims on *Noerr-Pennington* grounds.

*Noerr-Pennington* is a fact-based affirmative defense that courts

have routinely held should not be decided at the pleading stage.  Here,

numerous material facts and inferences are disputed.  Thus, it was

premature to decide the case on a motion to dismiss.  This case should

be remanded so the parties can conduct discovery on whether *Noerr-*

*Pennington* bars Plaintiffs' claims.

In any event, *Noerr-Pennington* does not apply here.  The district

court concluded that all of Defendants' conduct was either direct

petitioning or "incidental" to petitioning, and thus protected by the First

Amendment right to petition. But that conclusion – which fails to draw inferences in the light most favorable to Plaintiffs as the law requires – cannot be squared with the complaint's factual allegations that Defendants' threats were wholly unrelated to petitioning. Nor can it be reconciled with Defendants' violations of state and local lobbying law, which render Defendants' conduct unprotected. *Noerr-Pennington* does not apply here.

Even if *Noerr-Pennington* applies, the district court erred in finding that Defendants' conduct does not fall under one of the sham exceptions to *Noerr-Pennington*. Defendants engaged in individual sham petitioning against the Bahia redevelopment and SeaWorld by using the approval processes – rather than any outcome of the processes – to prevent the projects from going forward until Plaintiffs agreed to execute the union agreements. Defendants also used their control over the City Council and the Mayor to prevent the Bahia project from even being docketed for approval, admitted their opposition was filed without regard to its merit, and threatened to oppose the project until Plaintiffs agreed to a neutrality agreement and a PLA. As one court subsequently determined, Defendants' objections to the Bahia

project were meritless and akin to "economic blackmail." Appellants'
Request For Judicial Notice ("RJN"), Exh. 2 at 18:24.  Such meritless
opposition to cause delay is not protected by *Noerr-Pennington.*

Defendants also engaged in serial sham petitioning.  They have a
long history of weaponizing the approval process against large hotel
developments, having reflexively challenged every project in the
relevant market[2] over the last fifteen years with sham environmental
and land use objections and secondary boycotts targeting business
partners of the target developers.  Defendants challenge projects at
every stage regardless of merit to impose cost and delay to force
developers to agree to a neutrality agreement and/or a PLA.  When they
succeed, they then reverse their positions and support the projects,
which shows their objections are sham petitioning.

Because Judge Huie applied *Noerr-Pennington*, he did not rule on
whether the TAC's amended claims for monopolization and attempted

---

[2] The relevant market is luxury destination resorts in the cities of San
Diego and Coronado.  4-ER-671.

monopolization cured any defects previously noted by Judge Robinson. He should do so on remand.

It was also error for Judge Huie to deny Plaintiffs leave to file the FAC to assert a Sherman Act §1 claim. Plaintiffs relied on Judge Robinson's order that Plaintiffs would raise this claim in a TAC after the court ruled on the Defendants' motion for reconsideration. Plaintiffs then complied with Judge Lopez's order on reconsideration that they seek leave before adding a new claim. Thus, whether the TAC and FAC properly pled Sherman Act §1 and §2 claims should be remanded to the district court for decision.

## ARGUMENT

### I. PLAINTIFFS PROPERLY ALLEGED THAT DEFENDANTS ENGAGED IN UNLAWFUL SECONDARY BOYCOTTS, WHICH ARE NOT PROTECTED BY THE FIRST AMENDMENT.

#### A. EVANS HOTELS PROPERLY ALLEGED TWO UNLAWFUL SECONDARY BOYCOTTS.

Section 8(b)(4) of the NLRA prohibits unions' use of secondary boycotts – actions designed to force a third party to "cease doing business with any other person." *Nat'l Woodwork Mfrs. Ass'n v. NLRB*,

386 U.S. 612, 632-634 (1967); 29 U.S.C. §158(b)(4). Section 8(b)(4)(ii)(B) forbids a union from threatening, coercing, or restraining another person to force that person to cease doing business with an employer or other person. Section 8(b)(4)(ii)(A) prohibits a union from forcing an employer or other person to enter into an agreement requiring the employer to "cease or refrain" from "doing business with any other person." 29 U.S.C. §158(e). These prohibitions implement "the congressional objectives" of "shielding *unoffending employers and others from pressures in controversies not their own*." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692 (1951) (emphasis added).

A union engaged in a dispute with one employer (the primary) cannot pressure another employer or parties that deal with the primary to cease dealing with the primary. *Nat'l Woodwork Mfrs. Ass'n*, 386 U.S. at 620-27; *Iron Workers Dist. Council v. NLRB*, 913 F.2d 1470, 1475-1476 (9th Cir. 1990). Such tactics wrongly expand economic warfare beyond the parties involved in the dispute to injure neutral businesses and impair commerce. *See, e.g.*, *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 223 (1982) (noting that secondary boycotts impose a "heavy burden" on neutral employers and widens

"industrial strife"); *see also Local 1976, United Bhd. of Carpenters & Joiners v. NLRB*, 357 U.S. 93, 106 (1958) (purpose of the secondary boycott provisions is to limit industrial disputes to the parties involved).

"Recognizing that '[i]llegal boycotts take many forms,'" Congress "intended [Section 8(b)(4)'s] prohibition to reach broadly." *Int'l Longshoremen's Ass'n*, 456 U.S. at 225. By using the word "coerce," Congress "did not intend to proscribe only strikes or picketing." *Associated Gen. Contractors v. NLRB*, 514 F.2d 433, 438 (9th Cir. 1975). Union statements are "coercive threats" if they reasonably can be expected to threaten neutral parties with "ruin or substantial loss." *NLRB v. Retail Store Emps. Union Local 1001*, 447 U.S. 607, 614 (1980). Courts have found prohibited statements to include:

- Telling a neutral party "not a wheel will turn[,] [n]othing will move." *NLRB v. Teamsters Local 445*, 473 F.2d 249, 252 (2d Cir. 1973);

- "Just don't act like a school kid. You know what I'm talking about[.]" *Wells v. NLRB*, 361 F.2d 737, 742 (6th Cir. 1966);

- "[W]e are going to have to stop the job." *Id.*

- "[I]f you don't have [a subcontractor] shut down[,] I'm going to have to shut you down." *NLRB v. Operating Eng'rs, Local 571*, 317 F.2d 638, 641 (8th Cir. 1963).

Threatened "economic retaliation and pressure" is unlawful coercion. *Kentucky State Dist. Council of Carpenters & Andrew J. Russell, Att'y at L.*, 308 NLRB 1129, 1130 n.2 (1992)  Likewise, a union's threats to cancel a labor agreement are coercive. *NLRB v. Elec. Workers Local 769*, 405 F.2d 159, 161-62 (9th Cir. 1968).  And the symbolic act of emptying shredded paper from trash bags into the lobbies of neutral office buildings to dramatize janitors' concerns, which disturbed tenants and other visitors, is coercive. *Serv. Emps. Int'l Local 525*, 329 NLRB 638, 638-639, 680 (1999), *enf'd*, 2002 WL 31724293 (9th Cir. 2002); *accord Pye v. Teamsters Local 122*, 875 F. Supp. 921, 927 (D. Mass. 1995); *Metro. Reg'l Council of Philadelphia*, 335 NLRB 814, 817, 826-29 (2001).  Judge Robinson correctly concluded that the SAC alleged that Defendants' threats to both Plaintiffs and SeaWorld were illegal coercive threats under Sections 8(b)(4)(ii)(A) and (B).  4-ER-779-782.

*First*, as he explained, Plaintiffs pled that Defendants threatened "negative publicity against SeaWorld" and opposition to "its plan to open new attractions" if it "continued its partnership with Evans Hotels." 4-ER-781. These threats included publicity over animal cruelty allegations against SeaWorld and a corporate campaign to organize SeaWorld's workforce. *See, e.g.*, 4-ER-661-662.

Defendants' threats to SeaWorld sought to have it "either terminate your deal with Evans Hotels or face years of delay in getting future attractions approved and immeasurable damage to your image, reputation, and business in San Diego." *Id.* And because Defendants' threats were to force neutral SeaWorld to stop doing business with Plaintiffs, *id.*, the threats were illegal secondary boycotts.

Moreover, Plaintiffs adequately allege that Defendants' threats succeeded – they caused SeaWorld to end its joint venture with Plaintiffs, scrapping a planned hotel that would have earned over a hundred million in profits. 4-ER-661-664, 685-685. Such "threats of economic harm are coercive threats" because they threatened – and, indeed, caused – "ruin or substantial loss to a party not involved in the labor dispute." 4-ER-780 (internal quotation marks omitted). As Judge

Robinson correctly held, such threats constitute unlawful secondary boycotts under Section 8(b)(4)(ii)(B).  4-ER-781.

*Second*, Plaintiffs described in detail how Defendants employed threats to try to force Plaintiffs (in this context, a secondary) to agree not to engage contractors (the primary employers) who refused to enter a PLA for construction work on the Bahia redevelopment.  Defendants have threatened and coerced Plaintiffs by forcing damaging delays in approval of the Bahia lease amendment and directly threatening them with statements such as likening the situation to a "grenade with the pin out."  4-ER-649-656, 661, 665-669, 682, 688.

Section 8(b)(4)(ii)(A) prohibits such threats to force an employer "to cease doing business with any other person" unless the other person enter into agreements with unions.  29 U.S.C. §158(e).  Such forbidden agreements include "pre-hire" agreements, in which an employer and union agree to only use unionized workers or subcontractors before workers are hired and can decide for themselves if they want to be unionized.  *NLRB v. Local Union 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 344-45 (1978); *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100,*

421 U.S. 616, 626-633 (1975) (union pre-hire agreement with contractor to subcontract mechanical work only to firms in collective bargaining relationship with union violated Section 8(e)). Judge Robinson thus correctly concluded that Plaintiffs "state[d] a claim against the [Building Trades] Defendants under Section 8(b)(4)(ii)(A)." 4-ER-782; *see also Acco Constr. Equip., Inc. v. NLRB*, 511 F.2d 848, 850 (9th Cir. 1975) (union coercing agreement with developer restricting "freedom of the contractors to employ non-union heavy equipment repairmen" violated Section 8(b)(4)); *NLRB v. Hotel & Rest. Emps. Bartenders' Union Local 531*, 623 F.2d 61 (9th Cir. 1980) (union threat to strike unless bowling alley canceled lease of on-site nonunion coffee shop violated Section 8(b)).

Finally, Judge Robinson correctly held the construction industry exception does not apply to Defendants' conduct, because Evans Hotels is not engaged in and does not employ any employees in the construction industry. 4-ER-782; *see also* 3-ER-594

Thus, Plaintiffs adequately alleged violations of Sections 8(b)(4)(ii)(A) and (B).

## B. THE FIRST AMENDMENT DOES NOT PROTECT SECONDARY BOYCOTTS.

Judge Huie held that Defendants' secondary boycotts were petitioning protected by the First Amendment under *Noerr-Pennington*. 1-ER-19-21.

However, the Supreme Court, this Court, and other courts have long held that the First Amendment does not protect speech in furtherance of a secondary boycott. *Int'l Bhd. of Elec. Workers v. NLRB* ("*IBEW*"), 341 U.S. 694, 705 (1951); *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 941 F.3d 902, 905 (9th Cir. 2019) ("*Iron Workers*"); *Warshawsky & Co. v. NLRB*, 182 F.3d 948, 952 (D.C. Cir. 1999); *NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 477 F.2d 260, 266 (2d Cir. 1973).

*IBEW* involved a dispute between a union and a subcontractor (the primary employer) that employed nonunion workers. The union had no labor dispute with another subcontractor or the general contractor (the neutral employers), but informed them both and some of their employees that the primary subcontractor was hiring non-union labor. This led employees of the neutral employers to stop working, and

the union's picket of the job site caused the general contractor to terminate the primary subcontractor.

The Supreme Court held that the union violated Section 8(b)(4) by inducing and encouraging employees of the neutral employers to engage in a work stoppage to force the general contractor to cease doing business with the primary employer. *IBEW*, 341 U.S. at 697-98, 705. The Supreme Court rejected the union's claim that its conduct was protected by the First Amendment because the statutory words "'induce or encourage' are broad enough to include in them every form of influence and persuasion." *Id.* at 701-02. Noting that the courts of appeal had already held that secondary boycott prohibitions on threatening speech does not impinge on First Amendment rights, the Supreme Court held that "[t]he prohibition of inducement or encouragement of secondary pressure by [Section] 8(b)(4)(A) carries no unconstitutional abridgement of free speech."[3] *Id.* at 705, n.9 (citing

_____

[3] The Supreme Court also cited the NLRB's decision in *Wadsworth*, 81 NLRB at 811-12, which found no constitutional infringement by applying secondary boycott law to prohibit peaceful picketing and the distribution of a "Do not patronize" list. *IBEW*, 341 U.S. at 703. The *(footnote continues on following page)*

*Paper Converters Union v. Le Baron*, 171 F.2d 331, 334-35 (9th Cir. 1948) (peaceful picketing) and *NLRB v. Local 74, United Bhd. of Carpenters & Joiners of Am.*, 181 F.2d 126, 132 (6th Cir. 1950) (work stoppages), *aff'd*, 341 U.S. 707 (1951)).

This Court likewise held in *Iron Workers* that "the 'First Amendment is not at all implicated' when activities prohibited by Section8(b)(4)(i) are proscribed." *Iron Workers,* 941 F.3d at 905 (quoting *Warshawsky,* 182 F.3d at 952). There, the union was involved in a labor dispute with one of two subcontractors (the primary) over wages, but there was no dispute with the other subcontractor. *Id.* at 904. The union sent text messages to employees of the secondary subcontractor encouraging them to cease performing work until the secondary contractor ceased doing business with the primary subcontractor. *Id.*

This Court held that the union's text messages violated Section 8(b)(4) by encouraging the neutral subcontractor's employees to strike.

---

injunction in *Wadsworth* was upheld in *United Bhd. of Carpenters v. Sperry*, 170 F.2d 863, 868-69 (10th Cir. 1948).

Following *IBEW*, this Court rejected the union's argument that conduct proscribed by Section 8(b)(4) could be protected by the First Amendment. *Id.* at 905. Citing decisions by the D.C. Circuit and the Second Circuit, this Court explained that "[t]here have been no changes to First Amendment jurisprudence in the interim that warrant divergence from the Supreme Court's analysis in *IBEW*." *Id.* at 906 (citing *Warshawsky*, 182 F.3d 952 and *Local Union, No. 3*, 477 F.3d at 266). This Court then refused rehearing en banc, rejecting two dissenting opinions that argued *IBEW* does not apply to "pure speech," which includes petitioning, but is "limited to picketing." *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1113, 1116 (9th Cir. 2020) (denying rehearing en banc); *see also Warshawksy*, 182 F.3d at 952 (Section 8(b)(4)'s prohibitions cover "every form" of coercive "influence and persuasion" including "handbilling and conversations"); *Local Union No. 3*, 477 F.2d at 263-66 (rejecting argument that union agent's statements to neutral employees encouraging them to refuse handling the goods of a primary employer was protected "pure speech" because

*IBEW* "dispose[d] of any First Amendment objections to [Section] 8(b)(4)").

It is well-settled that unions sacrifice some First Amendment rights in obtaining the benefits of federal labor law. *NLRB v. Assoc. Gen. Contractors, Inc.*, 633 F.2d 766, 772 n.9 (9th Cir. 1980) ("Association that would otherwise be protected [by the First Amendment] may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor relations in the public interest."). Thus, secondary boycotts premised on speech or petitioning by labor unions may be prohibited by "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 912 (1982) (citations omitted).

Judge Huie summarily dismissed these cases in a footnote stating that *Iron Workers* only "discussed the constitutionality of 29 U.S.C. § 158(b)(4)(i)." 4-ER-19-20, n. 10. But Sections 8(b)(4)(i) and 8(b)(4)(ii) are part of the same sentence. Both prohibit secondary boycotts: the "evil condemned by Congress in [Section] 8(b)(4)." *IBEW*, 341 U.S. at

705. The former prevents "inducing or encouraging" strikes to enforce secondary boycotts and the latter prevents threats and coercion to enforce secondary boycotts. It defies common sense to conclude that a Section 8(b)(4)(i) violation is not protected by the First Amendment, but a Section 8(b)(4)(ii) violation is protected.

As the Supreme Court has held, "the right to petition and the right to free speech" are "subject to the same constitutional analysis." *Wayte v. United States*, 470 U.S. 598, 610 n.11 (1985). Thus, Judge Huie was wrong to hold that some speech implementing a secondary boycott is not protected by the First Amendment, but some is. None is protected.

Judge Huie was also wrong to conclude that applying the secondary boycott laws here would risk "interfer[ing] with Defendants' petitioning rights." 4-ER-19-20, n. 10 (citations omitted). This ignores the broad principle that the Supreme Court relied on in *IBEW*. The Supreme Court, citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), followed established precedent holding that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct that violates a valid statute. *IBEW*,

341 U.S. at 705 & n.10.  In fact, "it has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *Giboney*, 336 U.S. at 502.  Thus, fraud, soliciting someone to commit a crime, or speech to induce unlawful activity are not constitutionally protected speech.  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (First Amendment does not protect "fraud" and "speech integral to criminal conduct"); *United States v. Williams*, 553 U.S. 285, 298 (2008) (speech "that is intended to induce or commence illegal activities" is unprotected).

Defendants argued below that their secondary boycotts are protected by the First Amendment, citing *Edward J. Debartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568 (1988).  As this Court recognized in *Iron Workers,* 941 F.3d at 906, *DeBartolo* involved peaceful hand billing that did not "threaten, coerce, or restrain" customers at a mall from shopping.  Thus, there was no secondary boycott.  The Supreme Court did not decide if the First Amendment protected coercive handbilling.  *Id*.  Here, Judge Robinson

correctly concluded that "Defendants' threats to both Plaintiffs and SeaWorld were 'coercive' for purposes of Section 8(b)(4)(ii)" and thus not "immunized by the First Amendment." 4-ER-781:26-28.

If Judge Huie's conclusion is upheld, the secondary boycott laws would be rendered unconstitutional and *IBEW* and *Iron Workers* would be overruled. Nothing justifies this revolutionary change in federal labor law.

Finally, because Defendants' secondary boycott activity is not protected by *Noerr-Pennington* or the First Amendment, it also is not protected conduct where it is alleged as the basis for antitrust violations. *See* 4-ER-689, 691. This is significant because multiple courts have found secondary boycotts, standing alone, can form the factual predicate for viable antitrust claims. *Connell Constr.*, 421 U.S. 616, 621-633 (unlawful secondary conduct violated both antitrust and labor laws where union coerced job owners to deal exclusively with union subcontractors); *Consol. Express, Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 521 (3d Cir. 1979) (where unlawful secondary boycott "has been shown to be illegal under federal labor law, a secondary party injured in his business or property by either has made out a prima facie

case under [the Clayton Act]"), vacated on other grounds, 448 U.S. 902 (1980)).

## II. *NOERR-PENNINGTON'S* SCOPE SHOULD NOT BE DECIDED AT THE PLEADING STAGE.

The TAC provides countless facts demonstrating why Defendants' conduct either is not covered by *Noerr-Pennington* or falls under the sham exception to *Noerr-Pennington*. *See*, *e.g.*, 4-ER-677-683. This Court has explained, "[w]hether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227 (1982). As such, "'courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage[.]'" *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 877 (N.D. Cal. 2021) (quoting *AbCellera Biologics Inc. v. Berkeley Lights, Inc.*, No. 20-CV-08624-LHK, 2021 U.S. Dist. LEXIS 123839, 2021 WL 2719264, at *6 (N.D. Cal. July 1, 2021); see also *Group14 Techs., Inc. v. Nexeon Ltd.*, No. C22-1354 TSZ, 2023 WL 3599580, at *2 (W.D. Wash. May 23, 2023) (rejecting *Noerr-Pennington* arguments at motion to dismiss stage because plaintiff had sufficiently

alleged sham petitioning); *Katana Silicon Techs. LLC v. Micron Tech.,
Inc*, No. 1:22-cv-00282-DCN, 2023 WL 3231201, at *9 (D. Idaho May 3,
2023) (refusing to analyze *Noerr-Pennington* or sham exceptions until
after discovery); *Mula v. Mula-Stouky*, No. 21-cv-04540-BLF, 2022 WL
3357673, at *6-7 (N.D. Cal. Aug. 15, 2022) (denying motion to dismiss
where plaintiff alleged the sham exception, because the "Court cannot
resolve that question on a motion to dismiss").

Here, Judge Huie ignored this rule and refused to make inferences
in Plaintiffs' favor as the law requires.  *Barker*, 584 F.3d at 824.  For
example, Judge Huie held he could not infer that Defendants filed their
objections against the Bahia redevelopment "without regard to merit."
1-ER-24-25.  But this ignores the many allegations that explain why
Defendants' challenges against the Bahia were spurious.  3-ER-590,
607; 4-ER-650-651, 667-668, 680.  This is particularly true with respect
to the retention of Gleason Road as confirmed by California Superior
Court Judge Timothy B. Taylor's decision holding that the argument for
retaining Gleason Road was baseless "economic blackmail."  RJN, Exh.
2 at 18:24

Judge Huie also found that he could not infer that Defendants were not seeking official action by a government body.  1-ER-28.  But this ignores the allegations explaining (i) Defendants filed their challenges to force developers to unionize, 3-ER-590-592, 608, 611, 616; 4-ER-648, 680, 689-670, (ii) do not care about securing the government action for which they petition, 3-ER-590-591, 615, 627-628, 632; 4-ER-643, 678, 680-681, (iii) never actually succeed in obtaining the relief for which they petition, 3-ER-590-591, 607, 614, 619, 627-628; 4-ER-639, 668, 680-681, and (iv) often reverse positions and support the same projects once developers agree to unionize, 3-ER-590, 614, 622, 627-628, 632-633, 668, 678, 680-681.

Finally, Judge Huie found that "any delay that Defendants sought resulted from persuading government officials to consider the objections."  1-ER-29:23-24.  But this ignores the allegations showing government officials were not persuaded by Defendants' objections and instead delayed the projects so that Defendants could pressure developers to unionize.  3-ER-590-591, 606, 626; 4-ER-645-646, 651-654, 656-657, 669, 674-675.

As the above shows, this case is factually complex and ill-suited

for resolution at the pleading stage on *Noerr-Pennington* grounds.[4]

Plaintiffs should be able to engage in discovery to prove that their

allegations are true.[5]

## III.  IN ANY EVENT, *NOERR-PENNINGTON* DOES NOT APPLY TO MANY OF DEFENDANTS' ACTIONS.

Even if *Noerr-Pennington* could apply at the pleading stage, it still

does not protect Defendants' conduct that was either (i) not petitioning

---

[4] The detailed factual allegations also satisfied the requirements for notice pleading.  Relying on *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531 (9th Cir. 1991), Judge Huie held that "a heightened pleading standard is applied" to claims involving *Noerr-Pennington*.  1-ER-13:1-12. This was error.  After *Mohla* was decided, the Supreme Court held that judicially created heightened pleading standards violate Federal Rule of Civil Procedure 8(a)(2).  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 515 (2002) ("A requirement of greater specificity for particular claims is a result that 'must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.'"); *see also Empress LLC v. City & Cnty. of San Francisco,* 419 F.3d 1052, 1057 (9th Cir. 2005) (following *Swierkiewicz* stating plaintiff did not have to meet a heightened pleading standard in claim involving *Noerr-Pennington* defense).

[5] Although the application of *Noerr-Pennington* raises a question of fact when the doctrine applies, that should not affect this Court's ruling that the First Amendment does not apply to Plaintiffs' secondary boycott claims.  That is a pure legal question.

or incidental thereto or (ii) an integral part of violating a valid statute. As a result, it is not a defense to any of Plaintiffs' claims.

### A. DEFENDANTS' THREATS TO SEAWORLD AND PLAINTIFFS WERE *UNRELATED* TO PETITIONING, SO THEY ARE NOT PROTECTED BY *NOERR-PENNINGTON*.

*Noerr-Pennington* protects two types of conduct: (i) direct petitioning and (ii) conduct incidental to direct petitioning. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Direct petitioning is a communication made directly to the government such as pleadings in litigation, letters to government bodies, and testimony at legislative hearings. *Columbia v. Omni Outdoor Adv'ng*, 499 U.S. 365, 379-80 (1990) (lobbying is petitioning activity); *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) ("communication[s] to the court" like complaint, answer, counterclaim, and other pleadings are fairly described as "petitions"). Conduct incidental to petitioning includes pre-litigation demand letters, *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 935-36 (9th Cir. 2006), discovery communications between litigants, *Freeman*, 410 F.3d at 1185, and settlement negotiations, *id.*

Without any discovery, the district court concluded that Defendants' threats to drum up negative publicity against SeaWorld, undermine its business, damage its reputation, and organize SeaWorld's labor force unless it cut ties with Plaintiffs were incidental to petitioning. 1-ER-18**; *but see* 4-ER-661-662. However, these threats had nothing to do with any petitioning of the government. They were unrelated to any of SeaWorld's projects under consideration by the government; they were on subjects like animal cruelty. 4-ER-661-662. Likewise, threats to oppose future SeaWorld projects were not incidental to petitioning because there was no existing government action to try to influence. *Id.*

The district court's conclusion that Defendants' threats to Plaintiffs were incidental to petitioning was similarly wrong. Defendant Lemmon threatened Plaintiffs with substantial economic harm, likening the unions' conduct to a "grenade with the pin out on the table." 4-ER-666-667. Defendant Browning threatened Plaintiffs that the unions would "stop at nothing" unless Plaintiffs agreed to their demands for a PLA. *Id.* These threats were made shortly after Defendants had destroyed the SeaWorld joint venture, so Plaintiffs

reasonably understood Defendants to be threatening pickets, corporate campaigns, and other unlawful actions against Plaintiffs and their clients.[6] *Compare* 4-ER-665 (SeaWorld ended on November 15, 2018) *with* 4-ER-666 ("grenade" and "stop at nothing" threats were made on November 27, 2018). Given that context, it was improper for Judge Huie to infer in Defendants' favor that those threats were solely incidental to petitioning.

Moreover, holding Defendants accountable for their threats to financially ruin Plaintiffs and SeaWorld unless Plaintiffs agreed to a PLA or to unionize the Bahia would not restrict Defendants' ability to petition the government about legitimate issues concerning the Bahia redevelopment. Whether the Bahia is unionized or whether Evans Hotels signed a PLA was not part of Defendants' opposition to the Bahia

---

[6] As the TAC details, during a labor dispute in the 1990s with Plaintiff Evans Hotels, Local 30 targeted several of its clients, threatening to disrupt conferences at Evans Hotels if they did not cancel their reservations. 4-ER-648-649. As a result, at least two of Evans Hotels' clients canceled their scheduled conferences. *Id.* This illegal conduct stopped after Evans Hotels filed a lawsuit against Local 30, which agreed to cease any attempt to unionize Evans Hotels-owned properties for five years. *Id.*

redevelopment, which was based on keeping Gleason Road – an opposition that has been held to be "economic blackmail." 4-ER-649-657; RJN, Ex. 2 at 18:24.

The district court improperly relied on *Sosa* to reach a contrary conclusion. *See* 1-ER-18-21. There, the Court held that pre-litigation demand letters could be incidental to litigation as could "engag[ing] in negotiations to settle legal claims," even if unsuccessful, because they facilitate access to courts. 437 F.3d at 936. Defendants' threats to Plaintiffs, by contrast, do not facilitate access to the government.

The district court also inexplicably relied on *Affordable Housing Development Corporation v. City of Fresno*, 433 F.3d 1182 (9th Cir. 2006), which concluded that defendant Councilman Mathys' dissemination of online content to influence public opinion in a dispute over housing "amounted to petitioning." 1-ER-16. However, unlike here, "no evidence was presented that Mathys intimidated anyone." 433 F.3d at 1193. Moreover, federal labor and antitrust laws were not involved, and no law prohibited his speech.

Because inferences from the allegations are to be favorable to Plaintiffs at the pleading stage, the district court erred in finding that the threats were incidental to petitioning.

**B.** ***NOERR-PENNINGTON* DOES NOT PROTECT COMMUNICATIONS IN VIOLATION OF THE BROWN ACT, LOBBYING DISCLOSURE LAWS, AND PROHIBITIONS ON EX PARTE COMMUNICATIONS WITH ELECTED OFFICIALS.**

"First Amendment rights are not immunized from regulation when they are used as an *integral part of conduct which violates a valid statute.*" *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) (emphasis added); *see also Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1307 (Fed. Cir. 1999) ("Noerr-Pennington does not protect conduct which is otherwise unlawful."). "Actions that fall outside the scope of 'political activity' include attempts to 'influence governmental action through overtly corrupt conduct, such as . . . ' unlawful meetings with government officials, or other forms of inducement that do not constitute legitimate lobbying." *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 51 (D.D.C. 2018) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263, 266 (D.C. Cir. 1981)).

Defendants engaged in numerous acts of unlawful conduct that is not protected by *Noerr-Pennington*. The TAC alleges that Defendants' meetings with a majority of council members violated the Brown Act; that all of Defendants Building Trades and Lemmon's lobbying violated lobbyist disclosure requirements; and that Defendants' meetings violated restrictions on ex parte communications with the Coastal Commission (Cal. Pub. Res. Code §30324). 3-ER-589, 592, 606, 608-610, 621, 631-632, 634; 4-ER-642, 651, 653-654, 678-579. The purpose of these laws is to ensure that communications occur in public and that the public knows who is lobbying government officials. These illegal communications are not legitimate petitioning and are unprotected by *Noerr-Pennington*.

The requirements of these laws are particularly relevant here because neither the City Council nor the Mayor can condition approval of a development on agreeing to a neutrality agreement. 3-ER-589-590, 609, 616-617; 4-ER-653. Consequently, Defendants and City Council members must make such demands in secret communications. *Noerr-Pennington* should not be extended to protect such illegal secret communications.

**IV. EVEN IF *NOERR-PENNINGTON* APPLIES HERE, DEFENDANTS ENGAGED IN SHAM PETITIONING UNPROTECTED BY *NOERR-PENNINGTON*.**

*Noerr-Pennington* safeguards parties' First Amendment right to petition the government by protecting *genuine* efforts to obtain government action, even if the action has anticompetitive effects. *Noerr Motor*, 365 U.S. at 144. *Noerr-Pennington* does not protect sham petitioning. *Id.* Although the sham exception takes many forms, there is a common thread: "***in whatever forum***, private action that is not genuinely aimed at procuring favorable governmental action is a mere sham that cannot be deemed a valid effort to influence government action." *Allied Tube*, 486 U.S. at 500 n.4 (emphasis added). Here, Defendants engaged in multiple forms of sham petitioning unprotected by *Noerr-Pennington*.

**A. DEFENDANTS ENGAGED IN INDIVIDUAL INSTANCES OF SHAM PETITIONING.**

Individual instances of sham petitioning exist where a party uses "the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044 (9th Cir. 2009) (quoting *City of*

*Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (original emphasis)).  For example, *Noerr-Pennington* generally protects a party's ability to petition the government to enact laws that harm their competitors because the law (the outcome) rather than their petitioning (the process) produced the anticompetitive effect.  *See*, *e.g.*, *Noerr*, 365 U.S. at 140-144 (railroads permitted to lobby for law that limited competition from truckers).  Conversely, petitioning is sham when a party files frivolous objections to license applications to impose cost and delay on the applicants because the objections (the process) rather than a decision by the government (the outcome) produced the harmful effects.  *See*, *e.g.*, *City of Columbia*, 499 U.S. at 380.

1.    *DEFENDANTS' PETITIONING AGAINST THE BAHIA REDEVELOPMENT AND ANY SEAWORLD PROJECT WAS INDIVIDUAL SHAM PETITIONING.*

Defendants engaged in several instances of individual sham petitioning.  First, Defendants' letters to the City Council with baseless objections to the Bahia redevelopment were sham petitioning.  In the letters, Defendants objected to the redevelopment because (i) there was purportedly a lack of information concerning the environmental review and (ii) the elimination of Gleason Road violated the master plan.  4-

ER-649-650.  But Defendants knew their objections were baseless and had no genuine interest in obtaining more information or retaining Gleason Road.  4-ER-650, 667-668, 678; RJN, Ex. 2 at 12-18.

Rather, Defendants used the objections to delay the approval process and pressure Plaintiffs to agree to a neutrality agreement and a PLA.  4-ER-668, 670, 674-675.  Defendants admitted that if Plaintiffs executed the agreements, they would drop their objections.  4-ER-678. If Plaintiffs did not agree, Defendants would "stop at nothing" and continue to create new objections out of "thin air" to ensure the project remained perpetually delayed.  4-ER-666-667.  This is the very definition of sham petitioning because Defendants used the approval process – not its outcome – to pressure Plaintiffs.

Three judges agreed.  Judge Robinson found that Defendants' letters to City Council were sham petitioning because they were "'intended only to delay [Plaintiffs], not to influence government action.'"  4-ER-776 (quoting *Clipper Exxpress*, 690 F.2d at 1253).  Judge Lopez concurred when she denied Defendants' reconsideration motion. 4-ER-705.  After a trial on the Gleason Road issue, Judge Taylor determined Defendants' objections were the "antithesis of open

government" and, because of their clear lack of merit, were initiated to "add[] expense and further delay" the redevelopment or "[e]conomic blackmail, in other words." RJN, Exh. 1 at 18.

Second, Defendants' secret meetings with a majority of the City Council to prevent the Bahia project from even being docketed were sham petitioning. Rather than seek government action, Defendants met with Council members to stop the approval process until Plaintiffs executed the union agreements. 3-ER-589-590, 592-593, 606, 608-609, 611-612; 4-ER-651, 656. The City Council President confirmed this, explaining to Plaintiffs she could not docket the project because it would upset Defendants and not because there were any substantive issues with the project. 4-ER-665. Defendants also obtained a commitment from Mayor Faulconer to not push for the project to be docketed. 4-ER-656, 666. This is sham petitioning because Defendants did not seek government action (i.e., a vote on the Bahia project), but sought to stop it altogether.

Third, Defendants engaged in sham petitioning when threatening to object to all future SeaWorld attractions. Knowing SeaWorld must obtain City Council and Coastal Commission approval before building

new attractions, 4-ER-661-662, Defendants threatened SeaWorld with severe opposition to any future attraction if it continued its partnership with Plaintiffs. *Id*. As a result, SeaWorld terminated the joint venture, and paid a $2.8 million termination fee, and lost a hundred million in profits. 4-ER-661-664, 685-686. Defendants could not have been seeking to influence government action through these threats because they did not know what future projects SeaWorld would undertake. 4-ER-678. Rather, Defendants were threatening to use the approval process to stall SeaWorld's projects, which, again, is sham petitioning.

Judge Robinson reached the same conclusion, finding "it is difficult to imagine in what way Defendants' intent to influence governmental action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions." 4-ER-78:3-5. Judge Lopez agreed. 4-ER-705.

Fourth, to the extent that it could be considered petitioning government at all, threatening to engage in a negative publicity campaign against SeaWorld on topics like animal cruelty (*see* 4-ER-661-662) is sham petitioning. Any such campaign would not be intended to generate government action, but would be "a mere sham to cover what

[was] an attempt to interfere directly with the business relationship[]"
of SeaWorld and Plaintiffs. *Noerr*, 365 U.S. at 144. This is the original
example of sham petitioning identified in *Noerr*. *Id.*

2. *JUDGES ROBINSON AND LOPEZ CORRECTLY
   FOUND THE INDIVIDUAL SHAM EXCEPTION
   APPLIES TO DEFENDANTS' CONDUCT; JUDGE
   HUIE ERRED IN HOLDING OTHERWISE.*

First, Judge Huie erred in refusing to infer that Defendants were
not seeking official governmental action through their petitioning
because "Defendants actively sought to delay or stop the Bahia Project"
and ultimately obtained the delay they sought. 1-ER-28:9. When a
party uses governmental processes to impose delay, as Judges Robinson
and Lopez had previously concluded, that is "classic" sham petitioning.
*City of Columbia*, 499 U.S. at 380; *see also Cal. Motor*, 404 U.S. at 512-
16 (sham exception applied where government process was used to
impose cost and delay); *Hanover 3201 Realty, LLC v. Vill.
Supermarkets, Inc.*, 806 F.3d 162, 180-83 (3d Cir. 2015) (sham exception
applied because defendants used the government process to impose cost
and delay).

Judge Huie then applied a piecemeal approach and held the sham
exception did not apply because things like Defendants having an

"ulterior motive for lobbying" and making baseless objections were not, on their own, dispositive. 1-ER-28-29. Even if not dispositive alone, Judge Huie erred by failing to analyze the allegations as part of a "holistic evaluation" of all relevant conduct to determine whether it is sham petitioning. *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 364 (4th Cir. 2013). When these facts are considered collectively with all other indicia of abuse of process alleged in the TAC, Plaintiffs pled significantly more than is required to trigger the sham exception.

Finally, Judge Huie erred in rejecting the reasonable inference that Defendants' threats to reflexively object to all future SeaWorld attractions was sham petitioning. Although not government petitioning in the first place (section III.A, above), it is reasonable to infer Defendants were threatening to use government processes to impose cost and delay on SeaWorld when they did not even know what the future projects would be or if they had any grounds for objections. 4-ER-678. As Judge Robinson correctly determined, Defendants' threats were "akin to 'protests . . . filed automatically and without regard to merit.'" 4-ER-778 (quoting *Clipper Exxpress*, 690 F.2d at 1254-55).

**B. DEFENDANTS ENGAGED IN SERIAL SHAM PETITIONING BY REFLEXIVELY CHALLENGING ALL HOTEL PROJECTS IN THE RELEVANT MARKET REGARDLESS OF MERIT.**

In serial sham cases, like the one here, "the question is not whether any [single action] has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for [an improper] purpose[.]" *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 2020) (citing *Cal. Motor*, 404 U.S. 508). The court must ask, "[w]ere the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id*. That some of the actions "turn out not to be frivolous," is not "fatal to a claim." *Id*. The exception recognizes that parties that weaponize the "costly, distracting, and time-consuming" nature of government proceedings do not receive *Noerr-Pennington* protection for those actions. *Id.*

As demonstrated below, Defendants have long had a policy of automatically challenging every hotel project in the Relevant Market without regard to merit and for the improper purpose of forcing

developers to unionize or terminate their projects.  This is textbook

serial sham petitioning.

      **1.**     *DEFENDANTS' OBJECTIONS TO ALL HOTEL*
                  *PROJECTS IN THE RELEVANT MARKET IS*
                  *SERIAL SHAM PETITIONING.*

Defendants have a standard tactic of filing successive challenges

against every major hotel project in the Relevant Market to harass

developers and force them to unionize.  Major hotel developments must

go through an approval process with various government entities like

the City Council, the Port of San Diego, and the Coastal Commission.

3-ER-606-607; 4-ER-658, n.9.  Defendants take advantage of this by

challenging the projects on frivolous environmental and land use

grounds at every stage.  3-ER-590-591, 606-607, 617-625, 629, 631, 633-

634; 4-ER-638-639, 640, 654-655.

When initial challenges fail, Defendants appeal or find new

avenues for challenging the projects.  3-ER-590, 618-620, 629-631; 4-

ER-639, 640-641, 666-668, 680, 682.  Defendants continue to concoct

challenges out of "thin air" until the target either (i) agrees to a

neutrality agreement and/or a PLA or (ii) ends the project.  3-ER-615-4-

ER-669.  Defendants have implemented this playbook against every

hotel project in the Relevant Market over the last fifteen years.  3-ER-606.[7]

Defendants bring their objections reflexively and without regard to their merit.  4-ER-680-681.  Defendants have levied hundreds of objections in roughly twenty administrative challenges, five writ petitions, and multiple appeals without ever obtaining the substantive relief they sought.  3-ER-616-4-ER-648; 4-ER-654, 659-662, 670, 680. The few times their objections were not rejected entirely, Defendants at best secured minor victories based on technicalities.  See, e.g., 3-ER-631-633.  And these occasional successes are "irrelevant" to whether the serial sham exception applies because, as this Court has recognized, the occasional success does not disprove the existence of a policy to reflexively and successively file challenges without regard to merit. *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017).

---

[7] The only time Defendants permitted a non-union project to proceed was the Legacy International Center.  Because it was a religious non-profit organization, it was not subject to the NLRA so Defendants could not force it to unionize.  4-ER-643.

Defendants have no interest in obtaining official government action on the environmental and land use issues for which they object. 3-ER-590-591, 615, 627-628, 632; 4-ER-643, 678, 680-681  They object to inflict cost and delay on developers and coerce them to agree to a neutrality agreement and/or a PLA.  3-ER-591, 605-606; 4-ER-669-670. If developers agree to their demands, then Defendants *drop their challenges* without obtaining the relief they sought and then often petition *in support* of the same projects that they had previously opposed.  3-ER-607, 622, 627-628, 633; 4-ER-645-646, 654-655.

The detailed allegations about Defendants' baseless and unsuccessful challenges establish a tactic of serial sham petitioning.

> **2.** *CONSISTENT WITH THEIR PLAYBOOK, DEFENDANTS MADE REFLEXIVE, BASELESS CHALLENGES TO THE BAHIA REDEVELOPMENT AND THREATENED TO DO THE SAME TO ANY SEAWORLD PROJECT.*

Defendants' policy of filing baseless challenges to cause delay and force unionization extended to the Bahia redevelopment.  As detailed above, after hearing about the Bahia redevelopment, Defendants sent letters to the City Council containing baseless objections.  4-ER-649-650.  They then met with a majority of Council members and Mayor's

staff to stop the redevelopment from even being docketed. 4-ER-656, 666. Defendants admitted these activities were part of a pattern of objections that would continuously be pulled out of "thin air" until Plaintiffs unionized or stopped pursuing the Bahia redevelopment. 4-ER-654-655, 678.

For example, at a June 2018 meeting, Defendant Lemmon threatened to use CEQA and other environmental challenges to hold the Bahia redevelopment hostage and explained the Bahia project would be doomed and held up by any and all means because Defendants "know how to do it, *we do it all the time*." 4-ER-654-655 (emphasis added). Likewise, at a November 2018 meeting, Defendant Browning explained Defendants would pull objections out of "thin air" to impose cost and delay, would stop at nothing to prevent the Bahia redevelopment from going forward, and planned to unionize "each and every hotel in San Diego." 4-ER-666-668.

Defendants next implemented their playbook against the SeaWorld project by threatening to reflexively object to all of SeaWorld's future, unknown attractions to force SeaWorld to terminate its joint venture with Plaintiffs unless Plaintiffs executed the union

agreements.  4-ER-660-662.  Again, these threats were baseless because Defendants could not know the projects they would be challenging or grounds for such challenges.  4-ER-678-679; *see also* 4-ER-778:3-5.  This is sham petitioning unprotected by *Noerr-Pennington*.  4-ER-778.

### 3.    *MANY COURTS HAVE FOUND SIMILAR ALLEGATIONS OF SHAM PETITIONING TO BE UNPROTECTED BY NOERR-PENNINGTON.*

Numerous cases involving similar, and often less severe, conduct than that alleged here have held the conduct was sham petitioning unprotected by *Noerr-Pennington*.

In *Icon at Panorama, LLC v. Sw. Reg'l Council of Carpenters*, a developer sued two unions for antitrust and labor law violations because they tried to hold a development hostage by filing baseless CEQA challenges with the local planning commission and state court. No. 2:19-cv-00181-CBM(MRWX), 2019 WL 7205899 (C.D. Cal. Aug. 7, 2019).  These actions were part of a union policy to reflexively challenge any large non-union development in the relevant market.  *Id.* at *1.  If the developer agreed to unionize, then the unions would drop the challenges without seeking any relief on the issues they have previously

raised because their true goal was unionization. *Id.* These allegations

triggered the sham exception at the pleading stage. *Id.* at *3-4.

Likewise, in *Waugh Chapel*, a developer sued unions that used

sham administrative objections and legal challenges to force it to

terminate its relationship with a non-union tenant. 728 F.3d at 366.

Based on the union's poor litigation record and other indicia of bad

faith, the Fourth Circuit overturned dismissal, finding there was a

genuine issue of material fact as to whether the unions engaged in

serial sham petitioning because "a factfinder could reasonably conclude

that the unions have abused their right to petition the courts and, as a

result, have forfeited the protection of the First Amendment." *Id.* at

366-67.

In *Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l

Union*, union defendants, which had unsuccessfully sought to unionize

the plaintiff for over a decade, petitioned municipal bodies to force the

plaintiff to either unionize or go out of business. 593 F. Supp. 2d 840,

843 (E.D. Va. 2008). Because the plaintiff showed that the petitioning

before the municipal bodies was committed with the intent of harassing

it, this was sham petitioning unprotected by *Noerr-Pennington*. *Id.* at 845.

In *Hanover*, the defendant supermarket allegedly filed four sham petitions to block development of a shopping center that would include a rival supermarket. *Hanover*, 806 F.3d at 181-82. The developer alleged the defendant was attempting to monopolize the market for full-service supermarkets through serial sham petitioning. *Id.* The Fourth Circuit upheld the claims, finding that four challenges (three of which were objections to agencies) triggered the serial sham exception because the defendants challenged the development at every stage and the challenges were largely unsuccessful. *Id.* These facts were sufficient at the pleading stage to show that the defendant brought the challenges pursuant to a policy of harassment meant to inflict cost and delay on the plaintiff. *Id.* at 182.

Finally, in *Ross v. Bremer*, developers alleged the defendants sought to block development of a shopping center through "repeated oppositions to requests for governmental approvals" and "repetitive, bad faith lawsuits . . . challenging all such governmental approvals." No. C77-183R., 1982 WL 1842, 1982 U.S. Dist. LEXIS 17802, at *2-3 (W.D.

Wash. Mar. 16, 1982). Based on the defendants' statements demonstrating the challenges were brought to delay the development, and the use of straw parties to bring challenges, the court found plaintiffs raised an issue of material fact sufficient to defeat summary judgment regarding whether the challenges were sham petitioning that violated the antitrust laws. *Id.* at *7.

As the above cases make clear, which include cases at both the pleading and summary judgment stages, serial objections to governmental entities intended to delay development is serial sham petitioning. This is what Defendants did here.

### 4. THE DISTRICT COURT ERRED WHEN IT FOUND THE SERIAL SHAM EXCEPTION DID NOT APPLY.

The district court erred in finding the serial sham exception did not apply because Plaintiffs failed to allege that they and Defendants "are competitors." 1-ER-25:5. Neither the Ninth Circuit nor other courts restrict application of the sham exception to competitors; they have applied it to conduct by unions against non-competitors, e.g., developers and employers. *USS-POSCO*, 31 F.3d at 804 (plaintiff was a contractor and defendants were unions); *Waugh Chapel*, 728 F.3d at 364 (plaintiff was a developer and defendants were unions); *Smithfield*,

593 F.Supp.2d at 843 (plaintiff was an employer and defendants were unions); *Icon*, 2019 WL 7205899, at *3-4 (plaintiff was a developer and defendants were unions).

Restricting application to competitors is inconsistent with the policy underlying the sham exception, which is to remove *Noerr-Pennington* protection from disingenuous petitioning done for an improper purpose. *Allied Tube*, 486 U.S. at 500 n.4. In the antitrust context, sham petitioning is routinely directed at non-competitors like employers and should not be protected because the parties do not compete. *See, e.g.*, *Waugh Chapel*, 728 F.3d at 364. Outside of the antitrust context, restricting application to competitors makes even less sense since the market position of the parties is usually irrelevant.

The district court also erred in finding that Defendants did not bring challenges without regard to merit because some of their challenges were "partially successful" or settled. 1-ER-25:6. But Defendants' partial successes do not prove their merit, because they were minor wins based on technicalities. 3-ER-630-631; 4-ER-637-638, 680-681. Such trivial and infrequent "successes" do not preclude application of the sham exception. *Int'l Longshore*, 863 F.3d at 1187.

Likewise, Defendants' settlements do not establish merit. They did not address the environmental or land use issues that Defendants raised. 3-ER-615-4-ER-682. Rather, Defendants dropped their challenges in exchange for neutrality agreements and/or PLAs – the relief they truly wanted. 3-ER-607, 622, 627-628, 633; 4-ER-645-646, 654-656. This incongruity between relief sought in litigation and the relief obtained shows that Defendants weaponized the challenge process and engaged in serial sham litigation. *United States v. Koziol*, 993 F.3d 1160, 1172 n.12 (9th Cir. 2021) (finding "incongruity between his settlement demands and the complaint would be probative evidence of sham litigation").

5. *DEFENDANTS' CONDUCT DIRECTED AT ADMINISTRATIVE AND LEGISLATIVE AGENCIES FALLS UNDER THE SERIAL SHAM EXCEPTION*

Judge Huie erred in holding that the serial sham exception can never be asserted when the petitioning activity involves lobbying outside an adjudicative setting and that the proceedings of the Coastal Commission, Port of San Diego, Wetlands Advisory Board, Planning Commission, Centre City Development, the City, or local city councils were legislative, not adjudicative. 1-ER-24, n. 15.

Courts routinely apply the serial sham exception to lobbying of legislative or administrative entities without requiring the entities to function in an adjudicative capacity. *See, e.g., Waugh Chapel*, 728 F.3d at 357 (first challenge levied at city council concerning rezoning decision); *Hanover*, 806 F.3d at 181-82 (majority of challenges levied at state environmental agency). This is because the serial sham exception concerns whether a party has a policy of reflexively using the government machinery (such as approval processes) to impose cost and delay rather than to obtain government action. *Cal. Motor*, 404 U.S. at 511. Such disingenuous petitioning is sham regardless of forum. *Allied Tube*, 486 U.S. at 500 n.4.

Several courts have rejected the argument that the serial sham exception applies only to lobbying directed at entities in their judicial or quasi-judicial role. *See, e.g., In re Skelaxin Metaxalone Antitrust Litig.*, No. 1:12-md-2343, 2013 WL 2181185, 2013 U.S. Dist. LEXIS 70968, at *72-77 (E.D. Tenn. May 20, 2013); *In re Prograf Antitrust Litig.*, 1:11-MD-2242-RWZ, 2012 WL 293850, 2012 U.S. Dist. LEXIS 12053, 2012

WL 293850, at *5 (D. Mass. Feb. 1, 2012)). In *Skelaxin*, for example,

the defendants argued the sham exception did not apply to FDA citizen

petitions because the agency was functioning in its quasi-legislative

capacity when deciding them. 2013 U.S. Dist. LEXIS 70968, at *72.

The court rejected the argument, noting:

> "'[I]f the sham exception applied only to adjudicative
> processes, then any act of advocacy before a legislative or
> quasi-legislative body would be shrouded in carte blanche
> immunity regardless of purpose or sufficiency—even if the
> activity was utterly baseless, an abuse of process, and
> motivated solely to stifle competition,'" which would be
> "contrary to the purpose of *Noerr* and its progeny."

*Id.* at *74-75 (E.D. Tenn. May 20, 2013) (quoting *In re Prograf Antitrust*

*Litig.*, 2012 U.S. Dist. LEXIS 12053, at *14). The court then applied the

serial sham exception. *Id.* at 76-77.

   This approach makes sense because the Supreme Court's concern

in *California Motors* – that, without the serial sham exception, *Noerr-*

*Pennington* would protect harassing conduct – applies to legislative

bodies as much as to courts and other adjudicative bodies. *Cal. Motor*,

404 U.S. at 511, 515.

   This approach is also consistent with the underlying purpose of

the sham exception, which is to remove *Noerr-Pennington* protection

from sham lobbying "in whatever forum." *Allied Tube*, 486 U.S. at 500 n.4.

Moreover, permitting the serial sham exception to apply to lobbying of

entities in their legislative or quasi-legislative roles poses no risk of

punishing or chilling *legitimate* lobbying because a party invoking the

exception still must show the lobbying was part of a policy of reflexively

opposing projects regardless of merit to impose cost and delay.

In holding that the serial sham exception can never apply to

legislative proceedings, Judge Huie relied on two of this Court's

opinions, *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056 (9th Cir.

1998), and *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886

(9th Cir. 1988).  Both are inapposite because they involved the single

sham litigation exception – not the serial sham exception.[8]  *Kottle*, 146

F.3d at 1061 (involving single sham litigation exception and

administrative agency); *Boone*, 841 F.2d at 889 (case concerned single

---

[8] The only other decision of this Court to discuss *Kottle*'s distinction
between lobbying and litigation, and refuse to apply the sham exception
to lobbying, is *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090,
1094-95 (9th Cir. 2000).  *Manistee* was a single sham claim so it
provides no support for the proposition that *Kottle* prevents the sham
exception from applying to lobbying in serial sham cases.

decision whether to amend comprehensive city plan to tackle "urban blight"). The *Boone* court also recognized that the plaintiffs never alleged that the defendant "was not genuinely seeking official action from the city and agency" through its lobbying. *Boone*, 841 F.2d at 895. Therefore, any holdings concerning the serial sham exception were dicta and do not bind this Court. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 737 (2007) (courts "'are not bound to follow . . . dicta in a prior case'").

> b.     *PLAINTIFFS SUFFICIENTLY ALLEGED DEFENDANTS' LOBBYING EFFORTS WERE MADE IN ADJUDICATIVE SETTINGS.*

Judge Huie also erred in holding the TAC failed to allege Defendants engaged in serial shams in "adjudicative" or "quasi-judicial" settings that would be actionable under *Kottle* and *Boone*. The TAC is replete with allegations showing Defendants' challenges occurred in adjudicative settings.

For instance, Plaintiffs explicitly allege that City Council approval of the lease amendment for the Bahia redevelopment is an adjudicative act and that decisions by the City Council, Port of San Diego, and Coastal Commission about other hotel development projects were

adjudicative acts.  3-ER-616-617, 619-620, 622, 626, 628, 631, 632; 4-ER-638-639.  Plaintiffs also allege that several of Defendants' challenges were made in proceedings that possessed hallmarks of adjudicative proceedings, including that many (i) were subject to appeal and judicial review (3-ER-618-622, 629, 632-634; 4-ER-638-539, 658), (ii) required oral arguments and hearings (3-ER-621, 622, 625, 627-628, 631-633; 4-ER-637-640, 642, 680), (iii) permitted written submissions by interested parties (3-ER-628; 4-ER-638, 641), and (iv) allowed representation by attorneys (3-ER-613, 619-625, 634; 4-ER-680).

Moreover, legislative acts are those that declare a public purpose, while adjudicative or administrative acts implement the legislative purpose.  *Park at Cross Creek, LLC v. City of Malibu*, 12 Cal. App. 5th 1196, 1204 (2017); *San Bruno Comm. for Econ. Justice v. City of San Bruno*, 15 Cal. App. 5th 524, 534-35 (2017).  Decisions like approving a general plan and enacting zoning laws are legislative acts because they reflect policy decisions as to how the land will be used.  *Citizens for Planning Responsibly v. Cnty. of San Luis Obispo*, 176 Cal. App. 4th 357, 367-68 (2009).  Approvals of individual projects within the scope of an existing plan, such as variances, conditional use permits, and

subdivision map approvals, are adjudicative acts. *Park at Cross Creek*, 12 Cal. App. 4th at 1204; *Citizens for Planning Responsibly*, 176 Cal. App. 4th at 367. The same is true of a city council's decision to enter a contract. *San Bruno*, 15 Cal. App. 5th at 534-35 (city's sale of property was adjudicative act); *Worthington v. City Council of Rohnert Park*, 130 Cal. App. 4th 1132, 1142-43 (2005) (city's contract with Indian tribe was not legislative act).

Thus, the City Council's vote on the lease amendment for the Bahia redevelopment, which did not require amendments to the Mission Bay Park Master Plan or zoning law changes – was an adjudicative decision. 4-ER- 649, 680. The same is true of many of the other projects subject to Defendants' objections. *E.g.,* 3-ER-616 (City's negotiation of Exclusive Negotiation Agreement with Cisterra), 618 (same), 619 (approval of Lane Field permit that did not require amending the Port Master Plan), 622-626 (actions by the Wetlands Advisory Board and the Planning Commission on whether Town & Country project complied with CEQA, was consistent with existing plans, and should receive permit); 4-ER-638-639 (approval of Hotel Del Coronado Master Plan).

Thus, because Defendants' sham lobbying occurred in connection with these adjudicative, not legislative proceedings, the serial sham exception to *Noerr-Pennington* applies.

## V. PLAINTIFFS' MONOPOLIZATION CLAIMS SHOULD BE REMANDED TO THE DISTRICT COURT TO BE DECIDED ON THEIR MERITS.

Judge Robinson dismissed Plaintiffs' monopolization claims with leave to amend because the SAC did not adequately allege that Defendants (i) participated in the relevant market, (ii) injured competition through their misconduct, or (iii) have a sufficiently large market share. 4-ER-789-794.. The TAC cured these deficiencies. 4-ER-673-675 (alleging market power), 675-677 (alleging antitrust injury and harm to competition/consumers).

Judge Huie did not evaluate these amendments because he dismissed the case on *Noerr-Pennington* grounds. As demonstrated above, *Noerr-Pennington* does not immunize Defendants' conduct underlying the monopolization claims. Therefore, the monopolization claims should be remanded to the district court to determine whether they state a claim.

## VI. THE DISTRICT COURT SHOULD ALLOW PLAINTIFFS TO FILE A FOURTH AMENDED COMPLAINT.

Citing the fact that the case had been at the pleading stage for four years, Judge Huie dismissed the FAC without leave to amend. 1-ER-33. He found Plaintiffs "have had ample opportunity to sufficiently plead their claims" and held that Plaintiffs have not "proffered any proposed amendments that would suggest [amendment would not be futile]." 1-ER-33:11-13. Judge Huie was mistaken.

First, leave to amend "'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and this policy is to be applied with extreme liberality." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Amendment must be allowed unless there is a good reason – futility, undue delay and undue prejudice, or bad faith – for denying leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Delay alone is not grounds for denying leave to amend. *Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973) ("the mere fact that the government could have moved at an earlier time to amend does not by itself constitute an adequate basis for denying leave to amend"); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th

Cir. 1999) (delay, though relevant, "is not a dispositive factor in the amendment analysis").

Leave to amend can be denied if there is an undue delay that prejudices the opposing party. *Lockheed*, 194 F.3d at 986 (district court did not abuse its discretion in denying leave to amend where delay was coupled with prejudice and bad faith); *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

Despite the time that has elapsed since the case was filed, Plaintiffs did not unduly delay raising the new Sherman Act claim. The case had been pending at the pleading stage largely due to the delays from the repeated reassignment of the case to new judges and the time judges had taken to rule, not due to any delays by Plaintiffs. See, e.g., 9-ER-2294 at Dkt. No 60 (first ruling on motions to dismiss issued seven months after matter was fully briefed); *id.* at Dkt. No 93 (second motion to dismiss decided on August 26, 2021, more than a year after the motion was fully briefed).

When Judge Robinson issued his 2021 ruling granting-in-part the motion to dismiss the SAC, it was the first instance where the court "address[ed] the sufficiency of Plaintiffs' individual claims on the merits." 4-ER-812:5-7. That order granted Plaintiffs "one final opportunity to amend their complaint" without prohibiting them from pursuing new claims. *Id.* Plaintiffs did not immediately add the new claim in the TAC in September 2021, because the parties – with Judge Robinson's approval – agreed to wait until the court decided Defendants' motion for reconsideration of the 2021 dismissal order. 4-ER-750-751.

Then, the case was reassigned yet again, and Judge Lopez ordered – for the first time – that Plaintiffs could not assert any "new claims for relief" without "a motion demonstrating good cause." 4-ER-705. To comply with that order, Plaintiffs filed the TAC without new claims, but moved three weeks later for leave to file the FAC to add the Sherman Act §1 claim. 9-ER-2299 at Dkt Nos. 114, 118.

Given that procedural history, the delay in seeking to amend the complaint to add that claim was not undue. Plaintiffs did not add the claim shortly after the first dismissal order to consider the merits of the

claim, because they instead relied on the court-approved agreement to wait to amend until the motion for reconsideration was decided. And when Judge Lopez *sua sponte* required Plaintiffs to seek leave to add the new claim, they promptly did. Under those circumstances, any delay was reasonable and could not be grounds to deny leave to amend. *See, e.g.*, *Schvimmer v. Off. of Ct. Admin.*, 857 F. App'x 668, 673 (2d Cir. 2021) (district court abused its discretion in denying leave to amend on grounds of undue delay because it had previously ordered plaintiff to defer filing the amended complaint until it decided a motion to dismiss the prior complaint).

Moreover, there was no prejudice to Defendants. The new theory was based on the same facts previously alleged, and no discovery had taken place before the amendment was sought. Defendants did not identify any prejudice beyond their empty assertion that they would be forced to "expend substantial resources on futile claims[.]"[9] 2-ER-

---

[9] Defendants also claimed incorrectly that the new claims were "based on allegations that two previous judges have held are nonactionable and/or do not support Plaintiffs' theories." 2-ER-302:13. But the previous rulings did not consider whether Defendants violated the Sherman Act §1.

302:12.  Nor did Defendants claim the amendment was being sought in

bad faith.  *See generally* 2-ER-285-317.

Judge Huie's finding that the new claim would significantly

burden Defendants is not supported by any evidence.  Defendants did

not dispute Plaintiffs' contention that "the factual predicate for the

proposed Section 1 claims for conspiracy in restraint of trade is

substantially similar to the allegations supporting the Section 2 theory"

(which was asserted in the TAC).  2-ER-327:14-15; *Hurn v. Ret. Fund

Tr. of Plumbing, Heating & Piping Indus. of S. Cal.*, 648 F.2d 1252,

1254 (9th Cir. 1981) (finding no prejudice where claim asserted two

years after the initial complaint was based on the same operative facts

as the pending claims and defendant asserted no "specific shortcomings

in discovery").

Judge Huie also held the new claim would impose a burden on

Defendants because it would require expert testimony.  2-ER-277-278.

If this were true, then no new claim could be pled that could involve

expert testimony.  No case supports that proposition, which even

Defendants did not assert.

## CONCLUSION

For the reasons set forth above, this Court should reverse the granting of Defendants' Motion to Dismiss the TAC on First Amendment grounds and allow Plaintiffs to proceed with their secondary boycott claims.  It also should reverse the district court's denial of Plaintiffs' antitrust claims on First Amendment grounds and instruct the district court to consider whether Plaintiffs have adequately pled Sherman Act §1 and §2 claims in the FAC.


Dated:  December 13, 2023       Respectfully submitted,

By:   *s/ Rex S. Heinke*
Rex S. Heinke
Jessica M. Weisel
Complex Appellate Litigation Group LLP

William M. Low
Higgs Fletcher & Mack LLP

Daniel J. Mogin
Timothy Z. LaComb
Mogin Rubin LLP

Lawrence D. Levien
Littler Mendelson, P.C.

*Attorneys for Plaintiffs, Appellants, and Cross-Appellees*

## STATEMENT OF RELATED CASES

Plaintiffs are not aware of any related cases in this Court.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-55728

I am the attorney or self-represented party.

**This brief contains** | 13,517 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⬤ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Rex S. Heinke | **Date** | 12/13/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

**ADDENDUM OF STATUTORY CITATIONS**

# ADDENDUM OF STATUTORY CITATIONS

15 U.S.C. §1 ............................................................ A-1

15 U.S.C. §2 ............................................................ A-1

29 U.S.C. §158(b) .................................................. A-2

29 U.S.C. §158(e) .................................................. A-5

## 15 U.S.C. §1

### §1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## 15 U.S.C. §2

### §2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**29 U.S.C. §158**

**§158. Unfair labor practices**

*     *     *

**(b) Unfair labor practices by labor organization**

It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

A-2

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the

primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

(5) to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an

election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

\*   \*   \*

## (e) Enforceability of contract or agreement to boycott any other employer; exception

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible[1] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not

---

[1] So in original. Probably should be "unenforceable".

include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

\*   \*   \*