IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EVANS HOTELS, LLC, a California limited liability company;
BH PARTNERSHIP LP, a California limited partnership; and
EHSW, LLC, a Delaware limited liability company,

*Plaintiffs/Appellants/Cross-Appellees*,

- *v.* -

UNITE HERE! LOCAL 30; BRIGETTE BROWNING, an individual;
SAN DIEGO COUNTY BUILDING AND CONSTRUCTION TRADES
COUNCIL, AFL-CIO; TOM LEMMON, an individual; DOES 1-10,

*Defendants/Appellees/Cross-Appellants.*

On Appeal from the United States District Court for the
Southern District of California
Case No. 3:18-cv-02763-RSH-AHG

## THIRD BRIEF ON CROSS-APPEAL
## [APPELLANTS' RESPONSE AND REPLY BRIEF]

**HIGGS FLETCHER
& MACK LLP**
William M. Low
401 West A Street, Suite 2600
San Diego, CA 92101-7910
(619) 236-1551
wlow@higgslaw.com

**COMPLEX APPELLATE
LITIGATION GROUP LLP**
Rex S. Heinke
Jessica M. Weisel
355 South Grand Ave., Suite 2450
Los Angeles, CA 90071
(213) 878-0404
rex.heinke@calg.com
jessica.weisel@calg.com

*Additional Counsel Listed on Inside Cover*

**MOGIN RUBIN LLP**
Daniel J. Mogin
Timothy Z. LaComb
4225 Executive Square, Suite 600
La Jolla, CA 92037
(619) 687-6611
dmogin@moginrubin.com
tlacomb@moginrubin.com

**LITTLER MENDELSON, P.C.**
Lawrence D. Levien
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006
(202) 842-3400
LLevien@littler.com

*Attorneys for Plaintiffs/Appellants/Cross-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

REPLY BRIEF ON APPEAL ................................................... 1

SUMMARY OF ARGUMENT ................................................ 1

ARGUMENT ......................................................................... 6

I.     Plaintiffs Sufficiently Allege Violations Of The National Labor Relations Act's Prohibitions On Secondary Boycotts. ....................................................................... 6

     A.    The First Amendment Does Not Bar Plaintiffs' Secondary Boycott Claims. ........................................... 6

     B.    Plaintiffs Sufficiently Allege a Violation of §8(b)(4)(ii)(B) Based on Defendants' Threats Against SeaWorld. ...................................................... 13

     C.    Plaintiffs Sufficiently Allege a Violation of §8(b)(4)(ii)(A) Based on Defendants' Attempts to Force Plaintiffs to Agree to a PLA for Construction Work. ....................................................................... 15

II.    *Noerr-Pennington* Does Not Bar Plaintiffs' Claims. ........... 22

     A.    The *Noerr-Pennington* Issue Should Not Be Decided on a Motion to Dismiss. ............................... 22

     B.    In Any Event, Defendants' Threats to SeaWorld and Plaintiffs Are Outside *Noerr-Pennington*. .......... 26

     C.    Defendants' Unlawful Communications Are Not Protected by *Noerr-Pennington*. ................................ 29

     D.    Plaintiffs Sufficiently Allege Serial Sham Petitioning. ................................................................ 32

        1.    There is no basis for holding that lobbying can never constitute serial sham petitioning. ......... 32

        2.    Even if the adjudicatory/legislative distinction applies to serial sham petitioning, Plaintiffs sufficiently allege this case is adjudicatory. ..... 39

        3.     Defendants' actions toward other developers are relevant to the serial sham analysis. ......... 41

    E.    Plaintiffs Also Sufficiently Allege Individual Sham Petitioning. .................................................. 43

III.    The Court Should Remand The Monopolization Claims To Be Decided On Their Merits. .......................................... 49

    A.    Plaintiffs Have Not Waived Their Sherman Act §2 Claims. ................................................................. 49

    B.    If This Court Considers the Alternate Grounds for Deciding the Sherman Act §2 Claim, Plaintiffs Sufficiently Allege It. ................................................. 50

        1.     Plaintiffs adequately plead market power. ...... 52

        2.     Plaintiffs adequately plead antitrust injury. ... 55

        3.     The antitrust labor exemption does not apply. 60

IV.    Plaintiffs Should Have Been Granted Leave To File The Fourth Amended Complaint. .............................................. 64

CONCLUSION ......................................................................... 66

CROSS-APPELLEES' ANSWERING BRIEF ON CROSS-APPEAL... 67

SUMMARY OF ARGUMENT ................................................... 67

STATEMENT OF THE CASE .................................................. 69

ARGUMENT ............................................................................ 72

I.    Defendants Are Not Entitled To Attorneys' Fees. .............. 72

    A.    Awarding Attorneys' Fees Would Conflict With The Federal Policy Favoring Amendments. .............. 72

    B.    In Any Event, the District Court Did Not Abuse Its Discretion in Denying Fees and Finding Defendants Were Not Prevailing Parties. ................. 75

        1.     Even if the anti-SLAPP motions had been granted, Defendants are not prevailing parties because leave to amend was granted. ............... 75

2.    Defendants also are not prevailing parties because their anti-SLAPP motion, even if granted, accomplished nothing. ......................... 77

C.    In Any Event, the Anti-SLAPP Statute Does Not Apply to Plaintiffs' State Law Claims........................ 79

D.    Federal Courts Should Not Follow Anti-SLAPP Statutes. .................................................................... 84

CONCLUSION ........................................................................ 85

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbas v. Foreign Pol'y Grp., LLC,*
783 F.3d 1328 (D.C. Cir. 2015) ............................................... 84

*Acco Constr. Equip. Inc. v. NLRB,*
511 F.2d 848 (9th Cir. 1975) ................................................. 17

*Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers,*
325 U.S. 797 (1945) ............................................... 5, 54, 58

*Am. Ad Mgmt., Inc. v. GTE Corp.,*
92 F.3d 781(9th Cir. 1996) ................................................... 56

*Art of Living Foundation v. Does 1-10,*
No. 5:10-cv-05022-LHK, 2012 WL 1565281
(N.D. Cal. May 1, 2012) ...................................................... 74

*Associated Gen. Contractors v. NLRB,*
514 F.2d 433 (9th Cir. 1975) .................................................. 8

*B&G Foods N. Am., Inc. v. Embry,*
29 F.4th 527 (9th Cir. 2022) ................................................. 23

*B&G Foods N. Am., Inc. v. Embry,*
No. 2:20-CV-00526-KJM-DB, 2023 WL 3751991
(E.D. Cal. June 1, 2023) ...................................................... 23

*Barker v. Riverside County Office of Educ.,*
584 F.3d 821 (9th Cir. 2009) ................................................. 26

*BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO,*
90 F.3d 1318 (8th Cir. 1996) ................................................. 10

*Bedding, Curtain & Drapery Workers Union v. NLRB,*
390 F.2d 495 (2d Cir. 1968) ................................................. 10

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) ............................................... 56, 57, 58

*Bodine Produce, Inc. v. United Farm Workers Org. Comm.,*
494 F.2d 541 (9th Cir. 1974) ............................................ 63, 64

iv

*Boone v. Redevelopment Agency of City of San Jose,*
    841 F.2d 886 (9th Cir. 1988) ............................................................... 48

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ............................................................................ 8

*Brown & Root, Inc. v. La. State AFL-CIO,*
    10 F.3d 316 (5th Cir. 1994) ........................................... 12, 13, 27

*Brown v. Elec. Arts, Inc.,*
    722 F. Supp. 2d 1148 (C.D. Cal. 2010) ........................................ 73, 76

*Brown v. Pro Football,*
    518 U.S. 231 (1996) ............................................................................ 60

*Burgoyne v. Kronenberger,*
    No. C-11-06376 EDL, 2013 WL 12173923
    (N.D. Cal. Jan. 18, 2013) ............................................................. 78, 79

*Cal. Int'l Chem. Co. v. Neptune Pool Serv., Inc.,*
    770 F. Supp. 1530 (M.D. Fla. 1991) ................................................. 45

*California ex rel. Lockyer v. Safeway, Inc.,*
    371 F. Supp. 2d 1179 (C.D. Cal. 2005) ............................................. 61

*California Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ............................ 29, 31, 32, 33, 34, 36, 37, 42, 43

*Carbone v. Cable News Network, Inc.,*
    910 F.3d 1345 (11th Cir. 2018) ........................................................ 84

*Cent. Telecomms., Inc. v. TCI Cablevision, Inc.,*
    800 F.2d 711 (8th Cir. 1986) ............................................................. 45

*City of Columbia v. Omni Outdoor Advert., Inc.,*
    499 U.S. 365 (1991) ......................................... 3, 30, 34, 36, 43, 44, 48

*City of Cotati v. Cashman,*
    29 Cal. 4th 69 (2002) ......................................................................... 83

*City of Oakland v. Oakland Raiders,*
    20 F.4th 441 (9th Cir. 2021) ......................................................... 55, 56

*Clean Conversion Techs., Inc. v. CleanTech Biofuels, Inc.,*
    No. 12-CV-239-L JMA, 2012 WL 3585171
    (S.D. Cal. Aug. 20, 2012) ................................................................. 53

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ................................................. 22, 29, 46

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) ................................................. 60

*Coltrain v. Shewalter*,
66 Cal. App. 4th 94 (1998) ........................................... 73, 74

*Connell Constr. Co. v. Plumbers & Steamfitters Local 100*,
421 U.S. 616 (1975) .............................. 16, 17, 18, 54, 58, 60, 61, 63, 64

*Cont'l Mar. of S.F., Inc. v. Pac. Coast Metal Trades Dist. Council,
Metal Trades Dept., AFL-CIO*,
817 F.2d 1391 (9th Cir. 1987) ............................................... 64

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) ........................................... 84

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) ................................................. 50

*Dist. 30, United Mine Workers of Am. v. NLRB*,
819 F.2d 651 (6th Cir. 1987) ................................................. 14

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987) ............................................ 58, 59

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ................................................. 3, 34, 43

*eDrop-Off Chi. LLC v. Burke*,
No. CV 12-4095 GW (FMOx), 2013 WL 12131186
(C.D. Cal. Aug. 9, 2013) ............................................... 73, 74

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.
Trades Council*,
485 U.S. 568 (1988) ................................................. 7, 9, 11

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
24 F.4th 1262 (9th Cir. 2022) ........................................... 50

*Empress LLC v. City & Cnty. of San Francisco*,
419 F.3d 1052 (9th Cir. 2005) ......................................... 22, 25, 30

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
629 F.3d 1278 (Fed. Cir. 2010) ........................................... 43

*FilmOn.com Inc. v. DoubleVerify Inc.*,
    7 Cal. 5th 133 (2019) ............................................................ 81

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) .................................................. 56

*Harbor Performance Enhancement Ctr., LLC v. City of Los Angeles Harbor Dep't*,
    No. 21-55416, 2022 WL 1239055 (9th Cir. Apr. 27, 2022) ................ 23

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    403 F.3d 683 (9th Cir. 2005) ................................................ 74

*Ho v. City of Long Beach, Pub. Works*,
    No. 2:19-cv-09430-DOC-KES, 2020 WL 695887
    (C.D. Cal. Jan. 15, 2020) ..................................................... 76

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980) ................................................ 52

*Int'l Bhd. of Elec. Workers v. NLRB*,
    341 U.S. 694 (1951) ........................................................ 6, 11

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*,
    863 F.3d 1178 (9th Cir. 2017) ........................................... 37, 39

*Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*,
    456 U.S. 212 (1982) ......................................................... 9, 12

*Jackson v. Yarbray*,
    179 Cal. App. 4th 75 (2009) ................................................ 79

*Kearney v. Foley & Lardner*,
    590 F.3d 638 (9th Cir. 2009) ................................................ 24

*Klocke v. Watson*,
    936 F.3d 240 (5th Cir. 2019) ................................................ 84

*Kottle v. Nw. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998)................... 3, 4, 22, 24, 35, 39, 40

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) .................................................. 84

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) ........................................... 29, 74

*Lechmere, Inc. v. NLRB,*
  502 U.S. 527 (1992) ............................................................... 14

*Lin v. City of Pleasanton,*
  176 Cal. App. 4th 408 (2009) ............................................. 77

*Loc. Union No. 48 of Sheet Metal Workers Int'l Ass'n v. Hardy Corp.,*
  332 F.2d 682 (5th Cir. 1964) ................................................ 8

*Los Lobos Renewable Power, LLC v. Americulture, Inc.,*
  885 F.3d 659 (10th Cir. 2018) ............................................ 84

*Mackey v. Nat'l Football League,*
  543 F.2d 606 (8th Cir. 1976) ............................. 61, 63, 64

*Manistee Town Ctr. v. City of Glendale,*
  227 F.3d 1090 (9th Cir. 2000) ......................... 22, 36, 48

*Mann v. Quality Old Time Serv., Inc.,*
  139 Cal. App. 4th 328 (2006) ....................................... 75, 77

*Martin v. Inland Empire Utils. Agency,*
  198 Cal. App. 4th 611 (2011) ....................................... 75, 76

*Masimo Corp. v. Mindray DS USA, Inc.,*
  No. SACV 12-02206-CJC(JPRx), 2014 WL 12597114
  (C.D. Cal. Jan. 2, 2014) ...................................................... 76

*Mercatus Grp., LLC v. Lake Forest Hosp.,*
  641 F.3d 834 (7th Cir. 2011) ............................................. 30

*Metabolife Int'l, Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) ............................................. 72

*Moore v. Liu,*
  69 Cal. App. 4th 745 (1999) .............................................. 75

*Moran v. Endres,*
  135 Cal. App. 4th 952 (2006) ....................................... 77, 78

*Nat'l Woodwork Mfrs. Ass'n v. NLRB,*
  386 U.S. 612 (1967) ............................................................. 20

*Nelson v. Int'l Bhd. of Elec. Workers, Local 46,*
  899 F.2d 1557 (9th Cir. 1990) ..................................... 18, 19

*Nev. Indep. Serv. Contractors Ass'n v. Pack Expo W.*,
     No. CVS97-1492-KJD (RJJ), 2002 WL 1162663
     (D. Nev. Apr. 8, 2002) ........................................................................ 62

*NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, &*
     *Reinforcing Iron Workers, Local 229, AFL-CIO*,
     941 F.3d 902 (9th Cir. 2019) ...................................... 6, 7, 11

*NLRB v. Int'l Bhd. of Teamsters, et al., Local 294*,
     342 F.2d 18 (2d Cir. 1983) ................................................... 17

*NLRB v. Ironworkers Local 433*,
     850 F.2d 551 (9th Cir. 1988) ................................................ 14

*NLRB v. Loc. Union No. 103, Int'l Ass'n of Bridge, Structural &*
     *Ornamental Iron Workers, AFL-CIO*,
     434 U.S. 335 (1978) ............................................................... 16

*NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers*,
     477 F.2d 260 (2d Cir. 1973) ................................................... 7

*NLRB v. Retail Store Emps. Union Local 1001*,
     447 U.S. 607 (1980) ................................................................. 8

*NLRB v. Servette, Inc.*,
     377 U.S. 46 (1964) ................................................................. 12

*Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
     838 F. App'x 231 (9th Cir. 2020) ......................................... 58

*O'Leary v. Purcell Co.*,
     No. C-83-691-R, 1984 WL 1148 (M.D.N.C. June 11, 1984) ............... 45

*Operating Engineers Local 542 (Noonan)*,
     142 N.L.R.B. 1132 (1963) ...................................................... 18

*Or. Nat. Res. Council v. Mohla*,
     944 F.2d 531 (9th Cir. 1991) ................................................ 42

*Otter Tail Power Co. v. United States*,
     410 U.S. 366 (1973) ...................................................... 4, 41, 43

*Overstreet v. United Bhd. of Carpenters & Joiners, Local 1506*,
     409 F.3d 1199 (9th Cir. 2005) ......................................... 8, 18

*Painters Dist. Council 51 (Magnaro Corp.)*,
     321 N.L.R.B. 158 (1996) ........................................................ 19

*Painters Dist. Council 51 (Manganaro Corp.),*
   299 N.L.R.B. 618 (1990)..........................................................18, 19, 20

*Paladin Assocs. v. Mont. Power Co.,*
   328 F.3d 1145 (9th Cir. 2003)................................................51

*Park v. Bd. of Trs. of Cal. State Univ.,*
   2 Cal. 5th 1057 (2017)..........................................................80

*Phx. Elec. Co. v. Nat'l Elec. Contractors Ass'n,*
   81 F.3d 858 (9th Cir. 1996)..............................................62, 63

*Plevin v. City & County of San Francisco,*
   No. 11-02359, 2011 WL 3240536 (N.D. Cal. July 29, 2011)..............74

*Plumbers & Pipefitters Local 32 v. NLRB,*
   912 F.2d 1108 (9th Cir. 1990)................................................14

*Prime Healthcare Servs., Inc. v. Servs. Emps. Int'l Union,*
   97 F. Supp. 3d 1169 (S.D. Cal. 2015)..................................44

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
   508 U.S. 49 (1993)...........................................................34, 36

*Ramachandran v. City of Los Altos,*
   359 F. Supp. 3d 801 (N.D. Cal. 2019)................................73

*Rand Res., LLC v. City of Carson,*
   6 Cal. 5th 610 (2019).........................................................80

*Rebel Oil Co. v. Atl. Richfield Co.,*
   51 F.3d 1421 (9th Cir. 1995)................................53, 54, 59

*Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Loc. No. 150,*
   440 F.2d 1096 (9th Cir. 1971)...........................................29

*San Bruno Comm. for Econ. Justice v. City of San Bruno,*
   15 Cal. App. 5th 524 (2017)...........................................40, 41

*Sanders v. Brown,*
   504 F.3d 903 (9th Cir. 2007).............................................38

*Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union,*
   593 F. Supp. 2d 840 (E.D. Va. 2008)................................44

*Sosa v. DIRECTV, Inc.,*
   437 F.3d 923 (9th Cir. 2006)..............................................................27

*Spectacor Mgmt. Grp. v. NLRB,*
   320 F.3d 385 (3d Cir. 2003) .......................................................16, 17

*Starr v. Baca,*
   652 F.3d 1202 (9th Cir. 2011)............................................................26

*Storer Commc'ns, Inc. v. Nat'l Ass'n of Broad. Emps. &*
   *Technicians,*
   854 F.2d 144 (6th Cir. 1988)..............................................................12

*Stutzman v. Armstrong,*
   No. 2:13-cv-00116-MCE-KJN, 2013 WL 4853333
   (E.D. Cal. Sept. 10, 2013) ..................................................................76

*Swierkiewicz v. Sorema, N.A.,*
   534 U.S. 506 (2002)............................................................................24

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
   546 F.3d 991 (9th Cir. 2008)..............................................................38

*Trucking Unlimited v. Cal. Motor Transp. Co.,*
   432 F.2d 755 (9th Cir. 1970)........................................................42, 43

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.,*
   953 F.3d 955 (7th Cir. 2020)..............................................................36

*U.S. Gen., Inc. v. Draper City,*
   No. 2:06CV488, 2007 WL 527771 (D. Utah Feb. 14, 2007)...............30

*United Bhd. of Carpenters & Joiners v. NLRB,*
   357 U.S. 93 (1958)................................................................................9

*United Mine Workers of Am. v. Pennington,*
   381 U.S. 657 (1965)................................................................55, 58, 64

*United States v. Hardesty,*
   977 F.2d 1347 (9th Cir. 1992)............................................................25

*United States v. Koziol,*
   993 F.3d 1160 (9th Cir. 2021)................................................27, 37, 38

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades*
   *Council,*
   31 F.3d 800 (9th Cir. 1994)....................................33, 34, 35, 37, 38, 39

*Verizon Del., Inc. v. Covad Commc'ns Co.*,
  377 F.3d 1081 (9th Cir. 2004) ................................................. 67, 72, 74

*Warshawsky & Co. v. NLRB*,
  182 F.3d 948 (D.C. Cir. 1999) ................................................................. 7

*Wilbanks v. Wolk*,
  121 Cal. App. 4th 883 (2004) ............................................................... 81

*Williams v. Kula*,
  No. 20-CV-1120 TWR (AHG), 2020 WL 7770915
  (S.D. Cal. Dec. 29, 2020) ...................................................................... 78

*Wilson v. Cable News Network, Inc.*,
  7 Cal. 5th 871 (2019) ............................................................................ 80

*Woelke & Romero Framing, Inc. v. NLRB*,
  456 U.S. 645 (1982) ............................................................................... 17

*Yellowcake, Inc. v. Triwolf Media, LLC*,
  No. 1:20-CV-0981 AWI SKO, 2020 WL 6728934
  (E.D. Cal. Nov. 16, 2020) ..................................................................... 72

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I............................. 1, 6, 7, 11, 13, 24, 29, 66

## STATUTES

29 U.S.C. § 151............................................... 5, 6, 55, 64, 65, 66

29 U.S.C. § 152...................................... 4, 5, 6, 49, 54, 58, 66

29 U.S.C. § 157.................................................................... 14

29 U.S.C. § 158.............. 1, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21

Cal. Civ. Proc. Code § 425.16 .......................................... 71, 82

Cal. Penal Code § 524.......................................................... 81

Cal. Pub. Res. Code § 30324.............................................. 32

## RULES

Fed. R. Civ. P. 26 ................................................................. 66

## REGULATIONS

28 C.F.R. § 76.15 ..................................................................... 32

## OTHER AUTHORITIES

2 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* (1959) ....................................... 18

105 Cong. Rec. 10,104 (1959) ................................................. 18

105 Cong. Rec. 14,347 (1959) ................................................. 18

105 Cong. Rec. 18,128 (1959) ................................................. 18

105 Cong. Rec. 6428-29 (1959) ............................................... 18

105 Cong. Rec. 6648-49 (1959) ............................................... 18

105 Cong. Rec. 6664-65 (1959) ............................................... 18

H.R. Rep. No. 59-1147 (1959) (Conf. Rep.) ............................. 18

Charles A. Wright, et al.,
13 Fed. Prac. & Proc. Juris. § 3506 (3d ed.) ....................... 25

# REPLY BRIEF ON APPEAL

## SUMMARY OF ARGUMENT

Defendants oversimplify the issues on appeal. This case is not about ordinary lobbying. It is not ordinary lobbying to threaten an employer's business partner with economic harm unless it terminates its relationship with the employer. It is not ordinary lobbying to weaponize sham lobbying to block all nonunion developments in a market only to abandon those objections once developers cave to the unions' demands. This conduct violates federal labor and antitrust law and is not protected by the First Amendment.

*Secondary Boycott.* Defendants' threats to SeaWorld that forced it to cancel the joint venture with Plaintiffs and their threats against Plaintiffs to force them to agree to a project labor agreement ("PLA") for the Bahia redevelopment are not protected by the First Amendment. Defendants cite no authority that threats or coercion that violate §8(b)(4) of the National Labor Relations Act ("NLRA") is entitled to First Amendment protection. Defendants' cases merely hold that the conduct at issue was not a threat or coercion.

*Noerr-Pennington.*  First, this is not a case where *Noerr-Pennington* should be decided at the pleading stage.  The Third Amended Complaint's ("TAC") detailed allegations that, especially given inferences favorable to Plaintiffs, establish Defendants' conduct is not protected by *Noerr-Pennington.*

Second, in any event, Plaintiffs allege violations of the NLRA and Sherman Act that fall outside *Noerr-Pennington* because they do not involve petitioning or are not incidental to petitioning.  Communications that violate the Brown Act, lobbyist disclosure requirements, and restrictions on ex parte communications also are not protected by *Noerr-Pennington.*

Third, Plaintiffs allege the elements of serial sham petitioning.  Defendants' longstanding "playbook" is to file reflexive objections to hotel developments on environmental and land-use grounds that rarely, if ever, result in the relief they purportedly seek.  Once developers agree to PLAs and neutrality agreements, Defendants abandon their objections and regularly support the projects they just opposed.  Defendants' "playbook" uses the *process*, not the outcome of the process, to harm developers like Plaintiffs.

Defendants' argument that their actions are not serial sham petitioning because they file their reflexive objections before "legislative" bodies contravenes Supreme Court precedent that recognizes serial sham lobbying may fall outside *Noerr-Pennington*. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 381-82 (1991) (*"Omni"*); *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (*"Noerr"*).

Defendants cite *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1062-63 (9th Cir. 1998), but it did not involve the serial sham exception. And its rationale for distinguishing between "legislative" lobbying and adjudicative proceedings—that an "objectively baseless" standard cannot be applied to lobbying—is inapplicable to the serial sham exception, which does not require claims to be objectively baseless.

In any event, even under *Kottle*, the serial sham exception would apply. Plaintiffs allege that the City Council's approval of the Bahia lease amendment is an adjudicative act. Defendants dispute those allegations, but they cannot do so at the pleading stage. Defendants also wrongly contend that the serial sham exception cannot consider

their actions against other developers.  The Supreme Court has held to the contrary in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 371-72 (1973), and Defendants' cases do not support their argument.

Fourth, Defendants' petitioning against the Bahia lease amendment falls within the individual sham exception even if the City Council is a "legislative" body.  The Supreme Court has never excluded lobbying from the individual sham exception.  Nothing in *Kottle* prevents lobbying from being individual sham petitioning.  Defendants brag about creating objections to developments "out of thin air," they readily admit they will abandon their objections if Plaintiffs agree to a neutrality agreement and PLA, and they continue to oppose the Bahia development despite their stated grounds for opposing the Bahia lease amendment being false.  This sufficiently alleges individual sham petitioning.

*Sherman Act §2.*  The district court's dismissal of Plaintiffs' claims for attempted monopolization and conspiracy to monopolize, which violate the Sherman Act §2, was based entirely on *Noerr-Pennington*. Thus, it did not decide any of Defendants' other arguments.  Therefore,

this Court should remand the antitrust claims to the district court to decide those arguments.

If this Court does consider those arguments, they should be rejected. Plaintiffs have not waived issues on appeal that the district court never decided and were not required to address the reasons the district court gave for dismissing claims in the superseded Second Amended Complaint ("SAC"). Defendants cite no authority for their contrary argument.

Plaintiffs plead market power. And Defendants' argument that a §2 claim cannot lie against a union that enters agreements with a group of employers to monopolize a market is contrary to longstanding Supreme Court precedent. *Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 799-800 (1945).

Plaintiffs also plead antitrust injury. Defendants' conduct is not protected by the non-statutory labor exemption, which requires, inter alia, a collective bargaining relationship that Defendants and Plaintiffs have never had.

*Denial of Leave to Amend.* The district court abused its discretion in denying Plaintiffs leave to amend to plead a Sherman Act §1 claim in

the Fourth Amended Complaint ("FAC"). Defendants' prejudice and delay arguments were refuted in Appellants' Opening Brief ("AOB"). Defendants' argument that the amendments are futile merely rehashes their meritless argument that there is no viable antitrust claim.

Accordingly, Plaintiffs respectfully request that this Court reverse the order dismissing the TAC on First Amendment grounds, allow Plaintiffs to proceed with their secondary boycott claims, and instruct the district court to consider whether Plaintiffs adequately plead Sherman Act §1 and §2 claims in the FAC.

## ARGUMENT

### I. Plaintiffs Sufficiently Allege Violations Of The National Labor Relations Act's Prohibitions On Secondary Boycotts.

#### A. The First Amendment Does Not Bar Plaintiffs' Secondary Boycott Claims.

The Supreme Court and this Court's precedent is clear. When union conduct falls within the prohibitions of §8(b)(4) of the NLRA, the First Amendment does not apply. AOB 28-36; *see, e.g., Int'l Bhd. of Elec. Workers v. NLRB* ("*IBEW*"), 341 U.S. 694, 705 (1951); *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron*

*Workers, Local 229, AFL-CIO*, 941 F.3d 902, 905 (9th Cir. 2019) ("*Iron Workers*"); *Warshawsky & Co. v. NLRB*, 182 F.3d 948, 952 (D.C. Cir. 1999); *NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 477 F.2d 260, 266 (2d Cir. 1973).

Defendants contend that the Supreme Court's ruling in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988), requires §8(b)(4)(ii) be construed narrowly to protect First Amendment rights, so it does not apply to their conduct.

In *DeBartolo*, citing the statute's language, which makes it an unfair labor practice to "threaten, coerce, or restrain any person" to cease doing business with another, the Court simply held that peacefully passing out leaflets was not prohibited by §8(b)(4)(ii) because "[t]here is no suggestion that the leaflets had any coercive effect on customers of the mall."  485 U.S. at 578.

The Court relied on the doctrine of constitutional avoidance, i.e., that a statute should be interpreted to avoid a constitutional issue, to hold that the statute should be interpreted not to apply to non-coercive leaflets.  The doctrine only applies "'when, after the application of ordinary textual analysis, the statute is found to be susceptible of more

than one construction; and the canon functions as a means of choosing between them.'" *Boumediene v. Bush*, 553 U.S. 723, 787 (2008) (citation omitted). Here, there is no alternative interpretation of "threaten" or "coerce" that protects Defendants' conduct.[1]

"[W]hen Congress used 'coerce' [it] intended to *reach any form of economic pressure of a compelling or restraining nature.*" *Associated Gen. Contractors v. NLRB*, 514 F.2d 433, 438 (9th Cir. 1975) (emphasis added); *see also Loc. Union No. 48 of Sheet Metal Workers Int'l Ass'n v. Hardy Corp.*, 332 F.2d 682, 686 (5th Cir. 1964) (term "coerce" was meant to encompass "non-judicial acts of a compelling or restraining nature, . . . consisting of a strike, picketing *or other economic retaliation or pressure*") (emphasis added). Union statements are "coercive threats" if they reasonably can be expected to threaten neutral parties with "ruin or substantial loss." *NLRB v. Retail Store Emps. Union Local 1001*, 447 U.S. 607, 614 (1980).

---

[1] Similarly, in *Overstreet v. United Brotherhood of Carpenters & Joiners, Local 1506*, this Court applying the doctrine of constitutional avoidance held that a banner informing customers about a labor dispute was not coercive. 409 F.3d 1199, 1208-17 (9th Cir. 2005).

Plaintiffs allege that Defendants' agent told SeaWorld that they would cause it financial harm—by blocking all future projects and drumming up negative publicity—if it did not sever ties with Plaintiffs. 4-ER-661-662. Defendants thus threatened SeaWorld with substantial economic loss to force it to cease doing business with Defendants and it did. 4-ER-662-665, 671, 686. Defendants likewise threatened Plaintiffs with economic harm unless Plaintiffs agreed to a PLA for construction and maintenance work on the Bahia. 4-ER-654-655, 666-667.

That is precisely what §8(b)(4)(ii) was designed to prevent. *United Bhd. of Carpenters & Joiners v. NLRB*, 357 U.S. 93, 106 (1958) (purpose of the secondary boycott provisions is to limit industrial disputes to the parties involved); *see also Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 225 (1982) (because "'[i]llegal boycotts take many forms,'" Congress "intended [§8(b)(4)'s] prohibition to reach broadly").

*DeBartolo* and the other cases Defendants cite (Appellees' Answering Brief and Cross Appeal ("X-AOB") 41) involved peaceful hand-billing, banners, or letter-writing that was not coercive. In those cases, unlike here, the recipients of the unions' communications were not threatened with nor did they suffer financial harm.

As other circuits have recognized, to determine if statements rise to the level of unlawful "threats, coercion, or restraints" under the secondary boycott prohibitions, courts consider the objective circumstances surrounding the statements. *See, e.g.*, *BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318, 1331 (8th Cir. 1996) ("To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener."); *Bedding, Curtain & Drapery Workers Union v. NLRB*, 390 F.2d 495, 499-500 (2d Cir. 1968) (context "is frequently determinative" of whether union conduct is unlawful). Where inconsistent or conflicting evidence exists about what message was intended, that creates a fact question to be decided by a jury. *Id.* If a dispute exists about the object of the union's conduct, it presents a "question of fact." *Bedding, Curtain & Drapery Workers*, 390 F.2d at 499.

Thus, giving the TAC favorable inferences, Defendants' statements to SeaWorld and Plaintiffs were not expressions of any genuine opposition to future attractions or the Bahia redevelopment on

land-use and environmental grounds; they used the specter of economic harm to force SeaWorld to stop doing business with Plaintiffs and to force Plaintiffs not to do business with non-union contractors. These were threats or coercion that violate §8(b)(4)(ii).

*IBEW* and *Iron Workers* hold that the First Amendment does not protect such conduct. *Accord IBEW*, 341 U.S. at 705 (prohibition against secondary picketing "carries no unconstitutional abridgment of free speech").

Defendants nonetheless maintain that *IBEW*'s and *Iron Workers*' holdings do not extend to conduct that violates subsection (ii) of §8(b). Other than *DeBartolo*, they offer no reason why conduct prohibited by subsection (ii) receives First Amendment protection while conduct prohibited by subsection (i) does not. Nor can they.

Those subsections are part of the same sentence. It makes no sense that subsection (i)'s prohibition on speech "induc[ing] or encourag[ing]" employees to strike—speech that does not force anyone to act—is unprotected by the First Amendment while far more damaging speech like threats and coercion made directly to a neutral

employer would be protected.[2]  *See, e.g., Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. at 226 ("We have consistently rejected the claim that secondary picketing by labor unions in violation of §8(b)(4) is protected activity under the First Amendment.  It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment.") (internal citation omitted).

Defendants' cases are readily distinguishable.  In *NLRB v. Servette, Inc.*, 377 U.S. 46, 57 (1964) and *Storer Communications, Inc. v. National Ass'n of Broadcast Employees & Technicians*, 854 F.2d 144, 147 (6th Cir. 1988), the courts held that warning stores that unions intended to engage in peaceful hand-billing was not a "threat."

The third case, *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316 (5th Cir. 1994), recognizes that "nothing in the statute requires that the coercive pressure itself be unlawful; instead, . . . the

---

[2] Defendants repeatedly italicize the word "induce" but ignore §8(b)(4)(i)'s additional prohibition of any speech that "encourages" a secondary strike.  Thus, the conduct prohibited by subsection (i) can be less coercive than the conduct prohibited by subsection (ii).

relevant inquiry is whether the threat to engage in lawful activities was used as a means to obtain an unlawful objective." *Id.* at 323-24 (citing cases). There, a contractor offered to terminate a nonunion subcontractor in exchange for union lobbying against a bill pending in the state legislature. The unions neither caused the introduction of the bill nor lobbied in support of it before the contractor's offer. *Id.* at 319. Thus, the union did not coerce or threaten the contractor to terminate the subcontractor. *Id.* at 324.

Here, Defendants' statements were intended to coerce SeaWorld and Plaintiffs. And as *Brown & Root* recognized, when coercion is for an unlawful objective even a threat to engage in otherwise lawful activity violates §8(b)(4)(ii). Accordingly, the First Amendment does not bar Plaintiffs' secondary boycott claims.

**B.    Plaintiffs Sufficiently Allege a Violation of §8(b)(4)(ii)(B) Based on Defendants' Threats Against SeaWorld.**

Because the threats to block SeaWorld's future projects and to engage in negative publicity campaigns were coercive, Defendants' violated §8(b)(4)(ii)(B).

Misreading *Plumbers & Pipefitters Local 32 v. NLRB*, 912 F.2d 1108 (9th Cir. 1990) and *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 557 (9th Cir. 1988), Defendants argue that their threats to SeaWorld cannot be construed as threats of secondary activity. X-AOB 49-50. In those cases, the union threatened to picket a job site occupied by both a primary and secondary employer. Because picketing the primary employer at the jobsite was lawful, the threat could not be construed as a threat of unlawful picketing of the secondary employer. Nothing like that happened here.

Nor can Defendants evade §8(b)(4)(ii)(B) by arguing that their threats to organize SeaWorld were protected by §7 of the NLRA. X-AOB 50. §7 only protects employee "self-organization," not conduct of unions and their officers – who are regulated by §8(b)(4). 29 U.S.C. § 157; *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 537 (1992). Nor does §7 protect unlawful pickets by employees. *Dist. 30, United Mine Workers of Am. v. NLRB*, 819 F.2d 651, 656 (6th Cir. 1987). Therefore, it could not possibly protect Defendants' threats to a secondary employer.

Accordingly, Plaintiffs sufficiently allege a violation of §8(b)(4)(ii)(B).

### C. Plaintiffs Sufficiently Allege a Violation of §8(b)(4)(ii)(A) Based on Defendants' Attempts to Force Plaintiffs to Agree to a PLA for Construction Work.

Defendants also engaged in secondary conduct —delaying the Bahia lease amendment and threatening Plaintiffs directly (e.g., a "grenade with the pin out")—to force Plaintiffs to agree to PLAs for construction and maintenance on the Bahia. AOB 25-27. Defendants maintain that cannot violate §8(b)(4)(ii)(A), because Section 8(e) of the NLRA, 29 U.S.C. § 158(e), permits PLAs "between unions and construction-industry employers 'relating to the contracting or subcontracting of work to be done at the site of the construction . . . of a building, structure, or other work.'" X-AOB 46. Defendants are wrong.

§8(b)(4)(ii)(A) prohibits union conduct to force an employer to enter into an agreement prohibited by §8(e) of the NLRA. §8(e) prohibits "cease doing business agreements" between an employer and a union that are designed to affect labor relations with another employer. Although it provides a limited exception for employers primarily engaged in the construction industry, that exception does not apply here because Plaintiffs are not employers primarily engaged in the construction industry. 3-ER-594. As Judge Robinson correctly held,

Plaintiffs adequately allege that the construction industry exception in §8(e) does not apply to them. 4-ER-782.

Further, the exception only applies to agreements with employers whose employees the union already represents. *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 627-28 (1975) ("Congress did not intend to permit a union to approach a 'stranger' contractor and obtain a binding agreement not to deal with nonunion subcontractors."); *see also NLRB v. Loc. Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 347-48 (1978) (construction industry exception did not permit union without majority representation to picket employer to enforce prehire agreement). Because Plaintiffs are not in a collective bargaining relationship with Building Trades, Defendants' threats to pressure Plaintiffs to sign a PLA do not fall within the construction industry exception.

Nor does the exception protect Defendants' demand for "future maintenance" work at Plaintiffs' properties. Such work is not exempt from §8(e) because only "building or affixing to the land" constitutes construction under the exception. *Spectacor Mgmt. Grp. v. NLRB*, 320

F.3d 385, 394-95 (3d Cir. 2003). The "'purpose of the [exception] was to alleviate the frictions that may arise when union [workers] work continuously alongside nonunion [workers] on the same construction site.'" *Acco Constr. Equip. Inc. v. NLRB*, 511 F.2d 848, 851 (9th Cir. 1975). Those concerns do not apply to maintenance work. *Id.* at 852 ("on-site heavy equipment repair . . . is not the type of activity encompassed by the proviso"); *NLRB v. Int'l Bhd. of Teamsters, et al., Local 294*, 342 F.2d 18, 21-22 (2d Cir. 1983) (exception does not protect "'a boycott against suppliers'" on construction site).

Even if the exception applied, "Congress did not afford construction unions an exemption from §8(b)(4)[ ]." *Connell*, 421 U.S. at 630. Accordingly, "to threaten, coerce, or restrain" to force an employer to agree to such an agreement is unlawful even in construction industry contracts. *See, e.g.*, *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) ("even where construction unions have negotiated secondary clauses that are sheltered by the proviso, they may not enforce them by picketing or other forms of concerted activity").

Any attempt to narrow this rule would ignore Congress's stated intent to limit "top-down" organizing campaigns, in which unions used

economic weapons to force recognition from an employer regardless of employees' wishes.  105 Cong. Rec. 6428-29, 6648-49, 6664-65, 14,347 (1959); 2 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, at 1079, 1175-76, 1191-92, 1523 (1959) ("2 Leg. Hist. of LMRDA").

As the Supreme Court has recognized, Congress accomplished this goal by "tightening §8(b)(4), which prohibits the use of most secondary tactics in organizational campaigns."  *Connell*, 421 U.S. at 632.  The legislative history of that statute indicates that Congress did not intend for construction companies to be permitted to apply economic pressure to extract PLAs.  H.R. Rep. No. 59-1147, at 42 (1959) (Conf. Rep.); 105 Cong. Rec. 10,104, 18,128 (1959); 2 Leg. Hist. of LMRDA 1289, 1715. This is a view the NLRB has long held.  *Operating Engineers Local 542 (Noonan)*, 142 N.L.R.B. 1132, *enf'd*, 331 F.2d 99 (3d Cir. 1963).

Defendants' reliance on *Nelson v. International Brotherhood of Electrical Workers, Local 46*, 899 F.2d 1557, 1561 n.3 (9th Cir. 1990), *overruled on other ground as stated in Overstreet*, 409 F.3d 1199, and *Painters District Council 51 (Manganaro Corp.)*, 299 N.L.R.B. 618, 635 (1990), is misplaced.

*Nelson* is directly on point and supports Plaintiffs. There, this Court held that a union violated §8(e) and §8(b)(4)(ii) by attempting to enforce an agreement with an association of electrical contractors whose members were union and nonunion. 899 F.2d at 1561-63 & n.3. The association agreed to have its members hire only union members. That constituted an unlawful secondary agreement because the union did not represent the association's employees or the employees of the association's nonunion members and the association performed no construction work. *Id.* at 1562.

*Painters Dist. Council* does not support Defendants. The language they quote (X-AOB 47) is from an administrative law judge's decision that the NLRB vacated and remanded.

Moreover, even analyzing the ALJ's decision, the facts are distinguishable. During negotiations over a new agreement, the union sought to force a primary employer to employ only union members. In a subsequent decision, the NLRB held that the contract provision did not violate §8(e), which only extends to prehire agreements with "secondary" objectives. *Painters Dist. Council 51 (Magnaro Corp.)*, 321 N.L.R.B. 158, 163-68 (1996). Collective bargaining agreements that

restrict subcontracting solely to protect the jobs of the union's members are "primary," not "secondary," because they preserve the work of the bargaining unit. *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 629-30 (1967).

The NLRB held that the clause had a primary objective because it was intended to preserve the work of the primary employer's employees—not to put pressure on a secondary employer. *Painters Dist. Council 51*, 321 N.L.R.B. at 163-68. Because the case did not involve a demand for a prehire agreement from a secondary employer—which Defendants demand Plaintiffs enter into—both *Painters* decisions are completely irrelevant.

Defendants also argue that their conduct does not violate §8(b)(4)(ii)(A), because Plaintiffs do not allege that they sought a PLA from Plaintiffs, but with the general contractor that would perform the construction work. But Plaintiffs allege that Mr. Lemmon indicated that Building Trades would oppose the Bahia redevelopment as well as other developments unless Plaintiffs "agree[] to a PLA requiring the use of union workers for its upcoming construction developments and future maintenance work." 4-ER-688 (also alleging that "Mr. Lemmon has

demanded the PLA as a condition for Evans Hotels to 'go forward with your project' and put the pin back in the 'grenade'").  At the pleading stage, those allegations are more than enough.

Moreover, even if, as Defendants argue, these allegations are "implausible" because only a PLA with a construction-industry employer would be enforceable, that is merely an admission that Defendants have further violated §8(b)(4)(ii)(B).  Because they cannot enter into a PLA with Plaintiffs directly, they are threatening Plaintiffs with substantial economic harm unless they hire a contractor that will enter into a PLA with Building Trades and not a nonunion contractor. Defendants are therefore exerting pressure on a secondary employer "to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees. . . ."  29 U.S.C. § 158(b)(4)(ii)(B).

Thus, Plaintiffs allege facts that establish Defendants violated §8(b)(4)(ii) by using threats and coercion against them as part of their effort to obtain a PLA.

## II.  *Noerr-Pennington* Does Not Bar Plaintiffs' Claims.

### A.  The *Noerr-Pennington* Issue Should Not Be Decided on a Motion to Dismiss.

This Court has cautioned that whether petitioning activity is "sham" or genuine petitioning activity is a question of fact.  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982).  Thus, where, as here, the complaint alleges facts capable of establishing sham petitioning, the issue should not be decided at the pleading stage, because doing so would require deciding issues of fact.  AOB 36-37 (citing cases).

Defendants' cases involve complaints that lacked sufficient factual allegations to trigger a sham exception or admitted facts that defeated a sham petitioning claim.  *See, e.g.*, *Kottle*, 146 F.3d at 1062-63 (defendant's conduct could not be objectively baseless for individual sham petitioning because defendant obtained relief sought); *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1095 (9th Cir. 2000) (complaint foreclosed individual sham claim because the plaintiff's harm from county's failure to lease space was caused by the "outcome of the process," not abuse of the publicity/lobbying process); *Empress LLC v. City & Cnty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005)

(no allegation that harm resulted from abuse of government processes rather than their outcome); *Harbor Performance Enhancement Ctr., LLC v. City of Los Angeles Harbor Dep't*, No. 21-55416, 2022 WL 1239055, at *2 (9th Cir. Apr. 27, 2022) (plaintiff only alleged "non-concrete statements directed at government officials that did not indicate that any imminent actions would be taken[.]"); *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 538-39 (9th Cir. 2022) (plaintiff did not plausibly allege that a law firm's action was objectively baseless for individual sham and admitted that allegedly serial sham litigation had been successful).[3]  In each of those cases, the plaintiffs failed to sufficiently allege sham petitioning.

---

[3] In *B&G Foods*, this Court held the district court erred in denying leave to amend to allege that the defendants knew facts that might render their claims objectively baseless for individual sham and additional facts for serial sham regarding their lack of success, including that they never pursued most threatened claims and that "only a fraction of their threatened suits succeeded[.]"  29 F.4th at 541-42.  On remand, the district court held that plaintiff sufficiently pleaded that the defendants' litigation was sham.  *B&G Foods N. Am., Inc. v. Embry*, No. 2:20-CV-00526-KJM-DB, 2023 WL 3751991, at *4-7 (E.D. Cal. June 1, 2023).

Here, by contrast, the TAC plausibly alleges serial and individual sham petitioning. The TAC details hundreds of land-use and environmental objections in roughly twenty administrative challenges, five writ petitions, and multiple appeals without ever obtaining the substantive relief they purportedly sought. 3-ER-616-4-ER-648; 4-ER-654, 659-662, 670, 680-683. Once Defendants obtain their true objective, they drop their opposition and support the project they just opposed. 3-ER-607, 622, 627-628, 633; 4-ER-645-646, 654-655, 681. Defendants implemented their "playbook" against Plaintiffs' projects, delaying them with objections they knew were baseless unless Plaintiffs agreed to unionize. 4-ER-649-669. These facts sufficiently allege sham petitioning.[4]

---

[4] Defendants cite *Kottle* to argue *Noerr-Pennington* should be decided at the pleading stage to avoid chilling First Amendment speech. But *Kottle* applied a judicially crafted, heightened pleading standard, which does not survive *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512, 515 (2002) (rejecting any judicially created heightened pleading standards). AOB 39 n.4. Defendants defend the district court's use of a heightened pleading standard, claiming a conflict exists in this Circuit. X-AOB 12 & n.5 (citing *Kearney v. Foley & Lardner*, 590 F.3d 638 (9th Cir. 2009)). *Kearney*, however, erroneously followed *Kottle* but never discusses *Swierkiewicz*. Nor did it address this Court's earlier decision in

*(footnote continues on following page)*

Despite these detailed factual allegations, Judge Huie improperly decided issues of fact against Plaintiffs by refusing to accept allegations: (1) that Defendants filed their objections against the Bahia redevelopment "without regard to merit"; (2) that Defendants were not seeking official action by a government body, but instead were trying to delay approval until Plaintiffs gave in to Defendants' demands; (3) that Defendants' challenges of other hotel projects in the Relevant Market were not successful; and (4) that Defendants' threats of future opposition to SeaWorld were not being used as an anticompetitive weapon. 1-ER-24-30.

On appeal, Defendants ask this Court to repeat Judge Huie's error but, reviewing a motion to dismiss, this Court must draw reasonable inferences in Plaintiffs' favor and should hold it cannot decide *Noerr-*

---

*Empress LLC*, 419 F.3d at 1056, which squarely held that, under *Swierkiewicz*, no heightened pleading standard is required in *Noerr-Pennington* cases. This Court should follow the earlier decision in *Empress*. Charles A. Wright, et al., 13 Fed. Prac. & Proc. Juris. § 3506 (3d ed.) (if authorities conflict within a circuit, "the better rule is the earliest decision will be treated as precedential"); *United States v. Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (panel cannot issue opinion conflicting with decision of earlier panel but may only call for en banc review).

*Pennington* at this stage. *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."). Because Plaintiffs plausibly allege sham petitioning, the Court should not apply *Noerr-Pennington* to their non-labor claims at the pleading stage.

### B. In Any Event, Defendants' Threats to SeaWorld and Plaintiffs Are Outside *Noerr-Pennington.*

Defendants attempt to defend their threats to SeaWorld by arguing that they are protected "vague threats of future lobbying." X-AOB 27-28. This is an oversimplification and misapplies cases holding that *Noerr-Pennington* extends to conduct "incidental" to direct petitioning.

Defendants' threats that they would drum up negative publicity on subjects like animal cruelty (4-ER-661-662) unless SeaWorld cut ties with Plaintiffs are not incidental to any petitioning. Defendants do not

point to any existing or future lawsuit or issue before any government body to which their publicity campaigns would be incidental.

The same is true of their threats to block approval of SeaWorld's future projects. They were not incidental to petitioning because there was no existing or imminent government action to influence. 4-ER-661-662.

Defendants even concede the statements "allud[e] to a hypothetical future lawsuit, which may or may not be legally viable." X-AOB 28. That readily distinguishes the allegations here from a pre-litigation demand letter. X-AOB 26 (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006)). As *Sosa* recognized, incidental conduct must be "sufficiently related" to petitioning to fall within *Noerr-Pennington*. *Sosa*, 437 F.3d at 935. Threatening to oppose future projects, without knowing what those projects are or if there is any basis to oppose them is not "incidental" to any actual petitioning.[5]

---

[5] Defendants wrongly rely on *United States v. Koziol*, 993 F.3d 1160 (9th Cir. 2021), and *Brown & Root* for the proposition that threats of future petitioning are protected. In *Koziol*, letters threatening to bring a lawsuit that was never filed were unprotected by *Noerr-Pennington*. 993 F.3d at 1171-72. *Brown & Root* never decided if *Noerr-Pennington* protected the defendants' conduct because it held the union did nothing coercive. 10 F.3d at 326-27.

The threats made directly to Plaintiffs—likening Defendants'
conduct to a "'grenade with the pin out on the table'" and the threat to
"'stop at nothing'" unless Plaintiffs agreed to their demands (4-ER-666-
667)—were not incidental to petitioning.  As Plaintiffs allege, those
threats were made shortly after Defendants destroyed the SeaWorld
joint venture.  Given that context, and Plaintiffs' historical experience
with Defendants (4-ER-648-649, 666-667), Plaintiffs reasonably
understood that Defendants' threatened conduct would not be limited to
lawful petitioning (4-ER-666-667).

Moreover, Plaintiffs reasonably understood Defendants' threats to
mean that Defendants intended to engage in activity that did not
involve petitioning.  4-ER-667 (alleging Defendants understood the
threats to include future "pickets, corporate campaigns, and other
unlawful means against [Plaintiff] Evans Hotels and its clients unless
Evans Hotels conceded to the unions' demands").  Giving inferences
favorable to Plaintiffs, this Court should not hold at this pleading stage
that Defendants' threats of future action against SeaWorld and
Plaintiffs would be limited to petitioning or conduct incidental thereto.
Therefore, those threats are not protected by *Noerr-Pennington*.

Accordingly, Plaintiffs adequately allege conduct that does not fall within *Noerr-Pennington*—the threats made to SeaWorld and the threats made to Plaintiffs.

## C. Defendants' Unlawful Communications Are Not Protected by *Noerr-Pennington.*

*Noerr-Pennington* protects "legitimate effort[s] to influence government[.]" *Clipper Exxpress*, 690 F.2d at 1255. It does not extend to communications that violate state and local laws or are "an integral part of conduct which violates a valid statute." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) ("*Cal. Motor*") ("First Amendment rights are not immunized from regulation *when they are used as an integral part of conduct which violates a valid statute.*") (emphasis added); *see also Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Loc. No. 150*, 440 F.2d 1096, 1099 (9th Cir. 1971) ("the doctrines of Noerr and Pennington were [not] intended to protect those who employ illegal means to influence their representatives in government"), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012); *see also* AOB 44-45.

Defendants ignore this authority.  Instead, they argue their communications are protected because there is no "corruption or deceit" exception to *Noerr-Pennington*.  X-AOB 23 (citing, *e.g.*, *Omni*, 499 U.S. at 382, and *Empress*, 419 F.3d at 1057).[6]  But Plaintiffs do not allege that Defendants' communications are unprotected because they involved corruption and deceit.  They are unprotected because they violated, or caused others to violate, state and local laws.  This is particularly true because the communications violated laws designed to ensure legitimate lobbying.

These are not mere "technical" violations.  The Brown Act and the restriction on ex parte communications with the Coastal Commission force communications to occur in public.  The lobbyist disclosure laws guarantee the public knows who is communicating with government officials.  The requirements of these laws are particularly relevant because the San Diego City Attorney has found that neither the City

---

[6] Defendants' out-of-circuit authority is also distinguishable.  *Mercatus Group, LLC v. Lake Forest Hospital*, 641 F.3d 834, 845 (7th Cir. 2011), did not address conduct that was unlawful.  Likewise, *U.S. General, Inc. v. Draper City*, No. 2:06CV488, 2007 WL 527771, at *5 (D. Utah Feb. 14, 2007), merely rejected a "conspiracy" exception to *Noerr-Pennington*.

Council nor the Mayor can condition approval of a development on agreeing to a card check neutrality agreement.[7]  4-ER-653.  Yet that is what Defendants sought from the City Council and Mayor.[8]  Defendants had to do that in secret, because they could not ask the City Council or Mayor to impose that unlawful condition in public meetings.  Such unlawful, secret demands would be prevented by public disclosures and open meetings—as the law demands.

Defendants' interpretation of *Noerr-Pennington* to protect such communications would effectively nullify these laws.  Under Defendants' theory, the Brown Act, lobbyist disclosure requirements, and restrictions on ex parte communications with the Coastal

---

[7] Defendants attempt to dismiss the City Attorney memo on the grounds that "the City had no financial investment" in the development discussed in the memo.  X-AOB 17-18.  In fact, as the memo states, "the City owns the Site" of the development.  8-ER-2046.

[8] Defendants also misconstrue Plaintiffs' allegations about the veto agreement with the Mayor.  X-AOB 25 n.12.  Plaintiffs do not maintain that that agreement is independently unlawful or part of a "conspiracy." It gave Defendants the power to prevent votes on developments they oppose.  *See, e.g.*, *Cal. Motor*, 404 U.S. at 511-12 (serial sham conduct can bar opponents "from meaningful access to adjudicatory tribunals" and, thus, "usurp that decisionmaking process").  This is sham petitioning.

Commission (Cal. Pub. Res. Code § 30324) would be unconstitutional because they restrict petitioning. So too would prohibitions on ex parte communications with courts. 28 C.F.R. § 76.15. That plainly is not the law.

Defendants also argue their actions are protected because, in some instances, council members technically violated the statutes rather than Defendants. X-AOB 23-24. As the AOB established (at 44), *Cal. Motor*, which Defendants ignore, precludes such unlawful communications from receiving *Noerr-Pennington* protection. Here, even if Defendants are not subject to prosecution, their threats were an integral part of the violations of the Brown Act and open meeting laws. 3-ER-589-590, 592, 608-609. Conduct violating laws that ensure fair and transparent lobbying is not legitimate lobbying and is not protected by *Noerr-Pennington*.

**D.    Plaintiffs Sufficiently Allege Serial Sham Petitioning.**

    1.    *There is no basis for holding that lobbying can never constitute serial sham petitioning.*

Serial sham is established by showing systemic actions (lobbying or litigation) in which (1) the party pursues reflexive actions regardless

of merit that, rarely, if ever, result in the relief they purportedly seek

*and* (2) its actions are brought for an improper purpose, in this case, to

use the process to harm Plaintiffs. *Cal. Motor*, 404 U.S. at 511; *USS-*

*POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*,

31 F.3d 800, 810-11 (9th Cir. 1994).

Plaintiffs allege both elements. For more than 10 years,

Defendants' "playbook" has weaponized "costly, distracting, and time-

consuming" government proceedings not to obtain genuine relief on

land-use and environmental grounds, but to force hotel developers to

cave to Defendants' unionization demands. 3-ER-607-4-ER-669. That

is precisely the type of serial sham conduct that *Noerr-Pennington* does

not protect.

Relying on authority pertaining to the individual sham exception,

Defendants maintain that their "lobbying" activities are not serial

sham, because their objections cannot be found to be "objectively

baseless." X-AOB 14-15. They argue that communications with a body

like the City Council can almost never be sham petitioning. *Ibid.*

(claiming it is "virtually impossible" for such communications to be

sham). But the Supreme Court has recognized that lobbying can be

sham. *Omni*, 499 U.S. at 381 ("lobbying activity" will be a "sham" if defendant achieves delay "only by the lobbying process itself, and not by the governmental action that the lobbying seeks"); *Noerr*, 365 U.S. at 129, 144 (although railroad's lobbying for "the adoption and retention of laws and law enforcement practices destructive of the trucking business" was protected, Court recognized "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham" to cover anticompetitive actions "and the application of the Sherman Act would be justified").

Defendants' argument rests on an erroneous premise—that the serial sham exception requires the seriatim petitions be objectively baseless. But the tests for single and serial sham are different. *USS-POSCO*, 31 F.3d at 810-11 (Supreme Court's tests for sham petitioning in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE*"), and *Cal. Motor* "apply[ ] to different situations"). In serial sham cases, "the question is not whether any [single action] has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for [an

improper] purpose[.]" *USS-POSCO*, 31 F.3d at 811 (serial sham exists when objections are "part of a pattern or practice of successive filings undertaken essentially for purposes of harassment" and will not be defeated if some objections "turn out not to be frivolous"). The volume and lack of success establishes the serial actions are baseless, not their objective merits.

Because objectively baseless is not the test for serial sham, there is no reason why a pattern of lobbying cannot be serial sham petitioning. Defendants argue that lobbying can almost never be sham, relying on *Kottle*'s language that "it would seem quite pointless to ask whether the lobbying effort was 'objectively baseless.'" *Kottle*, 146 F.3d at 1061. That reasoning does not apply to serial sham lobbying where the court need only decide if the serial lobbying is done reflexively without regard for the merits of the objections and for an improper purpose. In any event, *Kottle*'s holding is *dicta* because it did not involve a serial sham allegation.[9] *Id.*

---

[9] The same is true of the other cases Defendants cite (X-AOB 14, 15) regarding their claim the sham exception does not apply to lobbying. *(footnote continues on following page)*

Defendants also do not address how their arguments can be reconciled with the fact that the serial sham exception's purpose—to prevent conduct abusing the processes of government—applies to lobbying just as much as litigation. AOB 65-66 (citing *Cal. Motor*, 404 U.S. at 511, 515); *see also Omni*, 499 U.S. at 381 (discussing how abuse of lobbying process would be sham).

Defendants also contend that Plaintiffs are trying to make the serial sham exception "purely *subjective*."[10] X-AOB 32. They are wrong. Defendants' pattern of reflexive objections and lack of success on their environmental and land-use challenges are objective measures of serial sham. AOB 62-63 (demonstrating how Defendants' purportedly

_____

*Manistee*, 227 F.3d at 1094-95 (single sham case alleging defendants opposed plaintiff's efforts to lease space in mall); *U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955, 965 (7th Cir. 2020) ("Defendants here did not bring multiple lawsuits or petition across various legislative and administrative fronts.").

[10] Defendants cite *PRE* to support their argument. X-AOB 32. *PRE* cites *Omni* (a lobbying case) to support the point subjective intent alone cannot trigger the sham exception. While *Omni* did find that intent alone was insufficient when the party genuinely sought the governmental action for which it lobbied, it also explained in the same paragraph that subjective intent plus abuse of the lobbying *process* is sham lobbying. *Omni*, 499 U.S. at 381-82.

successful litigations obtained only "minor wins based on technicalities" and their settlements "did not address the environmental or land use issues that Defendants raised"). That Defendants abandon the land-use and environmental concerns they raised once they obtain neutrality agreements and PLAs (AOB 63) also can be evaluated objectively. As *Koziol* recognized, such an incongruity between the claims and the settlements "would be probative evidence of sham litigation[.]" 993 F.3d at 1172 n.12.

Defendants also suggest that language referring to "baseless" serial filings in the context of serial sham is coextensive with the "objectively baseless" requirement in individual sham cases. X-AOB 33. This Court has firmly repudiated that argument. *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017) ("In the context of a series of alleged sham proceedings . . . the legal success of an occasional sham suit is irrelevant."); *USS-POSCO*, 31 F.3d at 811 ("the fact that a small number in the series of lawsuits turn out not to be frivolous will not be fatal to a claim under *California Motor Transport*; even a broken clock is right twice a day").

Defendants also maintain that their settlements of past disputes with hotel developers must be considered "successes" under *USS-POSCO*.[11] X-AOB 37. Under their theory, a court cannot look beyond the existence of a settlement to determine if the relief obtained is incongruous with the relief sought. That makes no sense and cannot be reconciled with *Koziol*, 993 F.3d at 1172 n.12.

Defendants' settlements demonstrate their systemic abuse of government process to force developers to accede to Defendants' demands for neutrality agreements and PLAs, because they include only token remedies for their land-use and environmental claims. *E.g.*, 3-ER-614 (Convention Center settlement addressed only "three cosmetic remedial actions during the construction phase" and none of the issues raised in the first 41 pages of their initial objections); 3-ER-629-630 (alleging that Defendants abandoned land-use and environmental objections once they received a neutrality agreement and PLA). Thus,

---

[11] Defendants' cases are not on point. *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1007-08 (9th Cir. 2008), applies the individual sham test from *PRE*. *Sanders v. Brown*, 504 F.3d 903, 913 (9th Cir. 2007), contains no analysis of the sham exception.

Defendants' settlements are not successes.  At minimum, they raise a question of fact.  Section II.A., above.  Under *USS-POSCO* and *Int'l Longshore*, Plaintiffs sufficiently allege a pattern of unsuccessful reflexive opposition to hotel developments.

> ## 2. *Even if the adjudicatory/legislative distinction applies to serial sham petitioning, Plaintiffs sufficiently allege this case is adjudicatory.*

Defendants rely heavily on *Kottle*, which, in an individual sham case, distinguishes between the narrow sham exception for communications to a "legislative" body and the sham exception for communications to a quasi-judicial, "adjudicative" body.  X-AOB 13-14; *see also Kottle*, 146 F.3d at 1061.  Even if the *Kottle* distinction applies in serial sham cases (which it should not), Plaintiffs sufficiently allege that the City Council, in voting on the Bahia lease amendment, as well as most of the other bodies deciding Defendants' challenges, acted in an adjudicatory role.  3-ER-616-632; 4-ER-638-642, 649, 679-680; *see also* AOB 68-69 (distinguishing between legislative acts such as approving a general plan and enacting zoning laws and adjudicative acts of approving individual projects within the scope of an existing plan).

The City made legislative decisions regarding the use of the land when it adopted the Mission Bay Master Plan Update ("MBMPU"). However, like granting a conditional use permit or approving a variance, the lease amendment is an adjudicative act.[12]  AOB 67-69 (citing cases); *e.g.*, *San Bruno Comm. for Econ. Justice v. City of San Bruno*, 15 Cal. App. 5th 524, 534-36 (2017) (contract to sell city property to a developer was adjudicative because it complied with existing general plan, and city approval of the sale contained no amendments to the plan, no new legislation, and no other legislative action).

The City's consideration of the Bahia lease amendment will involve public hearings, written and oral arguments, representation and arguments by counsel, and, if challenged, judicial review.  4-ER-680.  Those are hallmarks of an adjudicatory decision.  *Kottle*, 146 F.3d at 1062 (emphasizing that in adjudicative decision, government "conducts public hearings, accepts written and oral arguments, permits representation by counsel, [] allows affected persons to question

_____

[12] The same is true of most other developments Defendants have opposed.  3-ER-618, 619, 622, 626, 628.

witnesses[,]" issues findings, and its decision is subject to judicial review). Defendants' challenges to other hotel developments, many of which were pursued through administrative hearings and litigation, also involve adjudicatory proceedings. 3-ER-616-632; 4-ER-638-642.

Defendants dismiss the California cases cited in the AOB (at 68-69), arguing they discuss "adjudicative" acts when determining if the acts are subject to initiative or referendum. X-AOB 22. But the reason for that distinction is that referenda seek to overturn political decisions, while adjudicative decisions may be reviewed by courts. And while Defendants argue "legislative" under federal law is anything that involves political discretion (X-AOB 22), California similarly defines "legislative" acts as "political in nature." *San Bruno*, 15 Cal. App. 5th at 534.

3. *Defendants' actions toward other developers are relevant to the serial sham analysis.*

Defendants also argue that their actions against other hotel developers cannot be considered part of their pattern of baseless actions. X-AOB 35-36. But the Supreme Court has applied the serial sham exception when a pattern of conduct is directed at unrelated parties. *Otter Tail*, 410 U.S. at 370-72 (holding serial sham exception

may be met in an antitrust claim against a power company based on its actions against 12 different towns, some of which involved litigation and some of which did not); *Trucking Unlimited v. Cal. Motor Transp. Co.*, 432 F.2d 755, 762 (9th Cir. 1970) (identifying parties as one group of trucking companies against all smaller competitors, not a single victim), *aff'd*, *Cal. Motor*, 404 U.S. 508.

Defendants' cases do not support them. In *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531 (9th Cir. 1991), an environmental group sued to enjoin bidding on a timber contract. The counter-claimant argued that *Noerr-Pennington* did not apply because the environmental group had filed 216 administrative appeals that were "a pattern of baseless suits." However, the court affirmed dismissal of the counter-complaint because it did not sufficiently allege facts showing how the pending lawsuit "fits into that pattern." 944 F.2d at 535. That is not an issue here, because Plaintiffs allege Defendants' actions toward them is consistent with their demonstrated pattern of challenging every hotel development in the Relevant Market. 4-ER-648, 682.

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291-92 (Fed. Cir. 2010), also does not support Defendants. There, in assessing serial sham allegations, the court declined to consider certain proceedings, but offered no details about those proceedings, let alone if they were similar to any alleged pattern of sham conduct. In any event, this out-of-circuit case cannot override Supreme Court authority applying the serial sham exception based on conduct toward multiple parties. *Otter Tail*, 410 U.S. at 371-72; *Cal. Motor*, 432 F.2d at 762.

### E.   Plaintiffs Also Sufficiently Allege Individual Sham Petitioning.

Defendants suggest that lobbying can never be individual sham petitioning, but the Supreme Court has analyzed this on multiple occasions and has never held lobbying absolutely immune from liability. Indeed, its original example of sham petitioning involved lobbying. *Noerr*, 365 U.S. at 142-44 (discussing lobbying "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor"); *see also Omni*, 499 U.S. at 380

(holding sham lobbying occurs where defendants use the process as an anti-competitive weapon).

Defendants argue sham lobbying is "virtually impossible" to establish because it cannot be measured against an objective standard—"objectively baseless" or "frivolous" (X-AOB 14-15)—but that is why sham lobbying cases focus on whether defendants abused "the lobbying process itself." *Omni*, 499 U.S. at 381. There is no reason that cannot be evaluated under an objective standard in a sham lobbying case.

Consistent with that, even in post-*PRE* decisions, district courts have repeatedly applied the sham exception to lobbying. *See, e.g.*, *Prime Healthcare Servs., Inc. v. Servs. Emps. Int'l Union*, 97 F. Supp. 3d 1169, 1198 (S.D. Cal. 2015) (applying sham exception where lobbying was coercive and not well-founded—as here—without analyzing whether lobbying was objectively baseless); *Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 593 F. Supp. 2d 840, 844 (E.D. Va. 2008) (*Noerr-Pennington* does not apply where allegations

showed conduct before municipality was "committed with the intention of harassing" the plaintiff).[13]

Here, Plaintiffs allege that Defendants abused the lobbying process. Defendants know Plaintiffs must obtain government approval for the Bahia redevelopment. 4-ER-649-651. Defendants used their *de facto* control of governmental entities and sham lobbying to prevent the projects from going forward unless Plaintiffs agreed to card check neutrality and a PLA. 4-ER-649-669. Defendants told Plaintiffs their projects would be doomed without Defendants' support and that they would hold up the projects by any means, which included pulling challenges out of "thin air" until Plaintiffs acquiesced. 4-ER-654-655, 659, 666-667, 670.

Defendants have no interest in procuring relief for the environmental or land-use issues they raise in their objections; if

---

[13] See also *Cal. Int'l Chem. Co. v. Neptune Pool Serv., Inc.*, 770 F. Supp. 1530, 1534 (M.D. Fla. 1991); *O'Leary v. Purcell Co.*, No. C-83-691-R, 1984 WL 1148, at *9 (M.D.N.C. June 11, 1984); and *Cent. Telecomms., Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 722-25 (8th Cir. 1986). All apply the sham exception to lobbying without analyzing objective baselessness.

Plaintiffs agree to card check neutrality and a PLA, Defendants will drop their challenges and fully support the projects. 4-ER-678, 680-682. This epitomizes using the governmental process—as opposed to the outcome—as an anticompetitive weapon. It therefore is not surprising that Judges Robinson and Lopez both agreed that Defendants' actions were sham petitioning "'intended only to delay [Plaintiffs], not to influence government action.'" 4-ER-776 (quoting *Clipper Exxpress*, 690 F.2d at 1253); 4-ER-705.

Defendants attempt to characterize their conduct as legitimate "lobbying" (X-AOB 15-16), but that just improperly disputes Plaintiffs' allegations. For instance, Defendants cite their claims that the MBMPU requires retaining Gleason Road (X-AOB 15-16) but ignore Plaintiffs' allegation that Defendants "knew or had reason to know that the retention of Gleason Road was not a part of the MBMPU" and have continued to make that false claim despite the City and two advisory

boards stating it is not a requirement of the MBMPU.[14]  4-ER-650-651.

At this stage, the Court must accept Plaintiff's allegations as true.

Similarly, Defendants argue that their "lobbying" sought

government action (X-AOB 18-19), despite Plaintiffs' allegations that

they abused the process to ensure *inaction* by blocking the Bahia

redevelopment.  4-ER-680-681.  Supporting their point, Plaintiffs allege

that Defendants do not actually want to block the project (*i.e.*, the

government action for which they lobby); Defendants want it to go

forward once they secure a neutrality agreement and PLA.  4-ER-680-

681.  Again, at this stage, the Court cannot resolve disputed facts.

It does not help Defendants to claim they "successfully" blocked

the City Council from considering the Bahia lease amendment.  X-AOB

21.  That is just an admission that they are abusing the government

process.  Their goal is not to block the Bahia redevelopment.

---

[14] Defendants urge this Court to ignore the ruling of the California Superior Court, which confirmed that the MBMPU never required retention of the Gleason Road.  X-AOB 16-17; RJN, Exh. B at 12-17. Their argument that Plaintiffs waived reliance on the decision (X-AOB 16 n.8) should be rejected; the decision issued in February 2023, months after briefing on the motion to dismiss had been completed.

Defendants told Plaintiffs they "'can go forward with [the] project'" if they agree to a neutrality agreement and PLA. 4-ER-665-667; *see also* 4-ER-654-655 (Defendants threatened to "hold [] up" the project unless Plaintiffs unionized). Blocking the City's vote is abuse of the process.

These facts render Defendants' reliance on *Manistee* misplaced. X-AOB 20-21. In *Manistee*, the defendants—a city and government officials—opposed the plaintiff's attempts to lease space in a mall to certain tenants. They encouraged residents to lobby the city to oppose the lease. As a result of their actions, the lease negotiations fell through. The outcome of the process—that the property was not leased—was precisely the defendants' goal. *Manistee*, 227 F.3d at 1095. The *Manistee* defendants were not using the process to injure the plaintiff as Defendants are doing here.

Defendants also rely on *Omni's* and *Boone*'s statements that *Noerr-Pennington* protects deceptive statements. X-AOB 17. That *Noerr-Pennington* may apply to such statements in the first instance does not mean they cannot fall within the sham exemption. *See, e.g.*, *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894-96 (9th Cir. 1988) (after acknowledging that deceptive lobbying

statements can be protected, stating "[t]hat the complained about conduct is the type protected by the *Noerr-Pennington* rule does not end the dispute," analyzing the sham exception, and holding that the developers did not allege that defendants were "not genuinely seeking official action"). Here, the fact that Defendants knew their statements were false, made them up out of "thin air," and admitted they would abandon their opposition if Plaintiffs agreed to a neutrality agreement and PLA means Defendants' objections to the Bahia redevelopment were individual sham lobbying.

## III. The Court Should Remand The Monopolization Claims To Be Decided On Their Merits.

### A. Plaintiffs Have Not Waived Their Sherman Act §2 Claims.

The AOB did not address the district court's 2021 order dismissing the antitrust claims in the SAC. The district court did not rule on the §2 claim in the TAC, which is the operative pleading. Defendants cite no rule—and Plaintiffs are aware of none—that require Plaintiffs to appeal a ruling on a superseded pleading when the amended pleading contains allegations that cure the prior defects.

Moreover, because Judge Huie never considered the merits of the antitrust claims—having rejected them solely on *Noerr-Pennington* grounds—this Court should decline to consider alternate grounds for dismissal in the first instance. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1273 (9th Cir. 2022) (where district court did not address defendant's alternate ground for dismissal, "we decline to do so in the first instance" and "leave it to the district court to consider on remand").

## B. If This Court Considers the Alternate Grounds for Deciding the Sherman Act §2 Claim, Plaintiffs Sufficiently Allege It.

Attempted monopolization requires: (1) a specific intent to control prices or destroy competition; (2) anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) antitrust injury. *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949-50 (9th Cir. 1996).

Defendants use their power to destroy competition and control prices in the Relevant Market by preventing entry or expansion of non-union hotels so Defendants can unionize "each and every hotel in San Diego" and make union labor the norm. 3-ER-591-592; 4-ER-666-667,

675-676.  Plaintiffs allege several instances of anticompetitive conduct Defendants used to accomplish monopolization, including unlawful secondary boycotts, sham lobbying, and sham litigation.  3-ER-612-634; 4-ER-637-669.

Plaintiffs allege there is a dangerous probability Defendants will monopolize the Relevant Market, explaining Defendants "own" a majority of the City Council and have forced at least 75% of proposed construction projects in the Relevant Market to unionize or terminate over the last 15 years.  3-ER-370; 4-ER-673-676, 682, 689-690.  As this continues, Defendants' control of the Relevant Market will grow.  4-ER-666-668.  Finally, as discussed below, Plaintiffs allege antitrust injury.  4-ER-675-676.

Conspiracy to monopolize requires "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  Plaintiffs allege Defendants conspired to monopolize the Relevant Market and allege several overt acts taken in furtherance of that conspiracy.  4-ER-669-671.  Plaintiffs allege that

Defendants had a specific intent to monopolize the Relevant Market, providing examples of them blocking entry and expansion by non-union hotels and their admissions that their plan is to unionize "each and every hotel in San Diego" and make unionization the norm. 3-ER-591-592, 3-ER-612-4-ER-669; 4-ER-675-676.

On appeal, Defendants do not challenge most elements for either claim. They instead maintain: (1) Plaintiffs do not allege monopolization or market domination; (2) Plaintiffs do not have antitrust standing; and (3) Defendants' conduct is protected by the labor exemption to antitrust. Defendants are wrong.

### 1. *Plaintiffs adequately plead market power.*

Plaintiffs need not show market power for the conspiracy to monopolize claim. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) (market power need not be alleged "in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken"). But even if it were required, Plaintiffs sufficiently allege market power for both the attempted monopolization and conspiracy to monopolize claims.

Market power can be pled in two ways: (a) directly by showing defendants can restrict competition through things like restricting output and controlling prices, or (b) indirectly by alleging defendants control a large portion of a relevant market with significant barriers to entry and expansion. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Whether a defendant has market power is a question of fact ill-suited for resolution at the pleading stage. *Clean Conversion Techs., Inc. v. CleanTech Biofuels, Inc.*, No. 12-CV-239-L JMA, 2012 WL 3585171, at *4 (S.D. Cal. Aug. 20, 2012).

Plaintiffs plead market power directly. They allege that, through Defendants' control of government entities and use of their "playbook," Defendants restrict output and control prices by preventing new hotel projects in the Relevant Market and forcing hotels to use union labor. 3-ER-666-667, 673-674, 676. Plaintiffs identify several examples of Defendants exercising this control, which they could not do without market power. 3-ER-612-4-ER-648.

Plaintiffs also plead market power indirectly. Plaintiffs allege that Defendants control at least 75% of the Relevant Market. 4-ER-673-674, 691. Plaintiffs also allege Defendants have erected

insurmountable barriers to entry and expansion through their role as gatekeeper for project approvals in the Relevant Market. 4-ER-673-674. This pleads market power indirectly. *Rebel*, 51 F.3d at 1438.

Defendants maintain that §2 does not apply because their actions affect more than a single hotel operator. But the Supreme Court has long recognized that a union can violate §2 by excluding numerous nonunion businesses in a relevant market. *Allen Bradley*, 325 U.S. at 799-800. There, a union "waged aggressive campaigns to obtain closed shop agreements with all local electrical equipment manufacturers and contractors," by which they obtained a complete monopoly on electrical equipment manufacturing in New York. *Id.* "Quite obviously, this combination of business men has violated both Sections (1) and (2) of the Sherman Act." *Id.* at 800; *see also id.* at 811 (Congress "intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the Act.").

The Supreme Court has upheld actions against unions alleging violations of §2 where the union has attempted to drive non-union or smaller businesses out of a market. *Connell*, 421 U.S. at 622-24

(recognizing that unions can violate the Sherman Act §1 and §2 by "control[ing] access to the market"); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 665-66 (1965) ("One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy."). Defendants' suggestion that there is no monopoly or market domination because their agreements are with multiple hotels cannot be reconciled with this controlling precedent. Plaintiffs sufficiently allege market power.

### 2. *Plaintiffs adequately plead antitrust injury.*

To plead antitrust injury, Plaintiffs must show: "'(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021).

Plaintiffs allege Defendants engaged in illegal sham petitioning and secondary boycotts that prevented Plaintiffs from redeveloping the Bahia and constructing a SeaWorld hotel, costing Plaintiffs "more than $100 million in business injuries and/or loss of property." 4-ER-649-

669, 676-677.  Plaintiffs allege Defendants injured Plaintiffs by preventing their projects from progressing in the Relevant Market and such conduct violates antitrust laws precisely because it constrains supply below competitive levels.  4-ER-675-677; *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 173-74 (3d Cir. 2015) (injury caused by sham litigation that prevented development constituted antitrust injury); *City of Oakland*, 20 F.4th at 457 (prong satisfied where injuries flow from "limiting output below levels dictated by consumer demand").

Finally, Plaintiffs allege the type of injuries that antitrust laws seek to prevent.  Defendants harm competition by preventing or delaying large hotel projects in the Relevant Market, which reduces supply, increases prices, lowers quality, and restricts consumer choices.  4-ER-675-676.  These are prototypical antitrust injuries.  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) (higher prices from less competition "is assuredly one type of injury for which [antitrust laws] potentially offer[] redress"); *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("it is difficult to image a more typical example of anti-competitive effect than higher prices").

Defendants argue Plaintiffs cannot allege antitrust injury because the parties do not participate in the same market. X-AOB 52-56. Plaintiffs allege that the parties not only participate in the Relevant Market, but also provide necessary inputs for it: Plaintiffs operate hotels and purchase labor (like that supplied by Defendants) in the Relevant Market and Defendants provide the construction labor necessary for the market to exist and service labor necessary for it to function. 3-ER-594-597; 4-ER-672. Plaintiffs further allege that Defendants participate in the Relevant Market by dictating entry and expansion. 4-ER-669, 673, 675-676.

The Supreme Court has also made clear parties need not participate in the same market if plaintiffs' injuries are "inextricably intertwined with the injury the conspirators sought to inflict." *McCready*, 457 U.S. at 484. In *McCready*, the Supreme Court found plaintiffs had standing despite not participating in the relevant market because their injury: (1) was the means by which the defendant achieved its illegal ends; (2) was the predictable result of the unlawful conduct; (3) was "inextricably intertwined with the injury the

conspirators sought to inflict"; and (4) was the type Congress sought to redress. *Id.* at 472-85.

Requiring unions to be competitors of a plaintiff also would be inconsistent with other Supreme Court cases recognizing unions can violate §2. *E.g.*, *Connell*, 421 U.S. at 622-24; *Pennington*, 381 U.S. at 665-66; *Allen Bradley*, 325 U.S. at 799-800.

Thus, this Court has applied *McCready* to find antitrust injury where parties do not participate in the same market. *Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 236 (9th Cir. 2020) (antitrust injury where plaintiff was not in same market as defendant because injuries were "'means by which it [was] alleged that [Defendants] sought to achieve its illegal ends'") (quoting *McCready*, 457 U.S. at 484 n.21).

Defendants' reliance on *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987), is misplaced. *Eagle* involved whether a union and its members had standing to challenge conduct that reduced the price of tuna where they did not sell tuna and were only indirectly harmed through lower wages tethered to the price of tuna. *Id.* at 541-42. The members lacked standing because their injuries were too remote and

not the type antitrust laws were intended to prevent. *Id.* at 540-42.

Instead, the tuna sellers were the appropriate parties to sue because

they were directly injured. *Id.* No similar issues exist here:

Defendants directly injured Plaintiffs, Plaintiffs allege conventional

antitrust injuries, and Plaintiffs are the appropriate party to bring suit.

Defendants also contend that Plaintiffs' allegations concerning

harm to competition and consumers are conclusory and implausible.

Defendants are wrong. The TAC explains in detail how Defendants'

actions prevented or delayed entry of numerous hotels, causing "the loss

of hundreds or thousands of additional hotel rooms," and "significantly

reduc[ing] the number of competitors[.]" 4-ER-675-676. This "not only

harm[ed] competition *per se*," but also eliminated downward pressure

on pricing and upward pressure on quality, service, innovation, and

choice, resulting in higher prices and lower quality rooms and services

for consumers. 4-ER-675-676.

Conduct that causes a reduction in supply leading to higher

prices, lower quality services, and fewer choices for consumers presents

archetypal harms to competition and consumers. *Rebel*, 51 F.3d at 1434

(evidence of restricted output is direct proof of injury to competition);

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 502-03 (9th Cir. 2010) (allegations of higher prices and lower quality services plead harm to competition). Plaintiffs sufficiently allege antitrust injury.

3.    *The antitrust labor exemption does not apply.*

Defendants make sweeping claims that "efforts to unionize a labor market do not violate the antitrust laws" and "anti-competitive restraints directed at increasing a labor market's unionization are not actionable." X-AOB 57-58. Defendants essentially claim they are immune from antitrust laws because their goal is unionization. But the Supreme Court has rejected this argument. *Connell*, 421 U.S. at 625 ("the methods the union chose are not immune from antitrust sanctions simply because the goal [unionization] is legal").

Defendants rely on the non-statutory labor exemption, which shields some restraints *imposed through collective bargaining* that eliminate competition over wages or working conditions and *indirectly* restrain trade. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996); *Connell*, 421 U.S. at 623. This "limited" exemption is designed to enable meaningful collective bargaining; it is not "an open-ended

invitation to those involved in a labor dispute to restrain competition."
*California ex rel. Lockyer v. Safeway, Inc.*, 371 F. Supp. 2d 1179, 1184
(C.D. Cal. 2005), *aff'd in part, rev'd in part*, 615 F.3d 1171 (9th Cir.
2010), *aff'd on reh'g en banc*, 651 F.3d 1118 (9th Cir. 2011).  Where a
"'direct restraint on the business market has substantial
anticompetitive effects'" that do not "'follow naturally from the
elimination of competition over wages and working conditions,'" that
restraint "contravenes antitrust policies to a degree not justified by
congressional labor policy, and therefore cannot claim a nonstatutory
exemption from the antitrust laws."  *Id.* at 1184-85 (quoting *Connell*,
421 U.S. at 625).

To determine applicability of the non-statutory exemption, this
Court applies the test from *Mackey v. National Football League*, 543
F.2d 606 (8th Cir. 1976), which extends the exemption "only if (1) the
restraint primarily affects the parties to the [collective bargaining]
agreement and no one else, (2) the agreement concerns wages, hours, or
conditions of employment that are mandatory subjects of collective
bargaining, and (3) the agreement is produced from bona fide, arm's-

length collective bargaining." *Phx. Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir. 1996).

The non-statutory exemption does not apply here. First, Defendants' restraints were not imposed through the collective bargaining process—the parties have not engaged in collective bargaining. 3-ER-598; 4-ER-688.

Second, Defendants' restraints do not follow naturally from the elimination of competition over wages or working conditions because they necessarily predate any such elimination of competition— Defendants typically must coerce developers to agree to card check neutrality and PLAs before unionization is possible. 3-ER-591, 602; *Nev. Indep. Serv. Contractors Ass'n v. Pack Expo W.*, No. CVS97-1492-KJD (RJJ), 2002 WL 1162663, at *3 (D. Nev. Apr. 8, 2002) (conspiracy between union and non-union "to force an employer to enter into a collective bargaining agreement is sufficient to prevent application of both the statutory and non-statutory exemption").

Third, Defendants directly restrained trade in the Relevant Market and caused substantial anticompetitive effects, as opposed to

indirectly restraining trade as a result of collective bargaining. 4-ER-675-676.

Finally, any agreement between Plaintiffs and Defendants would not have been procured through bona fide, arm's length collective bargaining. 4-ER-788-789. Plaintiffs allege that any agreement resulting from Defendants' conduct is the product of capitulation by coerced hotel developers facing Defendants' unlawful tactics, which include preventing their developments from going forward until they acquiesce. 3-ER-589, 598, 602; 3-ER-612-4-ER-648. This cannot be "bona-fide arm's-length negotiations," particularly at the pleading stage.

Defendants claim *Bodine Produce, Inc. v. United Farm Workers Organizing Comm.*, 494 F.2d 541 (9th Cir. 1974), holds that any agreement that is neither collusive nor unilaterally imposed is a "bona fide, arm's-length" agreement. X-AOB 60. But *Bodine* does not purport to define "bona fide, arm's length" and was decided thirteen years before this Circuit adopted the *Mackey* test and a year before the Supreme Court decided *Connell*, which is one of two cases this Court used to form the *Mackey* test. *Phx. Elec. Co.*, 81 F.3d at 861 (explaining the Ninth

Circuit "adopted the *Mackey* test in *Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Dist. Council, Metal Trades Dept., AFL-CIO*, 817 F.2d 1391 (9th Cir. 1987)" and that the *Mackey* test is derived from *Connell* and *Pennington*). Therefore, Defendants cannot claim that *Bodine* defined "bona fide, arm's-length" as used in the *Mackey* test. Defendants do not cite any decision that both applies the *Mackey* test and uses their definition of "bona fide, arm's-length."

Thus, the non-statutory labor exemption does not apply here.

## IV. Plaintiffs Should Have Been Granted Leave To File The Fourth Amended Complaint.

Judge Robinson gave Plaintiffs leave to amend and then approved the parties' September 2021 agreement to postpone any amendments until he ruled on Defendants' motion for reconsideration of the 2021 dismissal order. AOB 73; 4-ER-750-751. When that motion was denied by Judge Lopez, she restricted the scope of amendments by requiring Plaintiffs to seek leave to amend. AOB 73-74.

Defendants therefore are disingenuous when claiming Plaintiffs filed three previous complaints without asserting the §1 claim.

Plaintiffs could have filed the TAC with the §1 claim in 2021 while the case was still pending before Judge Robinson. Plaintiffs waited to do so to avoid simultaneously having the TAC on file while the district court reconsidered its ruling on the motion to dismiss the SAC. Plaintiffs should not have been penalized for abiding by the parties' agreement. Nor should they be penalized because Judge Lopez changed Plaintiffs' ability to freely amend—in conflict with Judge Robinson's earlier order.

Defendants' arguments about delay and prejudice have already been debunked. AOB 71-75. Defendants merely parrot Judge Huie's order that adding the claim would have resulted in significant added complexity, expense, and delay. X-AOB 62. But if, as Judge Robinson had ordered, Plaintiffs had been allowed to include the §1 claim in the TAC or had leave been granted, the district court could have decided the sufficiency of the claim at the same time it ruled on the other claims.

And the fact Plaintiffs submitted an expert declaration when they sought leave to add the §1 claim hardly added delay as Defendants contend (X-AOB 62 n.39); they received the expert opinion far earlier

than they would have under the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(D), so it caused no delay.

Finally, Defendants' futility argument fails for the reasons its arguments about the §2 claim fail. As detailed above (section III.B), Plaintiffs sufficiently plead antitrust standing and that Defendants' conduct is not shielded by the non-statutory labor exemption.

## CONCLUSION

For the reasons set forth above and in the AOB, this Court should reverse the granting of Defendants' Motion to Dismiss the TAC on First Amendment grounds and allow Plaintiffs to proceed with their secondary boycott claims. It also should reverse the district court's denial of Plaintiffs' antitrust claims on First Amendment grounds and instruct the district court to consider whether Plaintiffs adequately plead Sherman Act §1 and §2 claims in the FAC.

# CROSS-APPELLEES' ANSWERING BRIEF ON CROSS-APPEAL

## SUMMARY OF ARGUMENT

The district court's order denying attorneys' fees should be affirmed.

First, the TAC does not replead the state law claims that were dismissed with leave to amend. Consequently, under *Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081 (9th Cir. 2004), there was no basis for the district court to award fees in connection with an anti-SLAPP motion challenging claims in a superseded complaint. This is not a case where Plaintiffs dismissed the state claims while the anti-SLAPP motion was pending.

Second, the district court repeatedly found that Defendants were not prevailing parties for the purpose of the anti-SLAPP statute. Defendants' anti-SLAPP motions were never granted, and Plaintiffs were given leave to amend, which forecloses a finding that Defendants were prevailing parties.

Further, Defendants' anti-SLAPP motions had no practical effect. Plaintiffs chose not to replead state law claims that the district court held duplicated the secondary boycott claim. Consequently, Defendants

point to no facts, remedies, or damages that would no longer be litigated had their anti-SLAPP motions been granted.  Courts also have discretion to reject attorneys' fees awards when anti-SLAPP motions achieve trivial results and, as in this case, burden the court and parties with unnecessary motions.

Third, contrary to Defendants' arguments, the gravamen of the state law claims—Defendants' threats toward SeaWorld and directly toward Plaintiffs—was not speech protected by the anti-SLAPP statute. Threatening SeaWorld with economic harm unless it stopped doing business with Plaintiffs is not speech in connection with a matter of public importance because the threats did not contribute to any public debate.

Defendants also cannot claim their threats to Plaintiffs were in connection with an issue under consideration by the City Council.  They threatened economic harm unless Plaintiffs unionized—an issue the City was not considering.

Moreover, Defendants' threats to block the Bahia redevelopment with sham opposition was only one means by which they threatened to carry out their playbook.  Other means—such as harming Defendants'

relationships with partners and customers (like they had done with SeaWorld)—were not related to any issue under consideration by the City Council.

Fourth, the anti-SLAPP statute does not apply in federal courts. Although this Court is bound to follow its precedent holding otherwise, Plaintiffs seek to preserve this argument for future review.

## STATEMENT OF THE CASE

Defendants' factual statement is woefully incomplete.

In the SAC, Defendants included three state-law claims: (1) intentional interference with contract, (2) attempted extortion, and (3) violation of California's Unfair Competition Law. 5-ER-1190-1194. These claims were narrowly drawn. 5-ER-1190 (intentional interference claim was based "solely on Defendants' actions toward Evans Hotels and SeaWorld, resulting in the termination of their contractual relationship); 5-ER-1191, 1193 (attempted extortion and unfair competition claims based solely on same and on "Defendants' direct communications to Evans Hotels" and not on "any actions Defendants have taken before the City Council, in communications with

members of the City Council or the Mayor, or any statements made on Defendants' website").

Importantly, the SAC stated its claim was pled in the alternative to the secondary boycott claim, because, if "Defendants dispute that Sections 8(b)(4)(ii) and 8(e) apply to their activities toward SeaWorld or those activities otherwise fall outside the scope of those statutes" (as Defendants had previously argued), the state law claims could not be preempted by federal law. 5-ER-1190; *see also* FER-36-37 (arguing in opposition to motion to dismiss SAC that Defendants could not claim Congress intended to preempt the entire field of conduct alleged in the SAC while simultaneously arguing that federal law did not apply to Defendants' conduct); 4-ER-884-886.

Judge Robinson denied the motion to dismiss the secondary boycott claim and dismissed without prejudice the state law claims as preempted by the secondary boycott claim. 4-ER-779-782, 804, 810. Because the secondary boycott claim had survived dismissal and the state law claims were based on the same conduct, Plaintiffs did not replead them.

Defendants twice filed anti-SLAPP motions. Their first motion—challenging the First Amended Complaint—was denied as moot. 6-ER-1253; SER-31-32.

Judge Robinson also denied their second motion as moot and rejected their request for attorneys' fees. 4-ER-811. Because the court had "dismissed Plaintiffs' claims without prejudice and without addressing the Anti-SLAPP Motion on the merits . . . Defendants are not 'prevailing parties' for purposes of Section 425.16(c)(1)—or entitled to attorneys' fees—at this time." 4-ER-811.

After Plaintiffs filed the TAC, Defendants again sought attorneys' fees, claiming they were prevailing parties. 9-ER-2300. Contrary to Defendants' assertion (X-AOB 65) that Judge Huie denied their request for attorneys' fees because "there was no anti-SLAPP motion pending," Judge Huie quoted Judge Robinson's order at length and his holding that Defendants were not prevailing parties because the dismissal was without prejudice and the court had never addressed the merits of the anti-SLAPP motion. 2-ER-278-280 (quoting 4-ER-811). Judge Huie then recognized that "[n]one of this has changed." 2-ER-280.

# ARGUMENT

## I.     Defendants Are Not Entitled To Attorneys' Fees.

### A.     Awarding Attorneys' Fees Would Conflict With The Federal Policy Favoring Amendments.

This Court has long recognized that state anti-SLAPP laws "are not used in federal court if to do so would result in a 'direct collision' with a Federal Rule of Civil Procedure." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845-46 (9th Cir. 2001) (citation omitted).

This Court later held that, if the plaintiff dismissed the claims in an amended complaint, "the purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served." *Verizon Del., Inc.*, 377 F.3d at 1091. This Court added that the anti-SLAPP remedies would be available only if the amended complaint repeated the claims. *Id.* Thus, absent any repleading, attorneys' fees are unavailable.

Numerous courts agree. *Yellowcake, Inc. v. Triwolf Media, LLC*, No. 1:20-CV-0981 AWI SKO, 2020 WL 6728934, at *2 (E.D. Cal. Nov. 16, 2020) (refusing to grant attorneys' fees after amended complaint dropped claims previously subject to anti-SLAPP motion because "the Court has not actually addressed the merits of Defendants' S[LAPP]

motion and it never will because that motion pertains solely to a non-existent complaint"); *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 820 (N.D. Cal. 2019) ("[T]he Court denies the anti-SLAPP motion and request for fees without prejudice at this time. Defendants may renew their motion if [plaintiff] includes amended state law claims in his second amended complaint.") (footnote omitted); *eDrop-Off Chi. LLC v. Burke*, No. CV 12-4095 GW (FMOx), 2013 WL 12131186, at *4 (C.D. Cal. Aug. 9, 2013) (refusing to "resolve any anti-SLAPP motion, even if only for purposes of fee recovery, as to the *original* Complaint" that was superseded); *Brown v. Elec. Arts, Inc.*, 722 F. Supp. 2d 1148, 1156-57 (C.D. Cal. 2010) ("[S]hould a plaintiff refuse to re-assert the state law claims in its amended complaint as a result of the bringing of the initial special motion to strike, then the purposes of the state statute would still be served, thereby obviating the need to award fees otherwise available in the anti-SLAPP statute.").

Defendants rely on *Coltrain v. Shewalter*, 66 Cal. App. 4th 94 (1998). But *Coltrain* and its progeny apply only: "where the plaintiff voluntarily dismisses an alleged SLAPP suit *while a special motion to*

*strike is pending*, the trial court has discretion to determine whether the defendant is the prevailing party." *Id.* at 107 (emphasis added).

Defendants also cite *Art of Living Foundation v. Does 1-10*, No. 5:10-cv-05022-LHK, 2012 WL 1565281, at *25 (N.D. Cal. May 1, 2012), where a district court held that a defendant could seek attorneys' fees as the prevailing party because the plaintiff did not renew claims that were the subject of an anti-SLAPP motion to an earlier complaint that was denied as moot. However, neither *Art of Living*, nor the case on which it relies, *Plevin v. City & County of San Francisco*, No. 11-02359, 2011 WL 3240536, at *4 (N.D. Cal. July 29, 2011), discuss *Verizon* and the conflict between the anti-SLAPP statute and the liberal policy favoring amendments in federal court. Their reasoning has, thus, been rejected.[15] *eDrop-Off*, 2013 WL 12131186, at *4 (rejecting *Art of Living* and *Plevin* as inconsistent with *Verizon*).

---

[15] Defendants also rely on *Lacey v. Maricopa County*, 693 F.3d at 928, and *Hells Canyon Preservation Council v. U.S. Forest Service*, 403 F.3d 683, 687-88 (9th Cir. 2005) (cited in X-AOB 67). They add nothing because neither involved the anti-SLAPP statute.

**B.    In Any Event, the District Court Did Not Abuse Its Discretion in Denying Fees and Finding Defendants Were Not Prevailing Parties.**

Defendants' cross-appeal never discusses the standard of review. "The determination whether a party prevailed on an anti-SLAPP motion *lies within the broad discretion of a trial court.*"  *Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 340 (2006) (emphasis added).  Even where a plaintiff dismisses a suit while an anti-SLAPP motion is pending, the court has discretion to deny attorneys' fees and costs.  *Moore v. Liu*, 69 Cal. App. 4th 745, 753 (1999) (voluntary dismissal does not "automatically require[]" award of attorneys' fees).  Ample grounds support the district court's discretionary ruling that Defendants were not prevailing parties.

> 1.    *Even if the anti-SLAPP motions had been granted, Defendants are not prevailing parties because leave to amend was granted.*

In denying Defendant's motions, the district court granted Plaintiffs leave to amend.  California and federal cases are clear: where a complaint or cause of action is dismissed with leave to amend, the result is the "functional equivalent" of a denial of an anti-SLAPP motion, so the defendant is not a prevailing party.  *Martin v. Inland*

*Empire Utils. Agency*, 198 Cal. App. 4th 611, 633 (2011) ("[B]ecause the court's order granting defendants' anti-SLAPP motion with leave to amend was the functional equivalent of a denial, defendants were not 'prevailing parties' entitled to attorney fees."); *Brown*, 722 F. Supp. 2d at 1156 (defendant is not a "prevailing party" where leave is granted to "re-allege all of those same claims" in a new complaint); *Ho v. City of Long Beach, Pub. Works*, No. 2:19-cv-09430-DOC-KES, 2020 WL 695887, at *13 (C.D. Cal. Jan. 15, 2020) ("[W]here a district court dismisses a complaint with leave to amend, it is appropriate to deny the defendants' anti-SLAPP motion without prejudice."); *Masimo Corp. v. Mindray DS USA, Inc.*, No. SACV 12-02206-CJC(JPRx), 2014 WL 12597114, at *2 (C.D. Cal. Jan. 2, 2014) ("[D]istrict courts have denied defendants recovery of their attorney's fees and costs where the anti-SLAPP motion is granted, but the plaintiff is also given an opportunity to amend the complaint."); *Stutzman v. Armstrong*, No. 2:13-cv-00116-MCE-KJN, 2013 WL 4853333, at *21 (E.D. Cal. Sept. 10, 2013) ("[W]hen a plaintiff is granted leave to amend the complaint, a defendant whose anti-SLAPP motion is granted is not a 'prevailing party' for purposes of the anti-SLAPP statutory framework.").

Here, Judge Robinson found Defendants were not prevailing parties because he never addressed the anti-SLAPP motions on the merits and dismissed Plaintiffs' state law claims without prejudice.  4-ER-811.  Judge Huie held "this remains the case."  2-ER-281.  Those decisions were well within the district court's discretion.

   2.   *Defendants also are not prevailing parties because their anti-SLAPP motion, even if granted, accomplished nothing.*

A defendant is not a prevailing party "when the motion, though partially successful, was of no practical effect."  *Lin v. City of Pleasanton*, 176 Cal. App. 4th 408, 426 (2009).  "[W]here the results of the motion are 'minimal' or 'insignificant' a court does not abuse its discretion in finding the defendant was not a prevailing party."  *Mann*, 139 Cal. App. 4th at 340 (citation omitted).

In *Moran v. Endres*, 135 Cal. App. 4th 952 (2006), the plaintiffs alleged a civil conspiracy and numerous other torts caused by the defendants' attempted takeover a church.  *Id.* at 953.  The defendants filed an anti-SLAPP motion to strike the entire complaint.  *Id.*  The trial court granted the motion only as to the conspiracy cause of action and denied a fee request, reasoning that "the relief which the moving parties

received is minimal compared with the goals of their motions such that they cannot be found to have truly 'prevailed.'"  *Id.* at 954.

The California Court of Appeal affirmed, explaining that the defendants "obtained only the most illusory victory":  "[D]efendants' motion accomplished nothing, except that plaintiffs were put to the cost of defending the motion.  The possible recovery against defendants did not change.  The factual allegations which defendants had to defend did not change.  The work involved in trying the case did not change."  135 Cal. App. 4th at 954-55.  Thus, because the case "was essentially the same after the ruling on the special motion to strike as it was before," the results of the motion "were minimal and insignificant, fully justifying the court's finding that defendants should not recover fees." *Id.* at 955.

Other courts have likewise rejected fees awards where the anti-SLAPP motion did not provide any "'practical benefit'" while "burdening the Court (and Plaintiffs) and menacing Plaintiffs with the specter of attorneys' fees."  *Williams v. Kula*, No. 20-CV-1120 TWR (AHG), 2020 WL 7770915, at *8 (S.D. Cal. Dec. 29, 2020) (citation omitted); *Burgoyne v. Kronenberger*, No. C-11-06376 EDL, 2013 WL 12173923, at

*2 (N.D. Cal. Jan. 18, 2013) (denying request for attorneys' fees where benefit of anti-SLAPP motion was "questionable") (citing *Jackson v. Yarbray*, 179 Cal. App. 4th 75, 92 (2009)).

Here, the district court found that the state law claims dropped from the SAC were merely "repackage[d]" versions of the federal claims that are still asserted in the TAC. 4-ER-803-804. And "the state law claims are based on the same threats that formed the basis" for those federal claims. 4-ER-804. The omission of those claims has had little-to-no effect on this case. The factual allegations remain the same; the remedies remain the same; the damages remain the same.

Thus, Defendants' anti-SLAPP motion achieved nothing. The district court therefore acted within its discretion in finding they were not the prevailing parties.

## C. In Any Event, the Anti-SLAPP Statute Does Not Apply to Plaintiffs' State Law Claims.

Not all claims challenging speech are protected by the anti-SLAPP statute.

The California Supreme Court has explained that a claim "arises from protected activity when that activity underlies or forms the basis

for the claim." *Park v. Bd. of Trs. of Cal. State Univ.*, 2 Cal. 5th 1057, 1062-63 (2017). The defendant must "identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 884 (2019). "A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'" *Id.* (quoting *Park*, 2 Cal. 5th at 1060). "[A] claim does not 'arise from' protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim." *Rand Res., LLC v. City of Carson*, 6 Cal. 5th 610, 621 (2019).

Protected activity does not "underlie[] or form[] the basis for" the state law claims here. *Park*, 2 Cal. 5th at 1062-63. The intentional interference claim was predicated entirely on the threats to SeaWorld that caused it to abandon the joint venture. The gravamen of that claim are Defendants' private threats to cause economic harm to SeaWorld unless it ceased doing business with Plaintiffs.

Defendants assert that their threats to SeaWorld to oppose future expansion and to conduct negative publicity campaigns are protected by the anti-SLAPP statute because those issues are of public importance. But even if true, that is not enough to bring them within the anti-SLAPP statute. The speech must "in some manner itself contribute to the public debate." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 149-50 (2019) (quoting *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 898 (2004)).

Defendants' threats to SeaWorld do not meet this requirement. Even if animal rights and SeaWorld's expansion are matters of public interest, Defendants' privately communicated threats do not contribute to any public debate over those issues.

As for the attempted extortion and unfair competition claims,[16] their gravamen are Defendants' threats to harm Plaintiffs economically unless they agreed to a neutrality agreement or PLA. Those are not

---

[16] The unfair competition claim was based on Defendants' alleged violation of California's extortion statute, Cal. Penal Code § 524. 5-ER-1193. Therefore, its gravamen is the same as the attempted extortion claim.

protected speech "in connection with an issue under consideration or review" by a legislative body or official proceeding authorized by law. Cal. Civ. Proc. Code § 425.16(e)(2).  Demands to unionize the Bahia have no connection to the City Council's review of the Bahia redevelopment or Defendants' argument that the redevelopment would violate the MBMPU (an argument Defendants know to be false).  As Plaintiffs have alleged, the City Attorney had instructed the City Council that unionization and agreements between hotel developers and Defendants are issues that *cannot be considered* in connection with project approval.  5-ER-1136.

Defendants nonetheless claim that their letters to the Mayor, City Council, and other statements "were all made when the lease amendment was before the City Council."  X-AOB 69.  However, the state law claims were expressly not based on "any actions Defendants have taken before the City Council, in communications with members of the City Council or the Mayor, or any statements made on Defendants' website."  5-ER-1190-1191, 1193.

Moreover, the direct threats to Defendants included: (1) repeated warnings that Defendants would target Plaintiffs' business partner

SeaWorld if it refused to agree to Defendants' demands (5-ER-1143-1144); (2) statements to Bill Evans and Robert Gleason that agreeing to a PLA and card check neutrality agreement was necessary for Evans Hotels to go forward with the Bahia redevelopment and for it to be able to pursue other opportunities in San Diego (5-ER-1149-1150); and (3) likening the situation to a "grenade with the pin out," which Bill Evans and Robert Gleason understood to include all manner of union tactics, as well as continued opposition to the Bahia lease amendment pending before the City Council (5-ER-1149-1150). That conduct is not "in furtherance of the rights of petition or free speech" on an issue under consideration by the City Council. *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002) (citation omitted). At best, Defendants were offering to abandon any petitioning if Plaintiffs gave in to their demands. And none of Defendants' communications with the City underlie or form the basis for the extortion claim. *Id.*

Thus, because the anti-SLAPP statute does not apply to the conduct underlying the state law claims, Defendants were not prevailing parties entitled to attorneys' fees under it.

### D. Federal Courts Should Not Follow Anti-SLAPP Statutes.

Plaintiffs recognize that this Court is bound to follow its precedent that anti-SLAPP statutes apply to state law claims in federal courts. *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1141 (9th Cir. 2022) (panel was bound by prior decisions of the Ninth Circuit applying the anti-SLAPP statute). This is contrary to authority in numerous other circuits that have held anti-SLAPP statutes conflict with the Federal Rules of Civil Procedure. *La Liberte v. Reid*, 966 F.3d 79, 86-88 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240, 244-49 (5th Cir. 2019); *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 668-73 (10th Cir. 2018); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1349-57 (11th Cir. 2018); *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015).

Plaintiffs maintain that this Circuit's law is in error. Plaintiffs include this argument to preserve the issue for possible review by this Court sitting en banc or by the Supreme Court.

## CONCLUSION

For the foregoing reasons, the district court's order denying attorneys' fees should be affirmed.

Dated:  April 12, 2024                    Respectfully submitted,

                              By:  *s/ Rex S. Heinke*
                                        Rex S. Heinke
                                        Jessica M. Weisel
                              Complex Appellate Litigation Group LLP

                                        William M. Low
                              Higgs Fletcher & Mack LLP

                                        Daniel J. Mogin
                                        Timothy Z. LaComb
                              Mogin Rubin LLP

                                        Lawrence D. Levien
                              Littler Mendelson, P.C.

                              *Attorneys for Plaintiffs, Appellants,*
                              *and Cross-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-55692 & 23-55728

I am the attorney or self-represented party.

**This brief contains** | 15,376 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☒ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Rex S. Heinke | **Date** | April 12, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*